**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

ROBIN LEVINE, NOREEN MULVANERTY, :
SHAVONE SEASE, MALIK SULLIVAN, and LUCAS
KWONG, each individually, and on behalf of all others :     **Case No. 1:26-cv-01859**
similarly situated,

:     **CLASS ACTION
      Plaintiffs,                   COMPLAINT**

:
      -against-             **Demand for Trial by Jury**

:

THE CITY UNIVERSITY OF NEW YORK,
THE BOARD OF TRUSTEES OF THE CITY :
UNIVERSITY OF NEW YORK,
THE CITY OF NEW YORK, and :
FELIX V. MATOS RODRIGUEZ, in his official
capacity, :

x
            Defendants.
-------------------------------------------------------------------

1.     Plaintiffs Robin Levine ("Plaintiff Levine" or "Levine"), Noreen Mulvanerty

("Plaintiff Mulvanerty" or "Mulvanerty"), Shavone Sease ("Plaintiff Sease" or "Sease"), Malik

Sullivan ("Plaintiff Sullivan" or "Sullivan"), and Lucas Kwong ("Plaintiff Kwong" or "Kwong")

(collectively "Plaintiffs"), by and through their attorneys, The Dugger Law Firm, PLLC, bring this

civil rights action, individually and on behalf of all others similarly situated, against Defendant the

City University of New York ("CUNY" or "Defendant CUNY"), Defendant the City of New York

("NYC" or "Defendant NYC"), Defendant The Board of Trustees of the City University of New

York ("CUNY Board" or "Defendant Board"), Defendant Felix V. Matos Rodríguez ("Defendant

Rodríguez" or "Chancellor Rodríguez") (collectively, "Defendants") and allege as follows:

**PRELIMINARY STATEMENT**

2.     Almost two years ago, on May 7, 2024, Professor Jan Ramjerdi ("Professor

Ramjerdi") filed a putative class action seeking to challenge CUNY's illegal policies and/or

1

practices of refusing to accommodate disability-based remote teaching requests, related retaliation against professors for making these requests, and disability-based discrimination, among other legal violations.

3.      Professor Ramjerdi -- a long-tenured CUNY professor with serious and permanent or long-term mental health disabilities -- filed the putative class action to stop CUNY's alleged systemwide, illegal policies and practices of blanketly denying remote accommodations to disabled employees who requested such accommodations and bypassing the interactive/cooperative dialogue the law requires.

4.      Professor Ramjerdi alleged that CUNY's "one in-person class" mandate operated as a presumptive bar to fully remote accommodations, and that when she requested disability-related remote work or leave, CUNY escalated its discrimination and retaliation by: stripping her of teaching; reassigning her to mandatory in-person duties under threat of "unauthorized absences;" delaying/denying her alternative FMLA or accommodation-based leave request; and leveraging her medical documentation as a predicate for separation rather than accommodation.

5.      Professor Ramjerdi further alleged that CUNY's (illegal) position that FMLA leave could not be provided to employees with "permanent" conditions was a facial violation of the FMLA,[1] and that CUNY had developed a related standard operating procedure of a discriminatory and/or retaliatory accommodation process for disability-based remote work accommodation requests, especially concerning chronic, ongoing, and/or permanent or likely permanent mental health disabilities.

---

[1]      CUNY's violation of this statute was so clear that CUNY did not substantively defend the legality of its position in response to a request by Plaintiff Ramjerdi for an early motion for summary judgment on her FMLA claim. *See Ramjerdi v. The City of New York*, 1:24-cv-03380-NGG-RML, ECF No. 34 (E.D.N.Y.).

6.    While her lawsuit was pending, Professor Ramjerdi passed away on January 31, 2025, more than one year ago.

7.    As a result of CUNY's failure to comply with her disability-accommodation and FMLA leave rights, Professor Ramjerdi spent the last months of her life being denied the fully remote teaching accommodation she requested and being subjected to escalating adverse treatment.

8.    Instead of allowing her to teach all three of her classes remotely, CUNY required her to teach one in-person class.

9.    Professor Ramjerdi was not able to teach in-person because of her disabilities and by mandating that she could only teach two courses remotely (*i.e.*, 66.66% of her courses) instead of all three courses, CUNY barred Professor Ramjerdi from being able to teach during the last months of her life.  In conjunction with this denial, CUNY assigned her to an administrative job, brought disciplinary charges, and later initiated a medical-separation process based on the same disabilities for which she had sought an accommodation.

10.    The cruel irony of the denial of Professor Ramjerdi's fully remote teaching accommodation request was that she was already teaching two classes remotely and the entirety of her accommodation request was to teach just *one* more class remotely.

11.    As Professor Ramjerdi was already teaching two classes remotely allowing her to teach *one* additional class remotely would have required only a limited course-modality change within one department at one community college.

12.    At the time CUNY denied Professor Ramjerdi the disability-based accommodation of teaching three instead of two English classes remotely, Professor Ramjerdi's community college

within CUNY was offering numerous remote or hybrid English classes, any one of which could have been assigned to permit her to teach all three of her English courses remotely.

13. Yet, despite the minimal impact of one professor teaching one more English class remotely, and despite the availability of numerous remote English classes at her community college that she could have taught, CUNY maintained that allowing her to teach all three of her classes remotely, instead of two of her three classes, would have resulted in an undue hardship under the Americans with Disabilities Act and the New York City Human Rights Law.

14. CUNY implemented these illegal policies (i.e., a blanket ban on fully remote disability-accommodations for its faculty without an individualized determination) despite advertising itself to its prospective and current students -- especially its community college students, many of whom attend part-time classes while working -- as a remote learning institution.

15. The CUNY system consists of 25 colleges, 24 of which offer either hybrid or fully online classes and 13 of which offer complete online degree or certificate programs.

16. More than a third of the classes offered by CUNY's community colleges are remote classes (either fully or partially remote).

17. These community colleges collectively offered 3,694 remote or hybrid classes to students in the spring 2025 semester.

18. For example, at Queensborough Community College ("QCC"), where Professor Ramjerdi taught, during the spring 2025 semester the college generally offered 29.08% of its overall classes through online or hybrid instruction.  In total, QCC offered 440 remote or hybrid classes and its English Department offered 47 remote or hybrid classes.

19. Professor Ramjerdi's request involved only one additional remote English class at a college and within a department that already offered remote or hybrid sections.

4

20. Professor Ramjerdi continued to press her claims during her final illness, but CUNY did not change course prior to her death.

21. This case is necessary because CUNY did not change course either after Professor Ramjerdi filed suit or after her death.

22. After Professor Ramjerdi's death -- and notwithstanding the notice and scrutiny her lawsuit imposed -- CUNY continued to enforce substantially the same systemwide regime across campuses and job titles: (a) denying or materially restricting disability-based requests for fully remote work as a reasonable accommodation without a good faith individualized evaluation; (b) substituting purported "alternatives" that still require in-person attendance and therefore do not address the employee's disability-related limitations; and (c) treating disability-based accommodation requests as a predicate for retaliatory discipline, forced leave, AWOL status, or involuntary separations rather than a prompt for individualized assessment and good-faith interactive/cooperative dialogue.

23. This pleading does not rest on a single anecdote. It presently pleads six concrete employee examples -- Professor Ramjerdi and Plaintiffs Levine, Sease, Mulvanerty, Sullivan, and Kwong -- spanning CUNY's QCC, Kingsborough Community College ("KCC"), Borough of Manhattan Community College ("BMCC"), Hostos Community College ("Hostos"), and New York City College of Technology ("City Tech"), in both faculty and staff roles, all of whom encountered repeated barriers involving remote-work denials, rigid in-person requirements, repeated recertification demands, leave misuse, retaliatory scrutiny, or separation pressure.

24. Together, the five named Plaintiffs now before the Court show the same challenged practices operating across campuses and job titles. Plaintiff Levine was forced into retirement after Defendants refused to let her briefly continue working remotely despite medical clearance to

return remotely; Plaintiff Mulvanerty was approved on paper to work 100% remotely but denied a remote-compliant full load, not reappointed to her position, and forced into early retirement; Plaintiff Sease was denied physician-supported remote work and offered makeshift on-site half measures in the same disability exacerbating and triggering open-office environment; Plaintiff Sullivan was denied medically supported remote work, subjected to heightened scrutiny, and not reappointed to his position; and Plaintiff Kwong was forced repeatedly to re-litigate remote accommodations and, most recently, was denied remote completion of required peer-observation duties.

25.    Across CUNY, staff and professors alike have been subjected to the same policy, pattern, and/or practice of: (a) illegal denials of reasonable disability-based fully remote accommodation requests; (b) retaliation following such requests including unnecessary requests for the provision of a never-ending stream of duplicative medical submissions; and (c) related medical inquiry violations including repeated requests for medical documents from employees with obvious, permanent and/or long-term disabilities.

26.    Defendants' resistance was especially pronounced when remote-work requests or supporting medical documentation described the disability, limitation, or accommodation need as permanent, chronic, ongoing, long-term, expected to last years, until further notice, or indefinite. In those circumstances, Defendants repeatedly responded with semester-limited approvals, repeated recertification demands, diversions to leave or FMLA, claims that the request was too indefinite, or refusals to implement full remote work even where the employee could continue working with it.

27.    The challenged decisions were also communicated through recurring forms and decision documents, including employer decision letters, appeal responses, FMLA designation or

denial notices, remote-work directives, and medical-separation notices. The recurrence of those documents across campuses further shows that the challenged conduct was not isolated or ad hoc.

28. Defendants' disability-accommodation process for remote work was not ad hoc or isolated.

29. CUNY's own public workforce and disability-inclusion reporting further confirms that the challenged policies operated across a very large and geographically dispersed workforce. In its publicly posted Executive Order 31 Strategic Plan, CUNY reported that, as of August 21, 2024, it employed approximately 39,330 employees systemwide and had 880 employees with disabilities on a self-identified basis.[2]

30. That same public reporting states that CUNY processed 2,563 reasonable accommodations between 2017 and 2023, with annual volumes ranging from 159 to 1,141, demonstrating that accommodation activity within CUNY is not isolated or anecdotal but reaches hundreds or more than a thousand employees in some years.[3]

31. Separate CUNY workforce reports note systemwide headcount of approximately 41,951 employees across 25 campuses and the Central Office in a November 2022 snapshot and approximately 40,040 employees in Fall 2023, further confirming that any centrally influenced accommodation or remote-work policy necessarily affects a large and widely dispersed employee population.[4]

---

[2]   *See* City Univ. of N.Y., Executive Order 31 Strategic Plan, at 2 (Aug. 21, 2024), https://www.cuny.edu/wp-content/uploads/sites/4/media-assets/Executive-Order-31-Strategic-Plan.pdf.

[3]   *Id.*

[4]   *See City Univ. of N.Y., Fall 2022 CUNY Workforce Demographics*, at 7, https://www.cuny.edu/wp-content/uploads/sites/4/media-assets/Fall-2022-CUNY-Workforce-Demographics.pdf; City Univ. of N.Y., Staff Facts: Headcount Summary as of Fall 2023, at 3, https://www.cuny.edu/wp-content/uploads/sites/4/media-assets/Fall-2023-Staff-Facts.pdf.

32.     CUNY's remote-work governance was likewise standardized and systemwide.

33.     Beginning in or about spring 2022, CUNY imposed a 70% in-person expectation for professional staff, set systemwide course-modality expectations targeting approximately 70% in-person/HyFlex courses and 30% hybrid or online courses, and maintained a standardized process for remote-work agreements extending through 2025 and 2026, reinforcing that the challenged remote-work accommodation practices were administered under broadly applicable rules rather than isolated campus-specific decisions.

34.     CUNY's online instructional capacity was not isolated or experimental.  CUNY's School of Professional Studies ("CUNY SPS") publicly represents that it leads the University in developing and operating online degree programs and that it trains faculty throughout CUNY in online instruction, confirming that online delivery at CUNY was mature, centralized, and institutionally supported rather than exceptional or temporary.

35.     Board-published capital materials further stated that CUNY SPS's fully online offerings included all 13 of its bachelor's degrees and 12 of its 13 master's degrees, and that enrollment in its credit-bearing programs had grown to more than 4,000 students.  Those public representations show that online education at CUNY was established, system-supported, and sizeable.[5]

36.     CUNY Central also maintained university-level online functions.

37.     Board materials for April 2024 identify a Central Office appointment for "CUNY Online," specifically listing Evan Silberman as University Executive Director of CUNY Online, effective January 22, 2024.

---

[5]     *See* City Univ. of N.Y., Five Year Capital Plan FY 2023–2024 Through FY 2027–2028, at 47, https://www.cuny.edu/wp-content/uploads/sites/4/page-assets/about/administration/offices/fpcm/Five-Year-Capital-Plan-FY-2023-24-to-FY-2027-28.pdf.

38.    University-level governance itself also operated remotely.

39.    CUNY's Board and Board-committee governance operated remotely across multiple years while disability programming remained institutionally present. The Board of Trustees met on June 29, 2020 via audio teleconference; the December 14, 2020 Board meeting was held via video conference; the March 22, 2021 Board meeting was likewise held via videoconference; the November 22, 2021 Committee on Student Affairs and Special Programs was held remotely via videoconference with public access through the Board website and CUNY TV and listed among University Staff the Director of Disability Programs, Carrie Shockley; the Board met on January 19, 2022 via Zoom videoconference; and the Board again met on May 16, 2022 via Zoom videoconference. Those same public materials further show that related public-hearing functions were also conducted without convening in person, with CUNY instead accepting written and video submissions electronically. These records reflect institutional familiarity with remote governance, remote administration, and remote-access operations. These operations were not hypothetical or exceptional at CUNY but were repeatedly used in the University's own governance across 2020, 2021, and 2022.

40.    During the relevant period, remote teaching, remote administrative work, and hybrid operations were part of CUNY's ordinary functioning. The disputes pleaded below arose not because CUNY lacked any remote capacity, but because Defendants denied disabled employees access to already-existing remote modalities even when medical providers certified that remote work would permit them to continue working.

41.    While most CUNY community colleges offer a large number of remote courses, professors at those institutions who request disability-based remote teaching accommodations are

irrationally and summarily denied them, despite their availability to teach remotely and/or interest from students in enrolling in the same course remotely.

42. For example, at BMCC, where Plaintiff Mulvanerty taught, CUNY offered approximately 43.72% of its overall classes through online or hybrid instruction during the spring 2025 semester. In total, BMCC offered approximately 989 remote or hybrid classes for its students.

43. Remote assignments were readily available for Plaintiff Mulvanerty -- a senior professor at BMCC. Yet, instead of assigning Plaintiff Mulvanerty a remote class, brand-new adjuncts, including faculty located outside New York, were assigned remote courses that Mulvanerty was qualified and willing to teach, while Defendants refused to actually assign those remote courses to her even after human resources approved her to work 100% remotely.

44. Illustratively, during the spring 2025 semester as an example, between 29.08% and 51.99% of CUNY's community college classes were remote or hybrid (on average 39.6%), and there were 3,694 remote or hybrid classes across CUNY's community colleges:

| College | Total classes | Remote or hybrid classes | Overall remote/hybrid % | Fully online | Hybrid |
|---|---|---|---|---|---|
| Queensborough CC (QCC) | 1,513 | 440 | **29.08%** | 229 | 211 |
| Borough of Manhattan CC (BMCC) | 2,262 | 989 | **43.72%** | 679 | 310 |
| Bronx CC (BCC) | 1,139 | 422 | **37.05%** | 300 | 122 |
| Hostos CC | 683 | 271 | **39.68%** | 210 | 61 |
| Kingsborough CC | 1,429 | 743 | **51.99%** | 523 | 220 |
| LaGuardia CC | 2,098 | 760 | **36.23%** | 466 | 294 |
| Guttman CC | 198 | 69 | **34.85%** | 37 | 32 |

45. During the spring 2025 term, CUNY community colleges offered approximately 2,444 fully remote courses and 1,250 hybrid courses.

46.     Beyond available remote classes within standard degree programs, CUNY also offers several certificate and degree programs *entirely* online.  For example, QCC hosts an entirely online Business Administration (AS) degree program and BMCC hosts 22 entirely online certificate or degree programs.

47.     CUNY also publicly advertises its adoption of remote classes for its colleges and has repeatedly praised the benefits of remote learning for its prospective students.

48.     Defendants engaged in a systematic pattern and practice of disability discrimination, interference with the Family and Medical Leave Act rights, and retaliation against Plaintiffs -- dedicated employees and faculty members with medically-documented qualifying disabilities who sought reasonable workplace accommodations consisting primarily of remote work arrangements.

49.     Defendants violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504") and the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"), and/or the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-*101 et seq*. ("NYCHRL").

50.     Although, upon information and belief, the CUNY system represents one of the nation's top networks of higher education institutions, the teaching excellence provided by faculty to students has not been reciprocated by CUNY in how it treats its support staff and faculty with respect to their disability-based accommodation and medical leave rights.

51.     Defendants maintain a one-size-fits-all, in-person teaching mandate prohibiting or unnecessarily limiting fully remote work or teaching irrespective of the disability-based accommodations requested, particularly for those with permanent or long-term disabilities -- in violation of federal, state, and city disability and medical leave laws.

52.     Defendants' pattern or practice of disability discrimination and related retaliation includes, but is not limited to: (1) a standard operating procedure of illegal denial of remote work disability accommodations;  and (2) a standard operating procedure of retaliation against employees who requested fully remote disability accommodations (or protected leave).

53.     Plaintiffs provided Defendants with extensive medical documentation from board-certified physicians, surgeons, psychiatrists, psychiatric nurse practitioners, neurologists, gastroenterologists, surgical oncologists, pain management specialists, and/or licensed clinical social workers -- all certifying Plaintiffs' qualifying disabilities and recommending reasonable, fully remote work arrangements that would enable Plaintiffs to perform their essential job functions without exposing them to unacceptable health risks.

54.     Despite this extensive medical documentation, Defendants repeatedly denied Plaintiffs' disability-based remote accommodation requests, unreasonably delayed processing and/or approval of these requests, provided grossly inadequate partial accommodations that failed to address documented functional limitations, imposed arbitrary time restrictions shorter than medically-recommended periods, demanded repeated resubmissions of documentation already provided, and misrepresented medical providers' recommendations.

55.     Defendants demonstrated during the COVID-19 pandemic that remote work arrangements were operationally feasible and imposed no undue hardship when employees successfully performed their job duties from home for over a year while receiving positive performance evaluations, salary increases, and commendations for excellent remote work.

56.     Defendants violated the FMLA by retaliating against Plaintiffs for requesting and/or taking FMLA leave, including but not limited  by refusing disability accommodations,

refusing to permit Plaintiffs to return to work and/or return to work, as well as through termination.

57. Defendants refused to approve or consider disability-based leave beyond initial FMLA periods, instead requiring employees to sign ambiguous non-FMLA leave documents that did not acknowledge any right to additional leave as a disability-based reasonable accommodation as opposed to an unprotected discretionary general accommodation.

58. Defendants treated protected medical leave as a matter for suspicion and control rather than lawful compliance.

59. Defendants also engaged in a campaign of retaliation against employees who requested disability-based remote work accommodations or complained about or opposed the discriminatory denial of the same, including blatant threats to their employment, retaliatory changes to job descriptions, made after the fact, to undermine their disability accommodation rights, by portraying their positions as less compatible with remote work, and failure to honor remote work accommodations even when approved.

60. As a direct result of Defendants' unlawful conduct, Plaintiffs suffered severe adverse employment actions including forced retirement under threat of pay docking, termination while on protected leave, non-reappointment despite favorable appeal committee findings, initial denial and denial of full contractually-mandated teaching loads, constructive discharge through impossible choices between health and employment, and ongoing hostile work environments creating severe emotional distress and exacerbation of medical conditions.

61. The foreseeable and recurring result is that qualified employees with disabilities at CUNY -- both staff and faculty -- are deprived of reasonable accommodations that would

permit continued work, subjected to adverse action because of disability-related limitations, and deterred from requesting accommodations.

62.     This case therefore seeks to remedy -- and to enjoin -- CUNY's ongoing unlawful policies and practices.

63.     Plaintiffs seek class-wide declaratory and injunctive relief: (1) requiring lawful, individualized accommodation determinations and meaningful interactive/cooperative dialogue; (2) prohibiting categorical in-person mandates and other blanket restrictions from operating as presumptive denials of disability-based remote-work accommodations; and (3) preventing retaliatory and coercive responses to protected accommodation requests.

64.     Plaintiffs also seek additional individual injunctive relief and damages for CUNY's discrimination, continued failure to accommodate, and retaliation, and the constructive discharge resulting from the illegal denial of the requested accommodations that would have allowed them to continue working.

## JURISDICTION AND VENUE

65.     This Court possesses subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 29 U.S.C. § 2617(a) (FMLA enforcement jurisdiction), 29 U.S.C. § 794a (Section 504 jurisdiction), and 28 U.S.C. § 1343 (civil rights jurisdiction).

66.     The Court has jurisdiction over Plaintiff Mulvanerty's NYCHRL claims pursuant to 28 U.S.C. § 1367(a). Plaintiff Mulvanerty's NYCHRL claims are so closely related to Plaintiff's claims under the Rehabilitation Act and FMLA that they form part of the same case or controversy under Article III of the United States Constitution.

67.     Defendants are subject to this Court's personal jurisdiction in New York.

14

68.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within this district.

## PARTIES

69.     The named Plaintiffs are current and former CUNY faculty and staff employed at QCC, BMCC, KCC, Hostos, and City Tech.  Each is or was qualified to perform the essential functions of the relevant position with and/or without a disability-based reasonable accommodation and/or protected leave; each sought such protection; and each alleges that Defendants denied, constrained, failed to honor, or retaliated against those requests.

**Plaintiff Robin Levine**

70.     Plaintiff Levine was employed by CUNY and worked at Queensborough Community College for approximately twenty-one years.

71.     From 2002 to 2017, she primarily served as the Test Preparation Coordinator with the Campus Writing Center.

72.     In September 2017, Defendants eliminated that position and transferred Plaintiff Levine to the Office of the Registrar, within the Division of Academic Affairs, where she worked as an Enrollment Management Specialist.

73.     Her duties included coordinating the Academic Fresh Start program, performing prerequisite checking during peak registration periods, assisting on the Help Desk, and working on the University-wide TREX project concerning transfer-credit equivalencies.

74.     Previously, during 2004, Plaintiff Levine became a Higher Education Officer Assistant ("HEOa") at CUNY and served on QCC's ADA/Section 504 Subcommittee, which was supposed to meet at least once per academic year (preferably twice), thereby giving her direct

familiarity with QCC's disability-accommodation framework.  However, the Subcommittee met only once, in or about 2005, during the presidency of Eduardo Marti and under the oversight of then Vice President Diane Call, and then never met again.  After approximately a decade, Plaintiff Levine's name was removed from the Subcommittee roster.

75.     Throughout her employment, Plaintiff Levine received excellent performance evaluations and earned a salary differential increase based on her direct supervisor's letter of nomination for excellent work performance while working remotely during the COVID-19 pandemic and after.

76.     Since 1991 -- for over three decades -- Plaintiff Levine has suffered from Trigeminal Neuralgia (TN), a severe, chronic, and progressive neurological condition characterized by lancinating, paroxysmal, excruciating electric-shock pain in the face caused by demyelination and compression of the fifth cranial nerve that exits the brain behind her right ear.

77.     This condition, for which no cure exists, progressively worsened over the years, with the best available treatment being Microvascular Decompression ("MVD") brain surgery.

78.     On January 11, 2016, Plaintiff Levine received FMLA leave and underwent MVD brain surgery.  During this surgery, Plaintiff Levine suffered life-threatening complications: a blood clot formed causing her brain to swell off the mid-line, and she nearly died on the operating table.

79.     Surgeons performed an emergency craniectomy in which they removed a piece of Robin Levine's skull to allow her brain to swell and relieve the life-threatening pressure.  This piece of skull was never surgically replaced, leaving Plaintiff Levine with a permanent cranial defect and permanent physical evidence of her traumatic medical history.

80.     Plaintiff Levine was among the 1-2% of patients who experience potentially fatal complications from this procedure.

81.     Following her initial brain surgery, medical providers discovered that Plaintiff Levine had developed Hydrocephalus -- a dangerous accumulation of cerebrospinal fluid on the brain.  To address this additional life-threatening condition, Plaintiff Levine required surgical implantation of a shunt in her spinal canal to allow the excess cerebrospinal fluid to drain from her brain.

82.     Plaintiff Levine underwent this second major neurosurgery in mid-April 2016 and returned to work 7-10 days later while on intermittent FMLA leave.

83.     In fall 2022 and winter 2022-2023, Plaintiff Levine suffered shunt over-drainage complications in which the shunt removed too much cerebrospinal fluid from her brain, resulting in severe neurological symptoms including dementia-like episodes, hypersomnolence, and gait and balance issues that were terrifying and debilitating.

84.     Plaintiff Levine experienced a five-day hospitalization in November 2022 during this period of shunt over-drainage complications.  After contracting COVID-19 in mid-December 2022, which exacerbated her neurological condition and delayed the procedure that had been scheduled for December, Plaintiff Levine underwent outpatient shunt-removal surgery on January 17, 2023.

85.     Medical imaging performed on August 26, 2022, revealed findings consistent with Intracranial Hypotension in Plaintiff Levine, including diffuse smooth pachymeningeal enhancement, drooping of the splenium of the corpus callosum (brain sagging), mild enlargement of the pituitary gland with concave superior border, reduced distance between the medullary body and pons, and stable post-operative appearance of prior suboccipital craniectomy.

86.     This condition caused Plaintiff Levine to develop Frontotemporal Brain Sagging Syndrome (FBSS), resulting in severe gait and balance issues requiring twice-weekly at-home physical therapy sessions provided by the Visiting Nurse Service.

87.     On April 27, 2023, while still actively recovering from neurological conditions and receiving physical therapy for gait and balance issues, Plaintiff Levine was diagnosed with malignant melanoma (stage IA) in her upper left arm.

88.     On May 4, 2023, Plaintiff Levine consulted with Dr. Sam Yoon, a board-certified surgical oncologist and Chief of Surgical Oncology at Columbia Presbyterian Hospital, who explained that malignant melanoma is an aggressive form of skin cancer that metastasizes rapidly to the brain, lungs, kidneys, lymphatic system, and throughout the body.

89.     Even at stage IA, patients face a 10% risk of cancer recurrence, requiring skin checks every three months for one year, then every six months for up to five years, and appointments with the surgical oncologist every six months for two years, then annually for up to five years.

90.     On May 12, 2023, Plaintiff Levine underwent wide excision surgery performed under anesthesia in a hospital operating room, requiring removal of tissue measuring 3 inches by 1.5 inches by 1 inch deep into muscle tissue.

91.     Following this surgery, her arm remained tender, painful, subject to spasms, and developed complications including a raised pimple-like mound at the bottom of the surgical scar requiring dermatological evaluation.

92.     Due to her medical history, Plaintiff Levine maintains residual blood clots in her brain that create permanent ongoing health risks.  Medical providers explicitly warned that

COVID-19 exposure could exacerbate these blood clots or cause new clots to form, potentially resulting in stroke, permanent brain damage, or death.

93. This medical vulnerability made in-person work -- particularly in settings where Plaintiff Levine would be exposed to unmasked or unvaccinated students, colleagues, and visitors -- an unacceptable and potentially life-threatening health risk.

94. Plaintiff Levine was at all times a qualified person with a disability able to perform the essential functions of her job with or without a disability accommodation.

95. Plaintiff Levine was forced to retire after Defendants refused to approve her remote work accommodation.

96. Plaintiff Levine was constructively discharged from CUNY.

97. At all times relevant to the complaint, Plaintiff Levine was qualified for her position and could perform the essential functions of her position with or without reasonable accommodation.

**Plaintiff Noreen Mulvanerty**

98. Plaintiff Mulvanerty was hired by CUNY and worked at BMCC (a CUNY community college) on August 27, 2019. Through August 27, 2025, she served there as an Assistant Professor teaching pediatrics within BMCC's nursing program. BMCC also recognized prior service credit for seniority and benefits purposes, which by fall 2024 made Plaintiff Mulvanerty one of the more senior remaining faculty members in the department.

99. Plaintiff Mulvanerty holds a Doctor of Nursing Practice degree from Georgetown University and a board-certified family nurse practitioner with decades of clinical and teaching experience.

100.    Before and during her BMCC service, Plaintiff Mulvanerty accumulated approximately 30 years of teaching experience, including teaching at Pace University.  At BMCC, she taught lecture courses, supervised clinical and simulation instruction, and performed scholarship and service responsibilities associated with the tenure track.

101.    Plaintiff Mulvanerty worked both on BMCC's Chambers Street campus and in the nursing simulation program at Bellevue Hospital.  She had substantial pediatric and clinical experience, had previously taught simulation at BMCC, and had specialized training that made her well qualified to teach remotely and in simulation settings.

102.    Throughout her tenure, Plaintiff Mulvanerty demonstrated competence and dedication by teaching courses, supervising clinical simulations and laboratory work, serving on institutional committees, pursuing scholarship, and contributing to program development.  By fall 2024, she was among the more senior remaining faculty in the department and the lead professor for pediatrics. For example, in the spring of 2024, Plaintiff Mulvanerty was selected to participate in the prestigious Faculty Fellowship Publication Program (FFPP), and selected to serve on the Committee of the Academic Senate by her peers in the fall of 2024.

103.    Before fall 2024, Plaintiff Mulvanerty had been reappointed year after year and had never received an unsatisfactory annual evaluation.  In May 2023, her supervisor noted that her peer observations were satisfactory and that workshops she completed for online instruction had made her a better and more responsive educator.

104.    Plaintiff Mulvanerty was on track for continued tenure-track progress and had fulfilled her professional duties without any prior disciplinary issue.

20

105.    Plaintiff Mulvanerty suffers from multiple serious, chronic medical conditions constituting qualifying disabilities, including severe arthritis throughout her joints, especially her right hip, as well as related chronic pain and mobility limitations.

106.    On June 26, 2023, Plaintiff Mulvanerty underwent total hip replacement surgery and was admitted overnight through June 27, 2023.  The surgery did not go well and left her with chronic pain, immobility, and an ongoing need for pain-management treatment.

107.    Plaintiff Mulvanerty's impairments were functionally significant. The June 26, 2023 hip-replacement surgery exacerbated her condition and contributed to chronic pain, impaired mobility, and an ongoing need for pain-management treatment, which later affected her ability to perform hospital-based clinical work and other physically demanding in-person functions.

108.    Although Plaintiff Mulvanerty's June 26, 2023 total right hip replacement exacerbated her condition and caused ongoing pain and mobility limitations, she continued performing her BMCC duties for nearly a year without requesting leave or remote work and maintained perfect attendance despite her pain.

109.    It would only be after Plaintiff disclosed in spring 2024 that she might need accommodation and some recovery time in fall 2024 that Defendants, through Interim Chair Washington-Brown, began altering her schedule without meaningful discussion despite Plaintiff's repeated efforts to confer. Washington-Brown then circulated a fall 2024 schedule that changed Plaintiff's assignment without prior warning or meaningful explanation.

110.    In the summer of 2024, Plaintiff Mulvanerty underwent a total hysterectomy and related abdominal surgery after her surgeon advised that she had highly suspicious cells requiring surgical removal and biopsy.

111. This procedure created severe anxiety and psychological distress about possible cancer. Although, fortunately, pathology later revealed no cancer, her surgeon thereafter advised that she should not work in person during the fall 2024 semester while recovering.

112. By late 2024 and into January 2025, Plaintiff Mulvanerty also developed hypertension, for which her healthcare providers placed her on medication to manage this additional serious medical condition.

113. After discussing her situation with her pain management team, they advised Plaintiff Mulvanerty to take time to heal and rest, leading to her taking approved FMLA leave.

114. Healthcare providers later recommended that Plaintiff Mulvanerty continue on leave of absence for rest and rehabilitation for approximately three months following the conclusion of her FMLA leave.

115. In summer 2024, after additional surgery and on her surgeon's recommendation that she not return to campus that semester, Plaintiff Mulvanerty requested approval to work fully remotely for fall 2024.

116. Although CUNY's human resources eventually belatedly granted that request at the beginning of the semester (and later extended through the full fall 2024 semester) department leadership still refused to honor the accommodation in practice by failing to actually assign her remote teaching courses.

117. Defendants denied Plaintiff Mulvanerty a full teaching load, insisted she commit to in-person hospital clinical work, and threatened that her full-time status would be in question if she did not do so.

118. Plaintiff Mulvanerty's employment ultimately involuntarily ended in August 2025 after Defendants' discriminatory and/or retaliatory non-reappointment decision.

119.    At all times relevant to the complaint, Plaintiff Mulvanerty was qualified for her position and could perform the essential functions of her position with or without reasonable accommodation.

**Plaintiff Shavone Sease**

120.    Plaintiff Shavone Sease began her employment with KCC (a CUNY community college) in 1998 and has served the institution for more than twenty-five years.  Throughout that service, she maintained an exemplary employment record without known disciplinary issues, performance complaints, or negative evaluations.

121.    In 2018, Plaintiff Sease began working as Rooming Coordinator, a position she valued deeply and performed with distinction.

122.    In 2022, Defendants reclassified Plaintiff Sease's position to Higher Education Assistant, a significant advancement that recognized both her educational qualifications, including her master's degree, and the expanded scope of her professional responsibilities.

123.    Plaintiff Sease's Higher Education Assistant role merged the duties of her prior Rooming Coordinator position with those of the Assistant Director responsible for the Schedule of Classes.  In that dual capacity, she supervised, coached, and supported the Schedule of Classes Coordinator, served as the escalation point for complex scheduling matters, and coordinated across departments to protect schedule integrity and prevent disruptions to instruction.

124.    Following this reclassification, Plaintiff Sease's Department of Academic Scheduling was integrated into the Registrar's Office.  As part of that restructuring, she undertook additional Registrar duties beyond her defined role, including answering Registrar calls, learning core Registrar functions and responsibilities, and providing Friday virtual support via Zoom.

125. On April 1, 2023, Plaintiff Sease earned 13.3(b) job-security status, a significant employment milestone that provided tenure protections.

126. Plaintiff Sease currently serves as Supervisor of Rooming in her Enrollment Registrar Specialist (HEa) role at KCC. She manages classroom room assignments college-wide, ensuring that scheduled classes are placed in appropriate spaces based on capacity, instructional needs, technology requirements, and ADA accessibility accommodations for faculty and students.

127. She maintains official scheduling and space records; coordinates with campus planning, IT and instructional technology, and facilities to ensure rooms are operational and compliant, and generates room-utilization and scheduling analysis reports; manages post-mass-scheduling changes; resolves multi-department conflicts; and manages rooming for Continuing Education and approved special or external events that use campus classrooms and facilities.

128. Plaintiff Sease's work is highly technology-dependent, multi-system, and document-intensive. In performing her role, she must simultaneously manage CUNY first scheduling systems, process accommodation-related materials, coordinate with academic departments by phone and email, maintain physical scheduling materials, and resolve time-sensitive rooming and scheduling issues that affect instruction across KCC.

129. Plaintiff Sease's role also requires regular handling of confidential student, staff, and faculty accommodation information, including student scheduling records, medical documentation related to student disabilities, and sensitive departmental communications.

130. Plaintiff Sease took pride in this pivotal institutional role because her responsibilities directly supported KCC's ability to deliver instruction. Accurate rooming was

24

foundational to daily operations, and without accurate room placement and ongoing adjustments, instruction could not operate smoothly.

131.    Plaintiff Sease's work also exposed her to KCC's remote-work accommodation processing and gave her knowledge of a recurring campus process for disability-based remote-work determinations.  KCC processed numerous remote-work requests through recurring written decision forms, including written grants, extensions, denials, and continuing denials.

132.    Plaintiff Sease suffers from migraines, bilateral astigmatism with presbyopia, bilateral glaucoma, anxiety, and related sensory-processing limitations that substantially limit major life activities and are exacerbated by the large, open-office environment in which Defendants required her to work and process confidential matters.

133.    With a reasonable accommodation -- including remote work or a fully enclosed/private office away from the open-office environment -- Plaintiff Sease could perform the essential functions of her position, which are largely computer-based, systems-based, phone-based, and document-intensive.

134.    The need for a stable, private workstation later became central when Defendants proposed an improvised and non-private workspace as a supposed accommodation instead of providing an effective accommodation.

135.    Defendants nevertheless denied or inadequately addressed Plaintiff Sease's accommodation requests, proposed ineffective on-site half measures, and subjected her to materially adverse treatment after she complained about disability, accommodation denial, and retaliation concerns.

25

136.    At all times relevant to the complaint, Plaintiff Sease was qualified for her position and could perform the essential functions of her position with or without reasonable accommodation.

**Plaintiff Malik Sullivan**

137.    Plaintiff Sullivan was employed by Hostos (a CUNY community college) from April 6, 2015, through June 30, 2023, initially as a Substitute Assistant to Higher Education Officer (HEO) with the functional title Coordinator from April 6, 2015, through June 30, 2015, then as a full-time Assistant to HEO beginning July 1, 2015.

138.    In that administrative role, Plaintiff Sullivan performed office-based and computer-based responsibilities that, during the pandemic and thereafter, could be performed remotely without impairing the quality of his work.

139.    From 2015 through March 2022, Plaintiff Sullivan received performance evaluations ranging from "satisfactory" to "surpasses expectations" for seven consecutive years. Specifically, Plaintiff Sullivan's performance evaluations for February 2020-February 2021 and March 2021-February 2022 were both rated as "surpasses expectations."

140.    Plaintiff Sullivan served as Secretary of the institution's Affirmative Action Committee, participated as a member of committees related to Middle States Commission on Higher Education Standard 3 accreditation, and contributed to student retention initiatives including chatbot programs.

141.    In March 2022, medical providers diagnosed Plaintiff Sullivan with Complex Post-Traumatic Stress Disorder (Complex PTSD), a serious mental health condition constituting a qualifying disability under the ADA, Section 504, the NYSHRL, and the NYCHRL.

26

142.    Medical documentation from Plaintiff Sullivan's psychiatrist and licensed clinical social worker confirmed that his depression progressively worsened from a clinical severity rating of 3 out of 8 to a rating of 7 out of 8, attributable to Defendants' denial of accommodations and creation of an increasingly anxious, stressful, and hostile work environment.

143.    Plaintiff Sullivan was a qualified employee with a disability who sought remote work and protected leave so he could continue performing his job accurately, but Defendants denied or materially restricted those requests, escalated scrutiny of him, and ultimately notified him that it would not reappoint him while he was on a protected FMLA leave because of his disability accommodation requests, requests for and/or use of protected leave, and/or protected opposition.

144.    At all times relevant to the complaint, Plaintiff Sullivan was qualified for his position and could perform the essential functions of her position with or without reasonable accommodation.

**Plaintiff Lucas Kwong**

145.    Plaintiff Kwong is a tenured faculty member at City Tech (a CUNY senior college) with over a decade of distinguished service.  On November 15, 2021, Plaintiff Kwong received a formal offer of reappointment to the instructional staff with tenure, effective September 1, 2022.  The reappointment letter explicitly stated: "Reappointment is with tenure."

146.    Plaintiff Kwong has consistently demonstrated excellence in teaching, particularly in asynchronous online modalities, receiving positive peer observations and student feedback throughout his career. In addition to leading professional development workshops on online instruction and implementing pedagogical innovations that enhanced student learning and

engagement, Plaintiff Kwong was one of the recipients of a 2021 CUNY grant for faculty designing and teaching online courses. He subsequently earned both tenure and promotion to associate professor.

147.    Students who required flexible learning options due to work schedules, family obligations, disabilities, or other life circumstances thrived in Plaintiff Kwong's asynchronous courses and communicated their gratitude for the accessibility these courses provided.

148.    Plaintiff Kwong suffers from medical conditions of anxiety and ADHD that substantially limit major life activities and constitute qualifying disabilities under applicable law.

149.    On March 31, 2025, and again on November 15, 2025, Professor Kwong's licensed healthcare provider completed and signed a Health Care Provider Accommodation Assessment Form confirming his diagnoses and certifying that a remote work location removes heightened anxiety-inducing and ADHD-inducing stimuli, as evidenced by Plaintiff Kwong's demonstrated abilities to perform all essential job functions remotely.

150.    Plaintiff Kwong was and is a qualified faculty member able to perform the essential functions of his position with reasonable accommodation, including remote asynchronous teaching and related faculty work.

151.    Defendants nevertheless denied or delayed his disability accommodation requests before partially granting remote teaching only on appeal, while continuing to burden other faculty obligations with in-person requirements.

152.    In addition, for years, Plaintiff Kwong raised numerous health and safety issues concerning campus conditions -- all of which exacerbated his anxiety disability concerning in-person teaching.

153. At a February 2025 in-person department meeting, Plaintiff Kwong delivered an extensive presentation documenting not merely mold contamination, but also the likelihood of exposure to asbestos and other hazardous chemicals, with specific documentation of affected areas including buildings at CUNY where he had been assigned office space.

154. The likely presence of these hazardous materials only heightened Plaintiff Kwong's need for remote work as a reasonable accommodation of his anxiety disability, because he had a reasonable belief that it was not safe to teach in-person because of the potential hazards he had been attempting to draw attention to.

155. At all times relevant to the complaint, Plaintiff Kwong was qualified for his position and could perform the essential functions of her position with or without reasonable accommodation.

**Defendant City University of New York**

156. Defendant CUNY is the publicly-funded public university system of New York City, comprised of both senior and community colleges.

157. CUNY is the largest urban university system in the United States.

158. The central administration of CUNY's senior and community colleges is and operated out the offices 205 E. 42nd St., New York, NY 10017 with CUNY's Chancellor as its head.

159. CUNY's human-resources function was likewise centrally organized.

160. CUNY employs approximately 7,000 full-time faculty and approximately 22,000 non-faculty staff.

161. Since approximately May 2019, CUNY's Chancellor has been Chancellor Rodríguez.

29

162.    CUNY has received, and receives, federal financial assistance.[6]

163.    CUNY is the central governing body and/or system under which Hostos, QCC, KCC, BMCC, and City Tech operate.

164.    CUNY's centralized legal office renders legal services to the Board of Trustees, the Chancellor, and the presidents and administrative cabinets of the constituent colleges, and college presidents are responsible directly to the Chancellor and through the Chancellor to the Board.

165.    Upon information and belief, CUNY centralized authority includes the university-wide legal, budgetary, policy, and administrative functions through which CUNY's colleges are managed, coordinated, and supervised.

166.    Any reference to CUNY and/or Defendant CUNY in this Class Action Complaint includes and encompasses Defendant NYC and the CUNY Board.

**Defendant City of New York**

167.    Defendant NYC is a municipal entity created and authorized under the laws of the State of New York.

168.    Defendant NYC has received and currently receives federal financial assistance.

169.    Defendant NYC is financially responsible for satisfying monetary judgments

---

[6]    *See e.g.*, *CUNY Distributes $118 Million in Federal Pandemic Emergency Grants to 150,000 Students*, May 6, 2021 ("The CARES Act also provided the University with $118 million for institutional needs, including the purchase of computers, tablets and internet hotspots for students who needed them to fully participate in remote education; an expansion of mental health and wellness services; and tuition and fee refunds.  Similarly, CRRSAA also provides the University with $337 million to support the institutional needs of the University and its 25 campuses as they move toward recovery in the coming academic year."), https://www1.cuny.edu/mu/forum/2021/05/06/cuny-distributes-118-million-in-federal-pandemic-emergency-grants-to-150000-students/; *CUNY Receives More than $12 Million in Federal Funding to Support Campus* Programs, Feb. 16, 2023, https://www1.cuny.edu/mu/forum/2023/02/16/cuny-receives-more-than-12-million-in-federal-funding-to-support-campus-programs/; *CCNY receives $5M federal grant to increase research activity and doctoral graduations*, Feb. 6, 2024, https://www1.cuny.edu/mu/forum/2024/02/06/ccny-receives-5m-federal-grant-to-increase-research-activity-and-doctoral-graduations/.

against CUNY's community colleges, including QCC, BMCC, KCC, and Hostos, where Professor Ramjerdi and Plaintiffs Levine, Mulvanerty, Sease, and Sullivan worked.

170. Under New York Education Law, the CUNY Board of Trustees is the governing body of the City University and consists of seventeen trustees, ten appointed by the Governor with Senate confirmation and five appointed by the Mayor of the City of New York with Senate confirmation. The five mayoral appointees must include at least one resident of each of the five boroughs and at least one alumnus of a CUNY educational unit. Appointed trustees serve seven-year terms, renewable for one additional seven-year term, vacancies are filled in the same manner as the original appointment, and the Mayor may remove the trustees the Mayor appointed for cause after notice and hearing.

171. Upon information and belief, Defendant NYC exercised substantial governance and control over CUNY's community colleges through the Mayor's statutory authority over the University's governing structure and community-college budget process, and through NYC's direct role in payroll, leave-benefit, and insurance administration for community-college employees. Under Education Law § 6204, five of the seventeen CUNY trustees are appointed by the Mayor of the City of New York, and those mayoral appointees may be removed by the Mayor for cause after notice and hearing.

172. Under Education Law § 6229, the proposed operating and capital budget for CUNY's community colleges, after approval by the Board of Trustees, must be submitted to the Mayor for review and approval, and the Mayor then determines the expenditures he will recommend in his executive budget for those community-college programs and services.

173. Under Education Law § 6221, NYC must appropriate and pay operating aid for CUNY's community colleges, including the portion of central-administration and university-

31

wide operating costs attributable to community colleges.

174. CUNY's own official payroll materials further state that FISA-OPA administers New York City payroll for CUNY community colleges and that NYCAPS Employee Self-Service is available only to community-college employees on NYC payroll, while CUNY's benefits materials state that community-college employees are on New York City payroll for Paid Family Leave purposes and that the New York City Law Department serves as the insurance carrier for workers' compensation claims.

175. Upon information and belief, this recurring mayoral governance, budget-review, funding, payroll, leave-benefit, and insurance authority gave Defendant NYC ongoing control over material terms and conditions of employment at CUNY's community colleges and supports its status, at minimum, as a joint employer of Plaintiffs employed at CUNY community colleges.

176. Upon information and belief, and at minimum as to Plaintiffs employed at CUNY community colleges, including Plaintiffs Levine, Mulvanerty, Sease, and Sullivan, Defendant NYC and Defendant CUNY were joint employers because they shared and/or allocated control over material terms and conditions of employment, including payroll, payroll records, benefits, leave-benefit administration, insurance, budgetary approval, and governance of the community colleges.

**Defendant Felix V. Matos Rodríguez**

177. Since May 2019, Defendant Félix V. Matos Rodríguez has served as Chancellor of the City University of New York ("CUNY").

178. Under CUNY's Bylaws, the Chancellor is the chief executive, educational, and administrative officer of CUNY and its senior and community colleges; is charged with initiating, developing, and implementing university-wide educational and administrative policy;

is responsible for unifying and coordinating CUNY's operating systems, business and financial procedures, and management on a university-wide basis; and approves appointments, reappointments, and promotions to the instructional staff except where such matters are reserved to the Board of Trustees.

179. Rodríguez exercised that authority in practice.

180. On May 13, 2021, he announced that his office had decided that staff would return to their workplaces beginning the week of August 2, 2021, and that faculty would return in accordance with their campuses' academic calendars.[7] Thereafter, CUNY Central issued and/or caused to be issued spring-planning guidance aiming for 70% in-person/HyFlex courses and 30% hybrid or online courses and directing that, aside from unusual circumstances, all full-time faculty should teach at least one in-person course on campus.

181. Upon information and belief, CUNY colleges, presidents, and human-resources personnel implemented and followed those Chancellor-issued and CUNY-Central directives in administering course-modality, return-to-work, and accommodation-related decisions.

182. Upon information and belief, Rodríguez also implemented, approved, maintained, and/or enforced centralized CUNY leave and accommodation policies, forms, and procedures, including the Non-FMLA Medical Leave process, through which disability-related requests for additional leave were evaluated and administered.

183. Upon information and belief, Rodríguez also implemented, approved, maintained, and/or enforced the centralized CUNY policies and procedures that governed whether requests for additional disability-related leave would be considered as reasonable-

---

[7] Message from Chancellor Matos Rodríguez: Returning to In-Person Work, at 1 (May 13, 2021), https://hostos.cuny.edu/Hostos/media/Downloadable-Files/Ready-Office-of-the-Chancellor-Returning-to-in-person-work-05-13-21.pdf.

accommodation requests or instead diverted into the Non-FMLA Medical Leave process.

**Defendant Board of Trustees of The City University of New York**

184.    Defendant The Board of Trustees of The City University of New York (the "Board") is CUNY's governing body and oversees governance, policy-making, and operations across the University system.

185.    Under N.Y. Educ. Law §§ 6204 and 6206, the Board governs and administers CUNY and possesses the powers and duties of trustees of colleges. The Chancellor is appointed by and reports to the Board.

186.    CUNY's official policy materials state that the Board adopts and amends the University's Bylaws, that the Bylaws are the highest source of policy created within the University, and that Board-adopted non-bylaw policy action items are compiled in the Manual of General Policy.

187.    Plaintiffs name the Board as a Defendant for declaratory and prospective injunctive relief because this action challenges ongoing systemwide policies, rules, and practices concerning disability-based remote-work accommodations, in-person work requirements, failures of interactive/cooperative dialogue, and related retaliatory or coercive responses across multiple CUNY campuses and CUNY Central. On information and belief, complete prospective relief may require action by the Board to rescind, amend, supervise, or direct University-wide policy and governance.

188.    The Board, through its Office of the Secretary, is located at 205 East 42nd Street, New York, New York 10017.

## FACTUAL ALLEGATIONS

*COVID-19 Pandemic and Demonstration of Remote Work Feasibility*

189.    On March 16, 2020, in response to the COVID-19 pandemic and in compliance with federal, state, and local public health regulations and requirements, Defendants transitioned to a temporary remote instruction and work model, effectively closing physical campus buildings except for essential employees who maintained buildings and critical infrastructure.

190.    During the period of remote operations from March 2020 through mid-2021, Plaintiffs successfully performed all essential functions of their respective positions remotely from their homes.

191.    Plaintiffs generally received positive performance evaluations, met or exceeded productivity standards, fulfilled all professional obligations, and in multiple instances received recognition, salary differential increases, commendations, and formal acknowledgment for their excellent remote work performance.

192.    The extended remote work period from March 2020 through mid-2021 demonstrated that Plaintiffs' positions -- including administrative support functions, help desk services, rules writing, faculty teaching in online modalities, course development, committee participation, and scholarly work -- could be performed entirely remotely without imposing any undue hardship on Defendants' operations and without interfering with institutional missions.

193.    Defendants invested substantial resources in technological infrastructure, training programs, and support systems to facilitate remote work and online instruction during the pandemic, further demonstrating the operational and financial viability of remote work arrangements.  Students successfully learned in online and remote modalities, administrative functions continued uninterrupted, and institutional operations adapted to a remote work

35

environment.

194.    Defendants required their faculty to work remotely through the spring 2021 semester because of the COVID-19 pandemic.

195.    Upon information and belief, all, or almost all, faculty at CUNY, including Plaintiffs Mulvanerty and Kwong, performed their teaching fully remotely during this time-period.

### CUNY Announces Expectation that Its Faculty and Staff Return to In-Person Work

196.    Shortly before May 13, 2021, CUNY via Chancellor Rodríguez, announced its decision that staff and faculty would be returning to in-person work at CUNY. Specifically, Chancellor Rodríguez stated, in part:

> As we move closer to the reopening of our city and state and New York's massive vaccination program continues, my office has made the careful decision to mark the week of August 2 as the date for staff to return to their workplaces in preparation for more in-person fall. Faculty will follow in accordance with the academic calendar of their campus.[8]

197.    Upon information and belief, at this time, CUNY was pushing to achieve a 50% in-person presence throughout the university system, senior and community colleges alike.

198.    Beginning in August 2021, Defendants began requiring employees to return to in-person work on a phased basis.  Non-faculty employees at Hostos returned to in-person work on a half-time (50%) basis during the week of August 16, 2021.  Defendants increased this percentage to 60% (three days in-person, two days remote) in February 2022, then increased it again to 70% in-person, 30% remote in September 2022.

---

[8]    Statement by Chancellor Matos Rodríguez on "Returning to In-Person Work," at 2 https://www.baruch.cuny.edu/wp-content/uploads/sites/28/2021/05/May-13-Staff-to-Return-to-Campus.pdf.

*CUNY Announces a Target of 70% Fully In-Person Courses for Spring Semester 2022*

199.    In 2021, Defendants implemented a new policy mandating a minimum percentage of in-person instruction for faculty members, thereby limiting faculty members' ability to teach in online or asynchronous modalities even when such teaching methods were pedagogically sound, met student learning needs effectively, and accommodated faculty disabilities.

200.    Around this time, during approximately late August 2021/early September 2021, CUNY Central announced its target to return to 70% fully in-person courses for the spring semester 2022, and professional staff to work seven out of ten days on campus.[9]

201.    Upon information and belief, "[p]ractically and immediately," as to the 70% in-person requirement for courses, the CUNY Central "guidelines for planning the spring term," as set forth by Interim Executive Vice Chancellor and University Provost of CUNY Daniel Lemons ("Interim EVC Lemons"), included:

> Aim for 70% in-person/HyFlex courses and 30% hybrid and online courses.
>
> Select courses for hybrid/online that, to the best of your knowledge, match student needs as well as the likely future mix of program delivery modalities.
>
> Prioritize instructors for online/hybrid/HyFlex who have done at least one training sequence in those modalities and/or demonstrated success.
>
> Aside from unusual circumstances, all full-time faculty

---

[9]    Center for Worker Education Scope Newsletter Fall 2021, at 1, City Coll. of N.Y., https://www.ccny.cuny.edu/sites/default/files/2024-07/Scope%20V2%20%7C%202021%20Fall.pdf; GC FORWARD #15: 70% In-Person for Spring 2022, CUNY Graduate Ctr. (Dec. 9, 2021), https://www.gc.cuny.edu/news/gc-forward-15-70-person-spring-2022.

members should teach at least one in-person course on campus.[10]

202.    The policy in the aforementioned communication (the "70/30 In-Person/Remote Policy") did not make any specific provision or exception for faculty requiring a disability-based accommodation exception to this policy.

***Defendants Used These Policies to Restrict Remote Accommodations and Remote Instruction***

203.    In February 2022, Defendants implemented a hybrid work model requiring non-teaching, non-essential staff to work in-person 70% of their time and remotely 30% of their time. Defendants applied this policy inflexibly and rigidly, without regard to individual circumstances, job duties that could be performed entirely remotely, or the accommodation needs of employees with disabilities.[11]

204.    Defendants refused to grant exceptions to the 70% in-person mandate even when employees provided extensive medical documentation from qualified healthcare providers supporting their need for full remote work accommodations.

205.    On or about August 11, 2022, Chancellor Rodríguez reminded staff members of the 70% in-person requirement for fall 2022 (*i.e.*, the 70/30 In-Person/Remote Policy), which had been in place since spring 2022.[12]

---

[10]    Faculty Executive Committee Meeting, September 28, 2021, https://www.qcc.cuny.edu/governance/faculty/FEC-Meeting-Agenda-09-28-2021.pdf (emphasis added); *see also* OOA This Week, Oct. 21, 2021, https://myemail.constantcontact.com/OAA-This-Week--Thursday-Edition.html?soid=1134130875871&aid=da7juhDWkew.

[11]    Changes to In-Person Employee Density Level, City Coll. of N.Y. Off. of Hum. Res. (Jan. 19, 2022), https://www.ccny.cuny.edu/return-campus/blog/changes-person-employee-density-level; GC FORWARD #15: 70% In-Person for Spring 2022, CUNY Graduate Ctr. (Dec. 9, 2021), https://www.gc.cuny.edu/news/gc-forward-15-70-person-spring-2022.

[12]    70% In-Person Employee Density Level Extended to 12/31/22 & Refresher On Some Pertinent COVID Guidelines, City Coll. of N.Y. Off. of Hum. Res. (Aug. 17, 2022), https://www.ccny.cuny.edu/return-campus/blog/70-person-employee-density-level-extended-123122-refresher-some-pertinent-covid.

206.     In late December 2022, while Plaintiff Levine was on approved FMLA leave, Defendants instituted a policy that, absent specific medical documentation, remote work requests would no longer be granted based on personal fear of increased risk of complications from COVID-19 or other illnesses.

207.     Defendants announced this policy without proper notice to affected employees, applied it retroactively to pending accommodation requests, and used it as a pretextual basis to deny accommodation requests even when applicants provided extensive medical documentation supporting their need for remote work on grounds entirely unrelated to COVID-19 exposure fears.

***Environmental Hazards and Unsafe Working Conditions***

208.     In 2019, PSC-CUNY contracted environmental consultants identified "visible/active mold growth" in campus buildings at Defendants' institutions. Defendants obtained this report demonstrating actual knowledge of hazardous conditions, yet they downplayed concerns about mold and insinuated they had no need to conduct mold testing at all.

209.     In December 2021, as Defendants urged faculty and staff to resume working on campus and falsely claimed during a labor management meeting that reentry was safe, an environmental inspection firm found a pigeon infestation—including large quantities of guano—on the third floor of a City Tech building.

210.     The inspection report indicated that evidence of this infestation had existed since at least 2019, meaning CUNY knew or should have known about this hazardous condition for years.

211.     CUNY hired asbestos inspectors whose licenses were subsequently revoked by

regulatory authorities, conducted dangerous and improper asbestos abatement procedures, maintained grossly inadequate ventilation systems in violation of city building codes for years, and refused to conduct or disclose results of interior environmental testing for mold and asbestos concentrations despite repeated employee requests, presentations at department meetings with corroborating evidence, union grievances, and Freedom of Information Law (FOIL) requests.

212.     Employees, including Plaintiff Kwong, submitted formal complaints about these documented environmental health hazards.  From 2024 through 2026, Plaintiff Kwong delivered numerous presentations at department meetings with extensive corroborating evidence of mold, asbestos exposure risks, hazardous chemicals including PCB-containing light ballasts, pigeon infestation, and inadequate ventilation.

213.     Despite this overwhelming evidence, Defendants consistently downplayed concerns, denied the existence of hazards, or outright ignored these life-threatening conditions.

214.     These environmental concerns were not limited to Plaintiff Kwong or to City Tech.

215.     The late Professor Ramjerdi had likewise documented that air quality, mold, construction dust, and other toxins at QCC that affected her ability to teach safely in person.

216.     Professor Ramjerdi had objected to and described those conditions in writing as follows:

> Hi Martha, Thank you for considering my requests. I cannot teach in the Humanities Building or any building with ongoing construction and high levels of mold and other toxins. There are only a couple rooms on the 2nd floor that I have been able to teach in since 2016 as two prior Chairs are aware and I have not been able to use the English Dept offices. Chairs have informally accommodated my disability by assigning me rooms that don't make me sick and allowing me to hold office hours in hallways and outdoors. My problems with the air quality and mold in the Humanities building are documented in my many emails over the years since 2016.

40

217. These allegations further demonstrated Defendants' knowledge that mold, construction dust, poor air quality, and related environmental conditions on campus posed particular risks to disabled faculty.

218. These hazardous environmental conditions posed particular danger to some Plaintiffs, who suffered from immunocompromised conditions due to brain shunts and residual blood clots, neurological vulnerabilities to environmental toxins, respiratory sensitivities, and other disabilities making them especially susceptible to serious harm from mold spores, bacteria from guano (which become airborne and spread through ventilation systems), asbestos fibers, and inadequate air quality.

219. Defendants' insistence on mandatory in-person attendance despite these documented, unresolved health hazards was particularly egregious and dangerous for Plaintiffs, some of whose medical providers had explicitly warned that exposure to mold, poor air quality, and environmental toxins could exacerbate their existing medical conditions, trigger severe symptom flare-ups, and create serious health risks including respiratory complications, neurological deterioration, and life-threatening infections in immunocompromised employees.

### FACTUAL ALLEGATIONS SPECIFIC TO PROFESSOR JAN RAMJERDI (DECEASED)

*Professor Ramjerdi's Service, Disabilities, and Prior Accommodation History*

220. As noted above, Professor Ramjerdi passed away on January 31, 2025.  Her experience remains relevant as the initial example of Defendants' challenged policies and practices regarding remote-work accommodations, FMLA leave, retaliatory scheduling, discipline, and the use of medical status as a tool of separation rather than accommodation.

221. Professor Ramjerdi began working at QCC in 2003, was awarded tenure, and was promoted to Associate Professor effective 2009.  She was a long-serving tenured English

41

professor who, by all available accounts, excelled in her role.

222.     Professor Ramjerdi suffered from serious and long-term or permanent disabilities, including Bipolar II disorder, Post-Traumatic Stress Disorder, anxiety, depression, and severe physical and psychiatric symptoms triggered by exposure to mold and other environmental toxins.

223.     Long before the challenged denials at issue here, Defendants knew of Professor Ramjerdi's chronic condition.  They had approved prior FMLA leave for her in 2016, 2017, and 2019, and had also approved other disability-related adjustments, including a service-dog accommodation and classroom, office, and office-hours arrangements designed to reduce exposure to environmental triggers.

224.     Prior QCC English Department Chairs understood that Professor Ramjerdi could not safely teach in most classrooms in the Humanities Building because of poor air quality and toxin exposure.  They worked with her on classroom assignments and other practical measures before the challenged policies later displaced individualized accommodation with blanket return-to-campus rules.

***Successful Remote Teaching and the Spring/Fall 2022 Accommodation Cycle***

225.     From approximately mid-March 2020 through the spring 2021 semester, Defendants required faculty, including Professor Ramjerdi, to work fully remotely because of the pandemic.  During that period, Professor Ramjerdi successfully performed all essential duties of her job while teaching fully remotely.

226.     For fall 2021, Professor Ramjerdi continued teaching online after the then-Chair assigned her an all-online schedule.  That arrangement permitted her to continue working effectively, and it did so without any showing of operational hardship to CUNY.

227. When Professor Ramjerdi contacted HR in September 2021 about the process for spring 2022, HR responded that it was still waiting for guidance from the Central Office for any period after December 31, 2021. That response reflected that the treatment of remote-work accommodations was being shaped by centralized CUNY guidance rather than a campus-level assessment.

228. In December 2021, after CUNY announced its 70% in-person target and one-in-person-course expectation for full-time faculty, Professor Ramjerdi submitted a formal request to work fully remotely for spring 2022. Her psychiatrist certified severe limitations, stated that she would need to work from home for at least the next one to two years and probably longer, and explained that remote work would enable her to continue teaching.

229. On or about December 23, 2021, Defendants approved remote work only through May 31, 2022, despite medical support for a much longer duration. Then, in May 2022, HR informed Professor Ramjerdi that the accommodation would not be extended because CUNY was requiring a greater on-campus presence and offered only FMLA leave, leaves of absence, or annual leave instead of meaningfully evaluating continued remote accommodation.

230. After she re-submitted paperwork in summer 2022, including renewed psychiatrist support, Defendants allowed her to remain fully online for fall 2022 only because her Chair assigned her an all-online schedule -- not as an official disability accommodation.

***Semester-by-Semester Recertification and the Spring 2023 Denial***

231. During fall 2022, Defendants also retaliated against Professor Ramjerdi. In August 2022, shortly before the semester began, she was abruptly told that her schedule had to be changed and, with only about two weeks' notice, that she would have to prepare two sections of a course she had not taught in approximately eight years.

232. After she complained that the last-minute switch was discriminatory and retaliatory, the original course assignment was restored, albeit with a changed day.

233. In November and December 2022, HR again informed Professor Ramjerdi that her remote accommodation would not be automatically extended and that she would need to have her doctor recertify her need for accommodation on a semester-by-semester basis. Professor Ramjerdi objected that repeated recertification for a chronic condition was excessive, disruptive to scheduling, and itself aggravated the symptoms of her disability.

234. Professor Ramjerdi nonetheless complied and, on December 27, 2022, re-submitted accommodation paperwork for spring 2023. Her psychiatrist again identified the condition as permanent and again documented her need to work from home. Professor Ramjerdi also asked that, if recertification were to be required, the accommodation decision at least be completed before class scheduling so that she would not again be forced into last-minute chaos.

235. On January 19, 2023, Defendants denied Professor Ramjerdi's request to teach fully remotely for spring 2023, and on appeal, the QCC ADA Compliance Coordinator and Assistant Vice President for Equity, Inclusion, and Belonging Amaris Matos, stated that teaching and departmental responsibilities required an in-person presence and that a permanent remote arrangement would be a significant burden to QCC.

236. Defendants' denial communications framed the request as one for "100% remote" work "on a permanent basis," but the immediate dispute concerned the pending spring 2023 schedule after multiple prior semester-limited remote approvals.

237. At the same time, Defendants assigned Professor Ramjerdi two remote classes and one in-person class and threatened discipline if she declined the in-person assignment.

238. Yet, Professor Ramjerdi had already taught successfully fully remotely from

44

March 2020 through fall 2022, and for spring 2023 she sought only one additional remote class.

239.    The accommodation denial reflected adherence to the one-in-person-course rule and 70% in-person policy, not a genuine, individualized conclusion that one more remote class would create an undue hardship.

240.    When Defendants denied fully remote teaching, Professor Ramjerdi attempted to identify on-site conditions under which she could safely return.

*Denied Alternative Accommodations and Retaliatory Escalation*

241.    Defendants also refused to provide Professor Ramjerdi with a reasonable transition period or the kind of return-to-site notice that CUNY policy extended to staff.

242.    When she asked for fourteen days to adjust to returning onsite after almost three years of fully offsite work, quoting a CUNY policy stating that remote employees would receive at least seven days' notice and, where possible, fourteen days' notice before being required to return onsite, Defendants rejected that request, even though she explained that the transition implicated travel, access to indoor environments, and disability-related logistics.

243.    After denying fully remote teaching, Professor Ramjerdi proposed concrete in-person accommodations.  She requested a classroom and office in rooms with good air quality; preferably space outside the Humanities Building or otherwise in a location with better ventilation and filtration; a computer classroom or at least a podium with a functioning microphone and smart screen; and continuation of her service-dog accommodation.

244.    Professor Ramjerdi explained in writing that since 2016 she had been unable to use most Humanities Building classrooms because of air-quality and toxin exposure and that prior chairs had accommodated her by assigning tolerable rooms and allowing office hours in hallways or outside when necessary.

45

245.     Defendants did not meaningfully engage in a cooperative dialogue about those alternatives.  Instead, HR assigned Professor Ramjerdi to a Humanities classroom notwithstanding her stated inability to use most Humanities rooms because of poor air quality and, rather than solve the problem, sought still more doctor contact and documentation.

246.     Rather than relocate Professor Ramjerdi outside the Humanities Building or address the air-quality problem she identified, HR assigned her to room H-436 in the Humanities Building while confirming only that the room had podium technology and that she could bring her service dog.

247.     Professor Ramjerdi continued to press the point that her prior records, prior FMLA history, and successful remote work demonstrated both the legitimacy of her disability and the effectiveness of remote teaching as an accommodation.  She specifically explained that remote work had enabled her to work continuously for years after prior multi-month FMLA leaves, yet Defendants continued to treat leave as the preferred solution and accommodation as the exception.

248.     On February 3, 2023, while those on-site accommodation issues remained unresolved, Professor Ramjerdi also requested the temporary accommodation of teaching fully remotely until the in-person classroom issues could be resolved.  Defendants denied that narrower interim request as well.

249.     After she reported illness and inability to travel on February 3, 2023, Defendants removed her from the single in-person class, left her two remote classes intact, and reassigned her to administrative duties, requiring 4.5 hours onsite and 2.0 hours remote each week.

250.     Professor Ramjerdi then requested to perform those reassigned administrative duties fully remotely because of the same disabilities and illnesses, but Defendants again refused.

251.     As Professor Ramjerdi continued appealing, objecting, and requesting accommodations, Defendants escalated through retaliatory classroom observations, additional critical documentation placed in her personnel file, and other adverse treatment tied to her requests for remote accommodation and her complaints of disability discrimination.

***False Charges, Medical Separation, and Additional Pattern Evidence***

252.     On July 17, 2023, CUNY escalated further by serving Professor Ramjerdi with disciplinary charges seeking termination.  Among other things, those charges falsely accused her of falsifying or altering multiple medical accommodation forms that she had submitted in support of her remote-work requests.

253.     Those accusations were both false and pretextual.  The challenged forms were the very medical forms Professor Ramjerdi had used in the accommodation process, and any legitimate authenticity question could have been addressed directly through ordinary verification with her provider rather than through termination-level charges impugning her honesty.

254.     Defendants did not contemporaneously tell Professor Ramjerdi that they believed any medical form was forged or seek to clarify this issue directly with her.  Instead, during the accommodation process, they continued to demand provider contact and additional documentation and later transformed the purported authenticity issue into termination-level discipline.

255.     When that strategy became untenable, upon information and belief, after Defendants confirmed their forgery allegations were false, Defendants shifted to a retaliatory medical separation -- invoking alleged physical or mental incapacity as a basis to remove Professor Ramjerdi from her position instead of accommodating the very disabilities on which the remote-work request was based.

47

256.     Defendants also converted protected leave or sick time to unauthorized absences and docked her pay.

257.     The medical-separation approach treated Professor Ramjerdi's medical condition as a ground for exclusion from employment rather than as a basis for a disability accommodation.  In this way, it mirrored the broader pattern alleged throughout this Complaint: Defendants repeatedly used disability and medical documentation not to support continued work with reasonable accommodation, but to justify denial, discipline, leave pressure, and separation.

258.     Even though she is now deceased, Professor Ramjerdi's experiences, as set forth in further detail in her filed complaint in *Ramjerdi v. The City of New York*, No. 1:24-cv-03380-NGG-RML (E.D.N.Y.), remain a central example of Defendants' challenged policies, practices, and standard operating procedures.

259.     These experiences, as memorialized in her filed complaint and sworn statements, provide additional proof of the existence of CUNY's challenged policies, practices, and standard operating procedures.

## PLAINTIFF LEVINE

### *Plaintiff Levine's Long History of Serious Medical Conditions*

260.     As detailed above, Plaintiff Levine has suffered from Trigeminal Neuralgia since 1991 and underwent life-threatening brain surgery in January 2016 with near-fatal complications requiring emergency skull removal.

261.     She later developed Hydrocephalus requiring shunt implantation in March 2016, experienced shunt over-drainage complications causing dementia-like episodes in fall 2022 and winter 2022-2023, and experienced a five-day hospitalization in November 2022.

262.     After contracting COVID-19 in mid-December 2022, Plaintiff Levine underwent

48

outpatient shunt-removal surgery on January 17, 2023, developed Intracranial Hypotension causing Frontotemporal Brain Sagging Syndrome with severe gait and balance issues requiring twice-weekly physical therapy, and was diagnosed with malignant melanoma requiring wide excision surgery in May 2023.

***Robin Levine's Accommodation Requests Following FMLA Leave***

263.    On January 25, 2023, prior to the expiration of her FMLA leave for neurological complications, Plaintiff Levine sent an email to HR inquiring about working fully remotely.

264.    On February 5, 2023, Plaintiff Levine submitted a formal request to work fully remotely as an accommodation through August 21, 2023.

265.    The request was signed by Dr. Robert Weiner, M.D., and stated that because Plaintiff Levine had a history of Hydrocephalus and a shunt with multiple complications, she should avoid crowded offices and highly populated places.

266.    Plaintiff Levine also submitted a Fitness for Duty certification signed by her neurosurgeon dated February 9, 2023.

267.    This document cleared Plaintiff Levine to return to work beginning February 15, 2023, with an explicit medical recommendation that she do so remotely.

268.    On February 15, 2023, Defendants denied Plaintiff Levine's accommodation request for remote work, citing an institutional policy that fully remote work would no longer be granted based on fear of COVID-19 exposure.  Despite the neurosurgeon's explicit medical recommendation for remote work and Dr. Robert Weiner's certification supporting avoidance of crowded offices and highly populated places, Defendants refused to provide the requested remote accommodation.

269.    On February 15, 2023, Plaintiff Levine appealed the denial of her remote

accommodation request.

270.     On February 28, 2023, at Defendants' instruction, Plaintiff Levine submitted a new appeal and request for remote accommodation, removing COVID-19 exposure as an explicitly stated basis, as HR directed, in order to be reconsidered.

271.     On March 2, 2023, before Plaintiff Levine was due to return to the office, Dr. Robert Weiner submitted further medical documentation based on Plaintiff Levine's Intracranial Hypotension, explaining that she should not drive and requesting that she be permitted to work from home through August 2023.  Defendants approved remote work only through May 23, 2023, requiring her to return to an in-person schedule months before the requested end date.

272.     Despite Plaintiff Levine's February 9, 2023 Fitness for Duty certification clearing her to return to work remotely beginning February 15, 2023, Defendants did not approve her return to work until her FMLA leave ended on March 3, 2023.  Defendants forced Plaintiff Levine to use approximately 11 vacation days between February 15 and March 3, 2023, even though she had already been medically cleared to work remotely.

273.     Because March 3, 2023 was a Friday, Plaintiff Levine returned to remote work on March 6, 2023.

274.     After Plaintiff Levine had already returned to remote work on March 6, 2023, Human Resources later stated on or about March 20, 2023 that it needed the Fitness for Duty certification again, and Plaintiff Levine re-sent the same form.  Human Resources thus demanded duplicate medical paperwork more than a month after Plaintiff Levine had already provided it and after she had already resumed working.

***Plaintiff Levine's Melanoma Diagnosis During Neurological Recovery***

275.     On April 27, 2023, while Plaintiff Levine was still actively recovering from

Intracranial Hypotension, receiving twice-weekly at-home physical therapy sessions from the Visiting Nurse Service for severe gait and balance issues, and working under a remote accommodation scheduled to expire on May 23, 2023, she received the devastating news that she had been diagnosed with malignant melanoma in her left upper arm.

276.     Plaintiff Levine immediately notified her office and supervisors of this cancer diagnosis and the urgent need for surgical intervention.

277.     On May 4, 2023, Plaintiff Levine consulted with Dr. Sam Yoon, a board-certified surgical oncologist at NY Presbyterian Hospital/Columbia Medical Center and Chief of Surgical Oncology at Columbia Presbyterian Hospital.  The surgical oncologist explained the severity of Plaintiff Levine's condition -- malignant melanoma is an aggressive form of skin cancer that can metastasize quickly to the brain, lungs, kidneys, lymphatic system, and anywhere throughout the body.

278.     Even at stage IA, patients face a 10% risk of cancer recurrence.  The surgeon strongly advised that Plaintiff Levine needed to have surgery quickly to prevent the cancer from spreading and metastasizing to vital organs.

279.     On May 5, 2023, Plaintiff Levine submitted a new request for reasonable accommodation to work remotely while recovering from melanoma surgery, supported by her treating surgeon, Dr. Sam Yoon.  On May 11, 2023, Dr. Yoon supplemented that request with medical documentation expressly requesting that Plaintiff be permitted to work remotely through the end of the summer.  Plaintiff's then-existing remote accommodation was scheduled to expire on May 23, 2023.  Rather than immediately approve the medically supported extension request, Defendants allowed the request to remain pending for weeks.

280.     The surgical oncologist scheduled Plaintiff Levine's wide excision surgery for

Friday, May 12, 2023, to be performed as an outpatient procedure under conscious sedation in the hospital's operating room.

281. The surgeon explained that Plaintiff Levine would need a skin check every three months with a dermatologist for one year, then every six months for up to five years, would need to see him every six months for two years, then once a year for up to five years, and must remain vigilant to ensure the cancer did not return.

282. On May 11, 2023, approximately two weeks before her existing remote work accommodation was scheduled to end on May 23, 2023, and the day before her surgery, Plaintiff Levine submitted a request for extension of her remote work accommodation based on the melanoma diagnosis and upcoming cancer surgery.

283. The medical documentation submitted by Plaintiff Levine's surgical oncologist specifically explained that she was still recovering from Intracranial Hypotension, was working with a physical therapist at home to strengthen her core, was about to undergo major cancer surgery, and would assist her recovery if she did not have to maneuver herself in a car while driving 45 minutes to one hour each way to work as her arm healed following the wide excision surgery.

284. The surgeon's Health Care Provider Accommodation Assessment Form explicitly recommended that Plaintiff Levine work from home through the end of the summer (end of August 2023).

285. The form certified that Plaintiff Levine was fully capable of performing all tasks and functions of her job while sitting at a computer, typing, and answering phone calls, but that she should avoid the physical strain and manipulation on her surgical site that would result from driving 45-60 minutes each way in traffic to and from work.

286. On Friday, May 12, 2023, Plaintiff Levine underwent the wide excision surgery. Surgeons removed the malignant melanoma tumor, requiring an excision measuring 3 inches by 1.5 inches by 1 inch deep into the muscle tissue of Plaintiff Levine's left upper arm.

287. This was major, invasive surgery creating significant functional limitations, ongoing pain, tenderness, spasms, and wound healing complications that persisted for months.

*Defendants' Grossly Inadequate and Shortened Accommodation*

288. Despite the severity of this cancer surgery, the ongoing recovery from Intracranial Hypotension, the continuing need for twice-weekly physical therapy sessions, and the clear medical recommendations from multiple physicians (including the surgical oncologist, neurosurgeon, and internist/oncologist), Defendants granted Plaintiff Levine a remote work accommodation only through May 23, 2023 -- a mere *eleven* days after major cancer surgery.

289. Medical providers had explicitly requested accommodation through the end of summer 2023 (approximately through August 2023), yet Defendants would arbitrarily impose a much shorter accommodation period.

*Defendants' June 2023 Denial of Accommodation Extension Despite Medical Need*

290. On June 29, 2023, more than six weeks after Plaintiff's May 12, 2023 melanoma surgery, Defendants denied Plaintiff's request to continue working remotely through the end of the summer, notwithstanding her providers' express recommendation and her ongoing post-surgical limitations.

291. The Acting Human Resources Director sent an email to Plaintiff Levine stating:

> Your request for accommodation allowing you to work 100% remotely has been denied. The documentation you submitted indicates that you will need approximately one month to recover. Your procedure took place over six weeks ago. An attempt at getting further information from your medical provider was unsuccessful.

292.    This denial grossly and deliberately mischaracterized the medical evidence and recommendations that Plaintiff Levine had provided.

293.    The Health Care Provider Accommodation Assessment Form completed by the board-certified surgical oncologist did not state a "one month" or "four week" limitation on recovery time.

294.    Rather, the surgeon had explicitly recommended accommodation through the end of the summer -- approximately three months from the surgery date -- to allow for proper surgical healing, continuation of physical therapy for the concurrent Intracranial Hypotension, and avoidance of the physical strain of driving 45 to 60 minutes each way in traffic while Plaintiff Levine's arm healed from the deep muscle excision:

> Ms. [Levine] is still recovering from intracranial hypertension and is working with a physical therapist at home to strengthen her core. Adding the melanoma surgery to this recuperative period, it would, therefore, be beneficial for Ms. [Levine] to work from home through the end of the summer. She will be more comfortable not having to maneuver herself in a car while driving 45 minutes to an hour to and from work each day as her arm heals. However, she is fully capable of performing the tasks of her job functions while sitting at a computer, typing and answering phone calls . . . The patient can perform her essential work functions from her home office but she will be unable to drive and need[s] to avoid getting an infection in the incision, especially during the first month after the surgery.

295.    The June 29, 2023 denial letter's claim that "an attempt at getting further information from your medical provider was unsuccessful" was also not accurate.  Upon information and belief, Plaintiff Levine's surgical oncologist's office had spoken with human resources personnel in mid-June 2023, informing them that Plaintiff Levine was not ready to return to in-person work and that the doctor had filled out the request asking for remote work through the end of the summer.

54

296. Plaintiff Levine had repeatedly attempted to facilitate communication between Defendants and her medical providers, but Defendants never requested additional information or a supplemental letter until after they had already decided to deny the accommodation.

297. The June 29, 2023 denial further stated: "Your department requires staff to be present at least part of the time in order to provide in-person support to its students. Reducing its in-person staff would significantly impact the department's ability to service our students."

298. That justification was inconsistent with Plaintiff Levine's actual duties. Plaintiff Levine answered the Help Desk phone line remotely throughout the workday, performed rules writing and other administrative functions by telephone and computer, and had only a small pre-pandemic in-person Help Desk component totaling approximately 3.5 hours per week.

299. Plaintiff Levine worked remotely answering the Help Desk phone line five days per week, every day, from 10:00 AM to 6:00 PM Monday through Thursday and 9:00 AM to 5:00 PM on Fridays.

300. Plaintiff Levine performed rules writing, administrative functions, and other duties that required absolutely no in-person presence and could be performed entirely remotely by telephone and computer.

301. The only arguably in-person duty Plaintiff Levine had performed, before the pandemic, was sitting at the in-office Help Desk for a total of 3.5 hours per week. However, this function was also being performed remotely by phone *after* the pandemic ended.

302. Given the minimal amount of time devoted to that task, and because the Help Desk services could be and in fact were provided remotely by telephone, any in-person component of that assignment was not an essential function of her position but, at most, a marginal one.

303. Plaintiff Levine could not resume in-person Help Desk duties post-pandemic due to the thrombosis (blood clot) in her brain that could be exacerbated or cause new clots if exposed to COVID-19 from unmasked or unvaccinated students or others who stopped by the Help Desk. However, she could have continued to provide these same services remotely.

304. Notably, Defendants' institution was operating on a four-day summer workweek during this period, with offices closed on Fridays from June 11, 2023, through August 11, 2023 (seven Fridays total). The institution had implemented a 50% hybrid remote work schedule for the summer, meaning employees were working in-person only two days per week and remotely two days per week.

305. What Plaintiff Levine requested was merely to continue working the other *two* required in-person days remotely while she recuperated from cancer surgery and Intracranial Hypotension -- an accommodation that would have affected only approximately six weeks of work -- from July 11, 2023, to August 25, 2023, when the fall semester began. This minimal, temporary accommodation would have imposed absolutely no undue hardship on Defendants, yet Defendants denied it.

### *Plaintiff Levine's Appeal Denial and Threats of Pay Docking*

306. Plaintiff Levine appealed the June 29, 2023 accommodation denial. Defendants permitted her to continue working remotely while the appeal was under review.

307. On July 3, 2023, the campus appeals coordinator denied Plaintiff Levine's appeal, stating that the review process had been followed correctly and that there was no evidence of bias in the HR process employed to address her request.

308. This appeal denial was sent via email while Plaintiff Levine was experiencing a service outage (loss of Verizon FIOS phone, internet, and television service for two days during the July 4th holiday period), and she did not learn of the denial until July 5, 2023.

309. On July 5, 2023, the Interim Executive Director for Human Resources sent Plaintiff Levine an email reiterating that her application to continue working remotely had been reviewed and denied and ominously threatening:

> Vice President Palmer has notified you that you are to resume working in person effective July 6. Please be advised that any absences or work performed remotely will be considered unauthorized since you do not have an approved accommodation.

310. The July 5, 2023 email directed Plaintiff Levine to report in person effective July 6 and stated that any absence or remote work would be deemed unauthorized, even though Levine was still recovering from melanoma surgery and Intracranial Hypotension, had medical support for remote work through the end of the summer, and had been working remotely while her appeal was pending.

311. From July 6, 2023 through July 10, 2023, while Plaintiff Levine was being told that she had to resume working in person and that any remote work would be unauthorized, the office itself remained remote because of construction. Defendants nonetheless maintained their directive that Levine physically return.

312. On July 7, 2023, Plaintiff Levine contacted her medical providers for additional documentation in an effort to satisfy Defendants' changing demands and preserve her employment. Around the same time, PSC grievance counselor Mitchell Manning advised Plaintiff Levine to exhaust available leave options and follow directives insofar as necessary to protect her position and ability to retire. Levine was therefore continuing to seek compliance and preserve her employment, not refusing to work.

57

313.    Around July 2023, during discussions between PSC grievance counselor Mitchell Manning and QCC Labor Designee/General Counsel Lois Florman, Defendants proposed moving Plaintiff Levine's desk to a location with less people around her so she could work with supposedly "limited exposure" to others.

314.    This proposed measure: (1) failed to effectively address her documented medical vulnerability to COVID-19 and other infectious diseases; (2) failed to eliminate exposure to unvaccinated or unmasked individuals; and (3) did not implement the medical providers' actual recommendation of remote work.

315.    Moving Plaintiff Levine's desk did not eliminate her commute, did not prevent contact with coworkers, students, or visitors, and did not provide the remote-work accommodation her medical providers had requested.

316.    On July 10, 2023, after being told she had to report back to in-person work on July 11 despite her pending medical issues and contrary to her doctors' requests that she remain remote through the end of the summer, Plaintiff Levine communicated to QCC leadership that Defendants' actions were forcing her into retirement.  Earlier that day, Interim Provost Sandra Palmer ("Interim Provost Palmer") informed Levine that she was "due to return to work tomorrow, July 11," and later advised her that if she sent a letter of intent to President Christine Mangino that same day stating she would retire as of a certain date, "once that is done, you will not have to come in to work."  Plaintiff Levine then wrote to President Mangino in an email entitled "Urgent - Intent to retire imminently," explaining that she had been recovering from a serious intracranial condition, had recently undergone surgery for malignant melanoma, remained under doctors' care, and could not safely return to in-person work without jeopardizing her health.  In that communication, Plaintiff Levine made clear that retirement was not a voluntary career choice

made in the ordinary course, but the consequence of QCC's refusal to permit her to continue working remotely during the limited period her physicians had requested and its insistence that she either return in person or proceed with retirement.

317.    On July 10, 2023, Plaintiff Levine informed supervisors and HR that she was being forced into retirement because of the failure to accommodate her disability and would not return to the office to work in person because doing so would be deleterious to her health.

318.    She explained that HR's pressure campaign had forced her to choose between following her doctors' recommendations and preserving her employment, that she was still awaiting further documentation from her surgical oncologist, and that she would retire rather than do something harmful to her health.

319.    Plaintiff Levine was constructively discharged by the failure to grant her accommodation and the mandate to return to work against her doctor's medical advice.

320.    Returning to work as instructed would have put Plaintiff Levine's health at serious risk because of her disabilities.

321.    CUNY was aware of these risks to Plaintiff Levine's health when it nonetheless ordered her to return to work in-person without a disability accommodation.

322.    Plaintiff Levine submitted her intent to retire and met with benefits administrators via Zoom on July 10, 2023, at 5:30 PM to go over the retirement process.

323.    Plaintiff Levine's official involuntary retirement date was August 10, 2023.

324.    Plaintiff Levine retired only after Defendants denied her request to remain remote through the end of the summer, informed her that remote work and absences would be treated as unauthorized, told her she would be docked pay if she did not report in person on July 11, and

59

refused to allow her to use accrued leave to bridge the short period needed to finalize retirement paperwork and hand off her duties while she remained medically unable to return.

325.   On July 10, 2023, Interim Provost Palmer, responded to Plaintiff Levine's request to use accrued sick and/or annual leave after Levine explained that she would be retiring imminently, would not return to the office on July 11 because she was not willing to jeopardize her health by driving in and working in person against medical advice, and needed a brief period to finalize her retirement paperwork and hand off her duties to others at QCC.  Palmer stated:

> I am very sorry about this, Robin. Yes, your plan is fine with me.
> Benefits will be able to tell you how many sick and annual leave
> days you have left. Whatever it is, there is no problem from my end.
> I truly hope your health improves and you are strong again. I know
> it has been rough for you. All the best.

326.   This email, sent by Interim Provost Palmer, demonstrated that she initially supported Plaintiff Levine's use of accrued leave, understood the severity of her medical situation, and saw no operational problem with allowing her time to process retirement while recovering.

327.   However, mere minutes later, Palmer sent a second email with a drastically different message prohibiting Plaintiff Levine from even using her own leave time to be absent:

> HR wants you to return to work tomorrow per my email to you
> earlier. If you do not show up for work tomorrow, you will be
> docked pay. The sick and AL annual leave days I approved are to go
> toward your retirement, not for taking time off from the days you
> are required to be in. I want to make that clear. I encourage you to
> show up tomorrow.

328.   This subsequent email constituted an unlawful threat orchestrated by Defendants' human resources department.   Defendants were not merely denying Plaintiff Levine's accommodation for remote work, they were simultaneously prohibiting her from utilizing the disability-based accommodation of leave, or for that matter merely using her pre-existing PTO and sick days as any disabled or non-disabled person would be able to do under CUNY policies.

329.     Indeed, Defendants' emails threatened Plaintiff with discipline and docked pay if she did not report to work in person the *very next day* -- despite being clearly medically unable to do so and while having available sick days and annual leave days to cover her absence.

330.     Defendants prohibited Plaintiff Levine from using accrued leave to avoid immediate in-person reporting even though she had earned that leave, remained medically unable to return in person, and sought only a brief period to complete retirement paperwork and transfer responsibilities.

331.     The reversal between Palmer's two July 10 emails reflected that college leadership initially saw no operational problem with Plaintiff Levine's short leave bridge, but after Human Resources intervened, Defendants insisted on immediate in-person reporting or pay loss.

### *Plaintiff Levine's Constructive Discharge Through Forced Retirement*

332.     Plaintiff Levine was constructively discharged.

333.     The fact that Plaintiff Levine was performing her job duties successfully, answering the Help Desk phone throughout the workday, performing rules writing and other administrative work remotely, receiving excellent performance evaluations, and earning a salary differential increase for excellent remote work further undermines any claim that her requested accommodation posed an undue hardship.

334.     Plaintiff Levine was not requesting to stop working; she was requesting to continue the same high-quality remote work she had been performing excellently while recovering from life-threatening medical conditions.

335.     The requested accommodation of continuing to work remotely for approximately six more weeks (two days per week during the summer's 50% hybrid schedule) would have cost Defendants nothing financially, would have imposed zero operational burden, and would have

allowed a 21-year veteran employee to heal from cancer surgery without being forced into premature retirement.

**Plaintiff Levine Was Subjected to Similar Discriminatory and Retaliatory Treatment by Many of the Same Employees of CUNY as Professor Ramjerdi**

336.    Plaintiff Levine's summer 2023 forced-return episode did not arise in isolation and was not the first instance in which QCC, through the same or materially overlapping accommodation and appeal channels, resisted a disability-based remote-work request. Before Defendants denied Levine's June-July 2023 request, Professor Jan Ramjerdi had already been pursuing materially similar disability-based remote-work requests at QCC through the same institutional apparatus. As alleged in the previously filed *Ramjerdi* action, Martha Aspromatis was among the QCC Human Resources officials receiving and handling Professor Ramjerdi's accommodation-related communications; Amaris Matos denied Professor Ramjerdi's January 2023 appeal by asserting that teaching and departmental responsibilities required an in-person presence and that a permanent remote arrangement would significantly burden QCC; and QCC Human Resources leadership, including Sangeeta Noel and Martha Aspromatis, exercised authority over remote-work requests, temporary remote work while requests were pending, leave processing, classification of absences as unauthorized, and related pay and discipline

337.    The repetition of this same conduct across the experiences of Professor Ramjerdi and Plaintiff Levine, two different QCC employees in different job categories, one faculty and one staff, both seeking disability-based remote work, both processed through the same or materially overlapping QCC Human Resources and appeal channels, and both met with substantially similar denials, narrowing tactics, leave substitution, and unauthorized-absence or return-to-site pressure, supports the inference that Levine's treatment was not an isolated mistake or a genuinely individualized judgment. Rather, it was consistent with an existing CUNY pattern, practice,

custom, policy, method of administration, and/or standard operating procedure of resisting, narrowing, delaying, denying, and/or failing to implement disability-based remote-work accommodations.

338.    These overlapping actors, overlapping decision channels, overlapping rationales, and overlapping coercive responses further support the inference that the challenged conduct at CUNY operated through repeatable institutional mechanisms rather than ad hoc, employee-specific decision-making. They therefore provide additional support for Plaintiffs' allegations that Defendants' challenged remote-work accommodation practices were administered in a manner capable of common proof across employees, job titles, and requests, including through recurring use of the same accommodation apparatus, the same appeal pathways, the same leave-substitution practices, and the same pressure toward in-person return, unauthorized-absence status, discipline, retirement, or separation.

## PLAINTIFF MULVANERTY

339.    As set forth below, Plaintiff Mulvanerty remained able and willing to work with reasonable accommodation.  Defendants nevertheless delayed acting on her fall 2024 request, approved remote work only after the semester was about to begin, failed to implement that approval in her actual assignment, and then used the resulting shortfall and her inability to commit to in-person hospital clinical work as grounds for an unsatisfactory evaluation and non-reappointment.

### *Plaintiff Mulvanerty's Medical Conditions and Surgical Complications*

340.    As detailed above, Plaintiff Mulvanerty suffered from severe arthritis throughout her joints, especially her right hip, underwent total hip replacement surgery on June 26, 2023, was

63

admitted overnight through June 27, 2023, and thereafter endured significant complications and chronic pain requiring ongoing pain-management care.

341.    At all relevant times, Plaintiff Mulvanerty was a qualified individual with disabilities. She had a record of such impairments and/or was regarded as disabled by Defendants, and with a reasonable accommodation—including remote lecture instruction, virtual simulation, special-project work, and management of contact hours over the contractual three-year period—could perform the essential functions of her position.

342.    Plaintiff Mulvanerty's work history also refutes any suggestion that she was unable or unwilling to work. After her June 26, 2023 total hip replacement and resulting chronic pain, she continued working at BMCC for nearly a year without requesting leave or accommodation. Until she later went out on approved leave, she had not taken a single day off since being hired on August 27, 2019.

343.    Notwithstanding her medical conditions, Plaintiff Mulvanerty continued to contribute meaningfully in scholarship and service during 2024, including grant-related work, program or advisory activity, simulation-related scholarship, and publication-related work. These facts are inconsistent with any claim that she lacked commitment, productivity, or scholarly progress.

344.    Plaintiff Mulvanerty's limitations were real and functionally severe.

345.    Hospital-based clinical work required moving from room to room, handling pediatric patients, and performing physically demanding tasks that her condition no longer permitted.

346.    Her disability also forced her to stop separate nurse-practitioner clinical work in a family practice clinic in urgent and primary care.

64

347.     Her inability to commit to in-person hospital clinical teaching was caused by her disability.

348.     However, Plaintiff Mulvanerty had been assigned to simulation for four years and was qualified to continue in that lighter-duty role.

349.     Simulation is a nursing-teaching modality in which students learn through controlled clinical exercises, including mannequin-based and virtual scenarios, rather than through the physical demands of hospital-floor patient care.

350.     But after Plaintiff subsequently disclosed her medical condition in Spring 2024, the new chair forced her into hospital-based clinical work instead, even though Plaintiff offered to continue in simulation and BMCC had already used simulation and remote modalities. Defendants thus rejected a feasible, less physically demanding assignment Plaintiff was qualified to perform and pushed her into one they knew conflicted with her medical limitations.

351.     Defendants' subsequent position that Plaintiff Mulvanerty was required to work in a hospital clinical setting, rather than continue in simulation as she previously had, would be contrary to recognized nursing-education guidance. The American Association of College of Nursing had publicly stated in 2017 that it "does not prohibit the use of simulation in offering quality clinical learning experiences," and further explained that CCNE "encourages innovative practices, including the use of simulation," provided that programs also include direct-care clinical practice experiences. Plaintiff Mulvanerty thus could have remained in simulation, as others had, and Defendants' insistence on hospital clinical work only began after she disclosed her medical condition.

352.     In summer 2024, Plaintiff Mulvanerty underwent a total hysterectomy and related abdominal surgery after her surgeon identified highly suspicious cells requiring removal and

65

biopsy.  This caused severe anxiety while she awaited pathology results and materially worsened her physical condition. Her surgeon advised that she should not return to in-person work during the fall 2024 semester while recovering.

*Plaintiff Mulvanerty's Spring-Summer 2024 Request for a Fall 2024 Remote Accommodation*

353.     By May 2024, Plaintiff Mulvanerty had already informed BMCC human resources that her post-surgical complications, severe joint pain, limited mobility, and upcoming hysterectomy might require disability-related remote teaching or leave while she recovered and resumed physical therapy.  On May 13, 2024, Benefits Manager Daniella Donald scheduled a formal reasonable-accommodation meeting regarding that request.

354.     On May 21, 2024, Plaintiff submitted medical documentation reflecting lumbosacral radiculitis, osteoarthritis, pain interfering with activities of daily living, and restrictions on lifting, carrying, pushing, pulling, sitting, and standing.  Plaintiff followed up again on May 30, 2024, but Defendants did not promptly resolve the request.

355.     Plaintiff Mulvanerty continued following up through the summer regarding both her accommodation request and her fall assignment. On July 15, 2024, she wrote to Interim Chair Linda Washington-Brown asking where she would be assigned for the first half clinical placement, explaining that she was scheduled for surgery on July 24, 2024, that the anticipated six-to-eight-week recovery period might require her to miss a few days in early September, and that she was still awaiting a response from Human Resources regarding her medical accommodation.

356.     Two days later, on July 17, 2024, Plaintiff again followed up with HR, stating that she had been seeking a reasonable accommodation since May, had made several attempts to reach HR without receiving a response, and remained uncertain about her fall assignment, which was adding to her stress as she prepared for surgery the following week.

66

357.    On July 24, 2024, the day Plaintiff underwent major abdominal surgery, Benefits Manager Daniella Donald advised that previously submitted medical forms did not contain the requested time period and requested updated doctor's notes or other documentation.

358.    On July 29, 2024, Plaintiff supplied updated medical documentation from her surgeon stating that, following the July 24 surgery, she required time to recover through September 9, 2024.  In the same communication, Plaintiff referenced ongoing pain-management treatment, advised that she had a follow-up appointment on August 15, 2024, and stated that she would submit further documentation.

359.    After Plaintiff later advised human resources that the earlier documentation did not reflect the full extent of her post-surgical limitations and, following her post-operative evaluation, she submitted updated medical documentation recommending that she teach remotely and attend meetings remotely for the fall 2024 semester, human resources eventually extended the remote-work approval through the end of fall 2024.

360.    Before HR finally approved her fall 2024 remote accommodation, however, Chair Linda Washington-Brown circulated the finalized fall 2024 teaching schedule on August 2, 2024, which removed Plaintiff Mulvanerty from a didactic course she had taught for the previous five years, replacing her with an adjunct professor and leaving Plaintiff with only a Saturday clinical assignment at Lincoln Hospital notwithstanding Defendants' knowledge that her medical limitations made in-person clinical work untenable. Chair Linda Washington-Brown gave Plaintiff no warning and no meaningful explanation for the change.

361.    Even with the fall semester approaching, Defendants still did not provide a timely determination.  On August 8, 2024, Plaintiff emailed incoming Chair Ronnie Ursin ("Chair Ursin") that her fall assignment remained incomplete and that she had yet to hear back regarding her

medical accommodation.  That same day, the process was still stalled between HR and department leadership: Chair Linda Washington-Brown indicated they were waiting to hear from HR, while Plaintiff understood HR to be waiting for management sign-off.

362.    On August 15, 2024, Plaintiff sent HR additional supporting medical documentation from her surgeon and pain-management providers and again advised that the semester was fast approaching and that she still had not heard back from Chair Ursin regarding her fall assignment. On August 19, 2024, rather than issue a prompt determination, HR required yet another updated request form, which Plaintiff promptly supplied on August 21, 2024.

363.    On August 22, 2024, after receiving an incomplete schedule that left her short four teaching credits, Plaintiff Mulvanerty discussed with Chair Ursin multiple ways to maintain a full workload while honoring her medical restrictions, including teaching virtual simulation, working on grants, teaching an additional online lecture, or performing a special project of Chair Ursin's choosing.  Only on August 23, 2024, after repeated follow-up by Plaintiff and with the semester imminent, did Benefits Manager Daniella Donald approve Plaintiff's request to work 100% remotely, and then only through September 9, 2024. Only on August 27, 2024, after Plaintiff had submitted additional documentation and an updated request form, did Donald extend the accommodation through the end of the fall 2024 semester.  Chair Ursin was copied on both approval emails.

364.    Although Human Resources ultimately approved Plaintiff Mulvanerty to work 100% remotely for fall 2024, Defendants delayed until the semester was imminent.

***Defendants Approved Remote Work on Paper but Refused to Implement It in Plaintiff Mulvanerty's Assignment***

365.    Even after this delayed approval, Chair Ursin did not provide Plaintiff Mulvanerty with a full remote-compliant teaching assignment.  On September 3, 2024, Plaintiff had to follow

up and advise that she was still waiting to hear back regarding her assignment and that she was able to teach a virtual simulation.  Chair Ursin responded that, because of her remote status for the semester, the only assignment she would be able to have was lecture, that virtual simulation was not an option, and that he had contacted Benefits to understand the impact on her full-time status.

366.    Upon information and belief, Human Resources later informed Plaintiff that Chair Ursin's representation that virtual simulation was unavailable was not true and that he was misinformed and incorrect.  Defendants nevertheless did not correct her assignment or provide a full remote-compliant load.

367.    On September 4, 2024, Plaintiff Mulvanerty again attempted to find a workable solution.  She reminded Chair Ursin that, during their August 22, 2024 conversation, she had offered to teach virtual simulation or complete a special project to make up the missing four credits, and she cited the CUNY contractual provision allowing annual undergraduate teaching contact hours to be managed over a three-year period.  She further explained that, because her reasonable accommodation had been approved for 100% remote instruction and virtual simulation was being withheld, she could make up the four credits over the next three years.  Defendants nevertheless failed to implement the accommodation in a manner that preserved Plaintiff Mulvanerty's full teaching role.

368.    Plaintiff Mulvanerty proposed multiple ways to satisfy her full workload while honoring HR's approved accommodation: (1) she could teach additional remote lecture courses; (2) she could teach or facilitate virtual simulation that she was uniquely qualified to teach; or (3) she could perform special projects, committee work, scholarship, or grant-related assignments that carried credit.

369.    Virtual simulation was not merely a speculative alternative invented after the fact. BMCC had used simulation and remote modalities before, including during the COVID period, and continued using Bellevue Hospital's simulation resources while its own simulation capacity was being developed.  BMCC had also taught simulation remotely during the COVID period. Plaintiff Mulvanerty had previously taught simulation, had substantial simulation experience, and had specialized remote-teaching and simulation training that made her particularly well qualified to teach in those modalities.

370.    Simulation was also materially lighter-duty than hospital clinical.  It involved teaching students in a single room using mannequins and adjustable equipment, rather than moving room to room and physically handling pediatric patients in a hospital setting.

371.    Remote teaching work was in fact available.  Plaintiff Mulvanerty identified specific remotely teachable or remote-capable offerings, including nurse leadership, an additional lecture course, LPN courses, med-surg, pediatrics, and fundamentals.  All lecture courses could be taught remotely, many instructors did teach remotely, and Plaintiff Mulvanerty was among the most qualified faculty in the department to teach those courses based on her education, certifications, and experience.

372.    Defendants denied these options and instead gave remote assignments to less experienced or newly hired adjuncts, even though Mulvanerty was among the most senior remaining nursing faculty, held the highest degree in the department, had the most pediatric and clinical experience, had the most certifications, and had taught the pediatrics lecture course at issue for the previous five years.

373.    The collective bargaining agreement governing Plaintiff Mulvanerty's employment explicitly provides:

> In order to avoid the loss of contact hours due to difficulties in scheduling, the annual contact hour workload shall be managed over a three-year period. The intent of this provision is to ensure that contact hours not scheduled in one year because the courses assigned to the faculty member do not permit an exact correspondence with the stated workload may be scheduled in a subsequent year within the three-year period. Calculated over the three-year period, the average annual contact hour workload of every faculty member shall equal the hours specified above.

374. Despite this explicit contractual provision, and despite Mulvanerty's seniority and qualifications, and despite human resources approval of 100% remote work, Defendants denied her a full teaching load and contractual reassigned time.

375. Plaintiff Mulvanerty specifically invoked the contract language permitting hours to be made up over a three-year period, and human resources indicated that the provision should address scheduling concerns, but department leadership still refused to assign her a complete workload.

376. Defendants' withholding of a full remote-compliant assignment, questioning of Plaintiff Mulvanerty's full-time status, criticism of her for not being in person, and reliance on those same circumstances in the evaluation and reappointment process were retaliatory and discriminatory actions taken because she requested and obtained a disability accommodation.

377. This deprivation also threatened her continued access to employer-provided health insurance, life-insurance benefits, and retirement contributions at a time when she was undergoing serious medical treatment.

### *Defendants Used the Accommodation Process and Resulting Assignment Shortfall Against Plaintiff Mulvanerty*

378. Defendants used Plaintiff Mulvanerty's need for an accommodation against her. In the subsequent annual evaluation, Chair Ursin criticized Plaintiff Mulvanerty for not being

"present, in-person" even though Defendants had approved her 100% remote accommodation for fall 2024, falsely characterized her request to perform virtual simulation and work on projects as an initial request "secondary to personal matters," and stated that "[t]he request was denied."

379. The evaluation was marked "unsatisfactory," and upon information and belief, the Department Personnel and Budget Committee did not support her reappointment as a result of this rating that was in turn based, or partially based on her use of and need for a reasonable accommodation of remote work to avoid in-person teaching.

380. On November 5, 2024, Defendants sent Plaintiff Mulvanerty a "time-sensitive" email requiring her to complete an annual evaluation form for the period August 2023 through May 2024 by the very next day, November 6, 2024, for purposes of reappointment for the 2025-2026 academic year.

381. This accelerated timeline and pressure demonstrated Defendants' intent to rush through a negative evaluation to support a predetermined decision to deny Plaintiff Mulvanerty's sixth reappointment.

382. On November 18, 2024, Defendants issued an annual performance evaluation rating Plaintiff Mulvanerty's performance as unsatisfactory -- the first unsatisfactory evaluation of her entire BMCC career -- and just a few months after she first requested and used a disability-based remote work accommodation for the first time in her career.

383. The evaluation was demonstrably unfair, inaccurate, and pretextual. It was issued by Chair Ursin -- the person doggedly retaliating against her because of her accommodation request -- even though he had not meaningfully supervised her during most of the review period, had previously been only an adjunct, and had met with her only once for roughly an hour before issuing the unsatisfactory rating.

384. Plaintiff Mulvanerty was not made aware of any alleged performance concerns during the observation period or during the entire semester until a November 15, 2024 meeting in which Chair Ursin and other faculty members -- including Monique Cayo, Melissa Butler, Marcell Edinbiro, and Charity Bynoe -- pressed her to promise that she would perform hospital clinical work in person notwithstanding her medical condition and HR-approved remote accommodation.

385. The core criticism was not deficient teaching but her refusal to guarantee in-person hospital clinical work despite disability-related limitations.

386. The negative evaluation ignored Plaintiff Mulvanerty's substantial accomplishments and also rested on a false premise of a requirement of in-person teaching generally, let alone a requirement for those approved for disability accommodation-based remote work to do so in contravention of that very protected accommodation.

387. Indeed, upon information and belief, there was no written policy in the faculty handbook, student handbook, or department procedures requiring her to teach hospital clinical in person.

388. Simulation and other non-hospital modalities were accepted alternatives to hospital clinical. BMCC had used simulation and remote modalities before, and other faculty received non-clinical or remote assignments. Defendants nevertheless treated Plaintiff's disability-driven inability to promise in-person hospital clinical as a disqualifying defect.

389. On December 2, 2024, Plaintiff Mulvanerty submitted a detailed rebuttal to the unsatisfactory evaluation, addressing the evaluation's inaccuracies and omissions regarding her teaching, peer observations, service contributions, scholarly work, and fulfillment of professional responsibilities.

390.    The rebuttal documented the massive turnover in the department, with up to 10 vacancies since Plaintiff Mulvanerty's arrival in 2019.  Plaintiff Mulvanerty explained that there was now an expanded program requiring qualified faculty who could teach all subjects -- qualifications that Plaintiff Mulvanerty possessed and that made her a valuable asset to the department.

391.    Defendants' portrayal of Plaintiff as underperforming also ignored her continuing scholarship and service.  During 2024, Plaintiff worked on grant and simulation-related projects, engaged in advisory or committee work, and continued publication or publication-related efforts, even while managing serious medical conditions.

### Spring 2025 FMLA Leave, Continued Staffing Retaliation, and Reappointment Appeal

392.    The retaliatory course of conduct continued into the spring 2025 leave and reappointment cycle, where Defendants delayed leave processing, continued to question Plaintiff Mulvanerty's workload and full-time status, and refused to restore her to her position notwithstanding the appeal record.

393.    Defendants first informed Plaintiff Mulvanerty in November 2024 that they were moving to deny her sixth reappointment for the 2025-2026 academic year. On November 17, 2024, Greer McPhaden, Director of Faculty Appointments, sent Plaintiff Mulvanerty a letter stating that the Nursing Department Personnel and Budget Committee ("Department P&B") had voted not to recommend her sixth reappointment as Assistant Professor.

394.    Plaintiff Mulvanerty timely pursued the internal appeal process. By letter dated December 2, 2024, she appealed the Department P&B's negative reappointment decision to the College-Wide Personnel and Budget Committee ("College-Wide P&B"). By letter dated December 5, 2024, Defendants notified Plaintiff Mulvanerty that the College-Wide P&B also

74

voted not to recommend her sixth reappointment as Assistant Professor for the 2025-2026 academic year.

395.    Upon information and belief, the negative reappointment votes were rendered on an incomplete record because neither the Department P&B nor the College-Wide P&B had Plaintiff Mulvanerty's full personnel file. When Plaintiff later obtained access to that file, she discovered that key materials documenting her certifications, scholarship, grants, teaching observation, and other accomplishments were missing. Once the omission was corrected and the complete file was provided to the Personnel Review Committee, that committee determined that her appeal had validity.

396.    President Munroe nevertheless refused to reverse the non-reappointment decision.

397.    Specifically, by letter dated December 20, 2024, she requested review by the Personnel Review Committee ("PRC"). On February 21, 2025, Plaintiff Mulvanerty was advised that the PRC had voted that her appeal "has validity," thereby confirming through Defendants' own internal review process that the denial of reappointment was sufficiently flawed to warrant relief.

398.    The timing and sequence of these events further support an inference of retaliation and disability discrimination.

399.    When Defendants informed Plaintiff Mulvanerty that the Department P&B and then the College-Wide P&B would not recommend her sixth reappointment, she had at that point requested and obtained a 100% remote accommodation, had objected to Defendants' refusal to implement that accommodation in her actual assignment, and had challenged the resulting adverse evaluation.

400.    Rather than correct those earlier wrongs of relying, at least in part, on her disability accommodation, ongoing disability accommodation need, and/or disability regarding the decision not to reappoint her, Defendants carried the same tainted process forward into the 2025-2026 reappointment cycle.

401.    This pattern of retaliation for requesting a remote work accommodation continued into the spring 2025 staffing process.  In December 2024, after her doctors recommended complete medical leave, Plaintiff Mulvanerty applied for FMLA and related leave protections.

402.    On December 20, 2024, Plaintiff Mulvanerty submitted a request for FMLA leave for Spring 2025 to HR.  On January 3, 2025, Plaintiff Mulvanerty submitted the required medical documentation supporting her FMLA leave request.  On January 17, 2025, Plaintiff Mulvanerty submitted additional FMLA documentation to ensure her request was complete and properly supported by medical certifications.

403.    On January 22, 2025, CUNY human resources confirmed receipt of Plaintiff Mulvanerty's FMLA documents and stated that a Designation Notice showing approved leave dates and anticipated return-to-work date would be sent by the end of the week.

404.    The same day Plaintiff Mulvanerty followed up with human resources regarding the status of her FMLA request, noting that she had applied on December 20, 2024 and detailing the additional supporting information she had submitted, but had still not received a response.  She also pointed out that under the FMLA, she should have received a response within five business days.

405.    Defendants' delay was caused in part by Chair Ronnie Ursin's failure to timely submit the timesheets HR needed to calculate her leave.

406.    CUNY human resources did not promptly process the request because, upon information and belief, Chair Ursin intentionally failed to provide the timesheets needed for human resources to calculate her leave, even though she had not previously taken time off and was entitled to preserve paid leave and benefits.

407.    On January 24, 2025, CUNY human resources sent Plaintiff Mulvanerty a Designation Notice confirming her approved FMLA leave dates, her anticipated return-to-work date, and requirement that she submit a Fitness for Duty Form upon her return to employment.

408.    Plaintiff Mulvanerty's FMLA leave ran from January 25, 2025 through April 2025.

409.    Plaintiff Mulvanerty's healthcare providers documented that she would be incapacitated for this continuous period due to her medical conditions, including time for treatment and recovery.

410.    After the initial twelve-week period, her doctors advised that she remain out for the rest of the semester, and Defendants approved further leave.

411.    Even before her leave request was fully processed, Defendants continued demanding that Mulvanerty address in-person clinical expectations and warned that she would not be assigned a full teaching load.

412.    In January 2025, Department Chair Ursin told Plaintiff Mulvanerty that he did not have another course to give her and would not assign the full twelve credits associated with her appointment.

413.    Defendants' refusal to assign Mulvanerty a full load while she was requesting or taking leave reinforced that the earlier fall 2024 deprivation was not a scheduling accident.  It was a continuing course of conduct aimed at marginalizing her, threatening her full-time status, and

positioning her for non-reappointment because she had requested a disability accommodation of remote work and could not agree to in-person hospital clinical work due to health limitations.

414.    On February 21, 2025, the Personnel Committee met to review Plaintiff Mulvanerty's sixth reappointment appeal. The Committee voted that Mulvanerty's appeal 'has validity.' Unlike the earlier committees that reviewed her case, the Personnel Committee had her complete file, including her certifications, scholarship, committee service, advisory work, grants, and research, and recognized that she should be returned to work.

415.    The reappointment process was further tainted because the earlier committees did not have Plaintiff's complete file, including materials relating to her certifications, scholarship, committee service, advisory work, grants, research, and rebuttal to the annual evaluation. Once the fuller record was reviewed, the Personnel Committee found that her appeal had validity.

416.    On March 21, 2025, Plaintiff Mulvanerty confirmed to the administration that her appeal submission was complete and formally requested reconsideration of the non-reappointment decision.

### *Post-FMLA Leave/Accommodation Request and Defendants' Channeling of Plaintiff Mulvanerty into Non-FMLA Leave*

417.    On March 26, 2025, Plaintiff Mulvanerty signed a consent to release and discuss health information to facilitate the accommodation process.

418.    On March 27, 2025, Plaintiff Mulvanerty's healthcare provider completed and signed a Health Care Provider Accommodation Assessment Form confirming her continuing need for rest and rehabilitation, ongoing viscosupplementation (gel) injections for severe osteoarthritis, and recommending continuation of leave of absence for the remainder of the Spring 2025 semester.

419.    On April 3, 2025, Plaintiff Mulvanerty signed and submitted a Reasonable Accommodation Request Form requesting to stay home for the remainder of the semester following her FMLA leave ending April 19, 2025 as a disability accommodation of her disability.

420.    In it, Plaintiff Mulvanerty explained that she was under the care of a pain management team for flare-ups due to severe osteoarthritis, was scheduled for serial knee gel injections and spinal epidural injections for her hip that would require rest and rehabilitation for approximately three months, and that she would need to stay home for the remainder of the semester in order to heal and recover.

421.    The same day CUNY human resources representative Tammina Guillaume responded and told her she could not request a disability accommodation of leave but had to instead request leave as non-FMLA leave -- upon information and belief an unprotected discretionary form of leave instead of protected disability accommodation-based leave "Good Afternoon,  The attached forms are the wrong forms to extend your leave If you wish to request an extension of your leave, here is a link to the form your doctor needs to complete and you return to me as soon as possible: Application for non-FMLA Leave.  Or would you like to request an accommodation (per the attached forms) If you need to set up a call to discuss, I'm available to do so next week Monday."

422.    During their subsequent phone call Tammina Guillaume told Plaintiff Mulvanerty that the reasonable accommodation request form could only be used for accommodations once she had returned to work and that to request additional leave, she could not fill out the reasonable accommodation form, and instead, had to fill out the non-FMLA leave form.

423.    Unlike the "Reasonable Accommodation Request Form" the "Application for Non-FMLA Medical Leave" form made no reference to a reasonable accommodation or the possibility of a reasonable accommodation.

424.    On or about April 11, 2025, Plaintiff Mulvanerty, as she was instructed to do, submitted an Application for Non-FMLA Medical Leave, with her healthcare provider certifying her incapacity and need for continued medical leave and rest/rehabilitation.

425.    At the same time, she also re-submitted the Reasonable Accommodation Request Form in order to make clear that, despite being told she could not do so, she was still explicitly seeking additional unpaid leave as a reasonable accommodation of her disability.

426.    Plaintiff Mulvanerty's email attaching the forms stated:

Dear Tammina-

I am requesting consideration for all available potential forms of leave in addition to my request for leave as a reasonable accommodation of my medical disability under the New York City Human Rights Law, New York State Human Rights Law, and Americans with Disabilities Act.

I previously requested additional leave as a reasonable accommodation under these statutes. I have attached those forms but am also submitting the non-FMLA leave form as instructed.

Kind regards,
Noreen

427.    Supporting documents dated April 16, 2025 confirmed the medical necessity of the requested leave and accommodation.

428.    By prohibiting Plaintiff Mulvanerty, pursuant to policy, from requesting additional unpaid leave as a reasonable accommodation of her disability – as an across-the-board prohibition following the expiration of her FMLA leave, Defendants violated her right to an individualized

disability accommodation analysis and her right to a good faith cooperative dialogue regarding her requested disability accommodation as required by the NYCHRL.

429.     In her submitted forms, Plaintiff Mulvanerty's healthcare provider certified that Plaintiff Mulvanerty was experiencing ongoing pain necessitating frequent medical treatments and follow-up appointments; could not stand or walk for long periods of time; could not bend or pick up anything over 5 pounds; could not tolerate prolonged sitting or standing; and could not tolerate a long commute. Her provider further recommended that Plaintiff Mulvanerty's treatment duration be determined based on her response to ongoing pain management interventions and medical assessments, with an estimated need for approximately three months of rest and rehabilitation following the conclusion of her FMLA leave on April 19, 2025.

430.     On April 25, 2025, Defendants issued a Non-FMLA Medical Leave Designation Notice to Plaintiff Mulvanerty confirming approved sick leave from April 20, 2025 through June 4, 2025, with an anticipated return date of June 5, 2025. The notice required Plaintiff Mulvanerty to submit a Fitness for Duty Certification prior to returning to employment.

431.     As noted above, Plaintiff Mulvanerty did not voluntarily elect non-FMLA leave in lieu of an accommodation.

432.     Plaintiff had expressly requested all available leave that might apply, including leave as a reasonable accommodation.

433.     Nevertheless, Defendants channeling her into a non-FMLA process rather than considering her disability-based leave as an accommodation and upon information and belief providing her only with a general accommodation equally applicable to non-disabled employees who did not have the disability accommodation rights that Plaintiff had because of her disability.

434.     Upon information and belief, the "medical leave" she was approved for was an unprotected discretionary "general accommodation," granted (or withheld) pursuant to CUNY policy or discretion that could be revoked at any moment -- not the statutorily protected disability accommodation that she had requested.

**College President Denies Plaintiff Mulvanerty's Appeal of her Non-Reappointment in Partial Reliance on Her Disability-Based Remote Work Accommodation and Disability**

435.     Despite the Personnel Review Committee's February 21, 2025 determination that Plaintiff Mulvanerty's appeal "has validity," and despite her documented qualifications, complete file, and completion of the work necessary for tenure-track progression, President Munroe refused to reverse the non-reappointment decision and, on May 20, 2025, denied her appeal and declined to recommend her reappointment.

436.     The real reason was, at least in part, because of her disability-related inability to commit to in-person hospital clinical work, a rationale that had already surfaced during the fall 2024 evaluation and non-reappointment process when she was informed that she was not being renewed because she could not attend clinical in person.

437.     Specifically, during the fall 2024 evaluation and non-reappointment process, Plaintiff was informed that she "did not pass [her] evaluation because [she] was not able to attend clinical in person," and that "if [she] couldn't attend hospital clinical [she] would not be able to continue." The written evaluation materials likewise stated that when she was asked to commit to an on-campus, hospital-based clinical rotation for the spring term, she "could not make that commitment."

438.     Upon information and belief, as a result of the discrimination and retaliation to which she was subjected, by late 2024 and into January 2025, Plaintiff Mulvanerty developed hypertension, which first arose after she learned that Defendants had denied her reappointment by

82

having the College-Wide Personnel and Budget Committee vote not to recommend her sixth annual appointment without tenure, threatening the loss of her BMCC position effective for the 2025-2026 academic year.

439. Her healthcare providers placed her on medication to manage this additional serious medical condition. Plaintiff Mulvanerty's joint pain also increased during this period. After consulting with her pain-management team, providers advised that she needed time to heal and rest.

440. Her threatened, and then actual loss of employment repeatedly jeopardized preservation of health insurance -- the only insurance she had during these medical crises.

441. Plaintiff Mulvanerty served a notice of claim on or about August 14, 2025.

442. Plaintiff Mulvanerty filed a class EEOC charge against CUNY and the City on or about August 16, 2025.

443. Plaintiff Mulvanerty attended a 50-h deposition on December 29, 2025.

444. Plaintiff Mulvanerty made a settlement demand to CUNY on February 10, 2026.

445. CUNY has not responded to the settlement demand.

## PLAINTIFF SEASE

### *Plaintiff Sease's Role and Prior Complaints*

446. Plaintiff Sease's position as a Higher Education Assistant at KCC expressly included responsibilities relating to compliance, the handling of confidential student, staff, and faculty information, and the maintenance of confidentiality.

447. The title overview for her role states, among other things, that the role promotes policies and procedures in compliance with local, state, and federal rules and regulations and

oversees the conformity of record-release procedures, including FERPA and other laws governing the confidentiality of student records.

448.    Because Plaintiff Sease's role itself included confidentiality and student-record responsibilities, she was professionally situated to recognize and object to unlawful or improper practices involving student records, access to institutional systems, and the handling of confidential information within the Registrar's Office.

449.    Plaintiff Sease is a Black woman.  Long before the February 2026 accommodation denial, Plaintiff Sease had already complained internally about race- and gender-based mistreatment by Sandy Lujan, who later became her supervisor.

450.    Plaintiff Sease reported that, during an earlier period when she wore African attire and wrapped her hair, Sandy Lujan told her that she "looked like Aunt Jemima with my hair wrapped."  In September 2025, after Plaintiff appropriately declined student-worker assistance because of the confidential nature of her work, Sandy Lujan said in the open office that Plaintiff had a "resting bitch face."

451.    After learning in February 2024 that Sandy Lujan would supervise her, Plaintiff Sease emailed KCC Chief Diversity Officer Lisa Khandhar seeking guidance and relief.  On February 15, 2024, Lisa Khandhar responded by asking, in substance, whether Plaintiff was raising an allegation of race-based harassment and discrimination against Sandy Lujan that OEO should investigate.  Defendants were therefore on direct notice of Plaintiff Sease's protected opposition to race-based discrimination.

452.    By January and February 2024, Defendants had been expressly notified through union communications, Plaintiff Sease's reports to management, and her complaint to Chief Diversity Officer Lisa Khandhar that placing Plaintiff Sease under Sandy Lujan would recreate a

conflict-laden and medically harmful working relationship. Defendants nevertheless implemented the reporting-line change predictably resulting in increased anxiety for Plaintiff Sease.

453. The harm Defendants caused was objectively documented. After hostile workplace interactions in March and April 2024, Plaintiff Sease sought care from the campus nurse, documented elevated vital signs, photographed a pulse reading of 132 beats per minute while at work, underwent cardiology evaluation for palpitations and tachycardia, and was placed on ambulatory cardiac monitoring that recorded repeated tachycardic episodes.

*Earlier Accommodation History*

454. In January 2023, Plaintiff Sease requested that she be permitted to work remotely indefinitely unless a small permanent office was designated, and the later February 2023 provider materials likewise reflected that the need for accommodation was permanent and tied to the ongoing effects of the open-office environment.

455. At the recommendation of her therapist and medical team, who recognized that the A101 office environment triggered dangerous medical symptoms, Plaintiff Sease sought a reasonable accommodation that would allow her to continue working productively while protecting her health.

456. On February 6, 2023, Plaintiff Sease submitted a formal Reasonable Accommodation Request Form requesting work from home and, in the alternative, an enclosed smaller controlled office away from the large open A101 environment. She explained that repeated office moves had culminated in placement in A101 and that the large open environment triggered disabling symptoms.

457.    In that request, Plaintiff Sease explained that the A101 office environment was not conducive to her mental or physical health; that the relocation and office conditions triggered anxiety, dangerously elevated blood pressure, headaches, panic attacks, and asthma aggravation; and that she was seeking remote work not to avoid work or reduce responsibilities, but to permit her to continue performing her duties efficiently and effectively without triggering serious medical symptoms.

458.    Plaintiff Sease further explained that she was fully capable of performing her job duties remotely because her work involved computer-based scheduling systems, email communications, phone consultations, and other functions that could be performed from any location with internet access.

459.    In her February 6, 2023 reasonable-accommodation submission, Plaintiff Sease expressly stated that her condition was "Permanent" when asked whether the condition was permanent or temporary and how long she anticipated needing an accommodation.

460.    On February 6, 2023, Plaintiff Sease's healthcare provider, DNP Luva Reeves, completed a Health Care Provider Accommodation Assessment Form supporting remote work from February 6, 2023 through May 7, 2023 to stabilize Plaintiff Sease's blood pressure, improve breathing and asthma control, and reduce exposure to stress triggers causing dangerous physiological responses.

461.    Despite this detailed medical documentation, Defendants denied Plaintiff Sease's remote-work accommodation request on February 8, 2023, just two business days after submission.

462.    Within days of Plaintiff Sease's February 6, 2023 submission, Defendants denied her request without conducting a good-faith evaluation of the accommodation she actually

sought.  When Human Resources later explained the denial, Defendants framed the provider materials as if they concerned temporary air-quality or chemical issues associated with painting, rather than the actual trigger Plaintiff Sease identified: the large, open, overstimulating A101 environment and the anxiety, blood-pressure elevation, headaches, panic attacks, and asthma aggravation it caused.

463.    On or about March 16, 2023, while Plaintiff Sease's accommodation issues remained active, Avery Mullen met privately with her regarding attendance, stated that he noticed a pattern, emphasized that the optics of her absences looked bad, and warned that if the situation continued she would have to answer to Sandy Lujan.  Plaintiff Sease contemporaneously documented that management was linking attendance pressure to her accommodation-related absences.

**Plaintiff Sease's Requests to Work Remotely Were Reframed as Attendance and Leave Issues**

464.    On or about January 18, 2024, Kingsborough human resources advised Plaintiff Sease that if she needed time off because of a recurring medical condition, a pattern of absences could lead to requests for doctor's notes, suggestions that she apply for intermittent FMLA, and possible discipline if she lacked FMLA protection. Human resources further advised that employees could not simply say they were "working remote today," and that remote work was limited to one designated day per week. Thus, rather than treating Plaintiff Sease's disability-related need to avoid in-person work as a request for reasonable accommodation, Defendants framed the issue as one of attendance control, leave use, and discipline.

465.    After Defendants denied Plaintiff Sease's November 15, 2023 request for fully remote work, human resources took the position that she could not both use annual or sick leave

87

and work remotely on Fridays. Plaintiff Sease then had to use sick leave while her appeal remained pending until the accommodation was approved on December 21, 2023.

466. Defendants repeated the same pattern after Plaintiff Sease submitted an updated request for accommodation on February 14, 2024 based on continued pain, ineffective treatment, and the need for home-based care. On February 22, 2024, human resources denied the request, again refused the fully remote accommodation supported by her medical documentation, and instead offered breaks, FMLA, and a partial arrangement requiring two days in person and three days remote, while reiterating that Kingsborough was "not an online college." Plaintiff Sease again had to use sick leave while her appeal was pending until April 5, 2024.

467. Defendants continued the same course in 2024. After Plaintiff Sease renewed her request for remote work because of severe pain, dizziness, imbalance, commuting danger, and the need for home-based treatment, human resources denied the request on June 24, 2024, insisted that in-person attendance was essential, and directed her to use intermittent FMLA for treatment. Then, in August 2024, even though Plaintiff Sease's doctor continued to support a fully remote accommodation, human resources again steered her toward FMLA paperwork.

468. By September 9, 2024, Defendants were requiring Plaintiff Sease to use two days of sick or annual leave each week in order to work remotely pending reevaluation in December, thereby forcing her to deplete accrued leave as the price of avoiding medically unsafe in-person work.

469. On August 28, 2024, Plaintiff Sease submitted a separate reasonable-accommodation request for a 7:00 a.m. to 3:00 p.m. schedule because visual and light-sensitivity conditions made commuting safely after dusk difficult. In that request, she expressly asked that the details remain confidential and not be shared with her direct supervisor.

470.    On December 12, 2024, HR denied the 7:00 a.m. to 3:00 p.m. schedule accommodation and substituted intermittent FMLA from 3:00 p.m. to 5:00 p.m.  Avery Mullen later instructed Plaintiff Sease to continue working 9:00 a.m. to 3:00 p.m. with leave through March 9, 2025, but without formal written HR confirmation.

471.    In April 2025, after communicating directly with Plaintiff's provider, Gila Rohr, Executive Director of Human Resources, ended or altered the prior arrangement and directed a return to a full 9:00 a.m. to 5:00 p.m. schedule. Plaintiff Sease later had to continue relying on intermittent FMLA, and by January 2026 Defendants had still not provided a timely formal written determination on her October 23, 2025 FMLA reapplication, prolonging uncertainty for more than 100 days.

472.    Plaintiff Sease therefore entered the February 2026 accommodation process against the backdrop of her prior race and gender complaints, the history of accommodation denials, and the absence of formal written HR documentation confirming the schedule arrangement on which she had relied.

*Confidentiality Objections and Open-Office Practices in A101*

473.    Plaintiff Sease's objections to A101 were not only disability-related; they also concerned the handling of confidential student and accommodation matters in an open office with student workers present.

474.    Long before March 2026, Plaintiff Sease had already been objecting to the handling of sensitive matters in an open Registrar's Office setting with student workers present. Plaintiff Sease expressly stated that conversations involving accommodations, student matters, and other confidential issues should not occur in that environment because student workers were physically present and could know the students being discussed.

475.    These practices were known to office leadership.  In a meeting, office leadership acknowledged the ongoing shredding and scanning practices, discussed moving those activities, and referenced plans to hire additional work-study students to assist with scanning and address a backlog of folders.  Rather than correcting the challenged practice, management discussed relocating and expanding it.

476.    Defendants and/or their agents, including Avery Mullen and Sandy Lujan, were on notice that Plaintiff Sease believed office practices involving student workers, confidential records, and protected information were improper.

477.    Notwithstanding that notice, Defendants continued to downplay Plaintiff Sease's confidentiality concerns and continued operating the office in a manner that exposed protected information to open-floor discussion and student-worker presence.

478.    For example, on February 3, 2026, Avery Mullen discussed a faculty member's ADA or accommodation needs on the open office floor in an area where approximately ten staff members were present and where student workers regularly worked and could hear such discussions.

479.    Plaintiff Sease had already raised to Avery Mullen and Sandy Lujan that discussing accommodation and medical information in that open area, especially with student workers present, was inappropriate and violated confidentiality, but those concerns were dismissed.

480.    On February 3, 2026, at approximately 1:00 p.m., Plaintiff Sease's supervisor, Avery Mullen, approached her on the open office floor and began discussing a faculty member's ADA or accommodation needs in a public area where Plaintiff Sease sat with her colleagues.

481. This conversation occurred in an open workspace with approximately ten staff members present who did not handle accommodations. Student workers also regularly worked in the same open area and could hear conversations conducted there. The discussion involved confidential medical and accommodation information.

482. Plaintiff Sease had previously raised to Avery Mullen and Sandy Lujan that discussing accommodations and medical-related information in an open area, especially with student workers present, was inappropriate and violated confidentiality expectations for protected medical and ADA information.

483. This was protected opposition to a violation of the Rehabilitation Act.

484. Defendants nevertheless downplayed her concern, stating in substance that Registrar staff dealt with confidential matters as well, thereby dismissing the distinction between ordinary office business and protected medical or accommodation information.

485. In these circumstances, the February 3, 2026 disclosure reflected the same cavalier approach Defendants had taken to disability-based accommodation requests more generally, and also occurred against the backdrop of Plaintiff Sease's ongoing complaints since 2023 about being removed from a single office after being placed in the Registrar's Office, which undermined privacy and contributed to a retaliatory work environment.

486. Plaintiff Sease objected to and complained about these practices.

487. Instead of correcting them, Defendants continued the challenged conduct and continued the pattern of materially adverse treatment and retaliation already alleged herein, including hostile supervision, intensified scrutiny, and continued disregard of confidentiality concerns.

*February 2026 Renewed Remote Work Request and Supporting Medical Documentation*

488.    On February 4, 2026, Plaintiff Sease submitted a renewed Request for Reasonable Accommodation seeking full-time remote work for a temporary twelve-week period, from February 16, 2026, through May 11, 2026, so that she could continue performing her job while avoiding the A101 open-office conditions that triggered her symptoms.

489.    In that February 4, 2026 request, Plaintiff Sease explained that her migraines, bilateral astigmatism with presbyopia, and bilateral glaucoma caused severe sensory-processing sensitivity in environments with multiple simultaneous visual and auditory stimuli.

490.    She further explained that the open-office environment triggered significant anxiety that compounded those physical symptoms and severely impaired her ability to concentrate on detailed scheduling tasks, process complex information accurately, meet deadlines, handle sensitive accommodation matters confidentially, and maintain cognitive function during periods of sensory overload.

491.    Plaintiff Sease further explained that her anxiety was especially heightened when she had to process accommodation requests for staff or students in an open office where students and staff were walking through the area and could overhear sensitive discussions.

492.    She stated that working from home would allow her to control lighting and noise, prevent the anxiety-migraine cycle, conduct confidential discussions privately, and perform her essential job functions effectively without environmental barriers compromising her work quality.

493.    On February 4, 2026, Plaintiff Sease's healthcare provider, Dr. Farruque Ahmed, completed a Health Care Provider Accommodation Assessment Form confirming that Plaintiff Sease had migraines, bilateral astigmatism with presbyopia, and bilateral glaucoma.

494.    Dr. Ahmed further confirmed that her condition was permanent, that it substantially limited major life activities, and that she experienced sensory-processing sensitivity causing overload in environments with multiple simultaneous visual and auditory stimuli such that office stimulation created difficulty performing essential job functions in an office setting.

495.    Dr. Ahmed further confirmed that a job modification or other work accommodation would enable Plaintiff Sease to perform the essential functions of her position and specifically recommended that she work from home for twelve weeks effective February 16, 2026 through May 11, 2026.

496.    On February 7, 2026, while her renewed remote-work request was pending, Plaintiff Sease filed an EEOC charge alleging race, disability, and retaliation discrimination.

***Defendants Framed the Process Around In-Office Measures and Denied the Request***

497.    On February 13, 2026, Gila Rohr, Executive Director of Human Resources, acknowledged receipt of Plaintiff Sease's February 4, 2026 request and Dr. Ahmed's provider form.

498.    Rohr stated that HR understood the provider materials to say that Plaintiff Sease had difficulty performing in an office setting because environmental stimulation and sensory overload triggered migraines and anxiety that impaired her ability to concentrate on her work.

499.    In that February 13, 2026 communication, Rohr nevertheless framed the dialogue around what Defendants might do "in the office" rather than seriously evaluating the physician-supported temporary remote-work request.

500.    Rohr asked what Defendants could do in the office to enable Plaintiff Sease to perform her job and what would change after May 11, 2026, while suggesting only piecemeal

93

on-site measures such as a screen filter, dimmed lights, a different location within the same large outer office space, or a cubicle around Plaintiff Sease's existing desk.

501. These proposed in-office measures did not address the full set of limitations Plaintiff Sease and her provider had identified, including multi-factor sensory overload, peak-period noise, constant foot traffic, confidentiality concerns, and the anxiety-migraine cycle created by the A101 environment.

502. On February 19, 2026, Defendants formally denied Plaintiff Sease's request for fully remote work. In the denial letter, HR acknowledged receipt of Plaintiff Sease's February 4, 2026 request and Dr. Ahmed's provider form, but stated in substance that KCC was "not an online college," that Plaintiff Sease had not applied for a work-from-home position, and that physical presence was an essential function of her job.

503. The denial issued only twelve days after Plaintiff Sease filed her EEOC charge further supports an inference of retaliation.

504. The February 19, 2026 denial letter further asserted that Plaintiff Sease needed to walk around campus to visualize classrooms, contribute to student events in the breezeway and cove, physically support in-person students, faculty, and staff, and that fully remote employees were having a detrimental impact on office operations.

505. The letter also stated that, as a remote employee in an in-person institution, Plaintiff Sease's supervisor could not ask her to perform duties that in-person staff could be asked to perform.

506. Instead of approving the physician-supported remote-work accommodation, Defendants offered only alternative measures: a screen filter; dimmed lights; a cubicle around Plaintiff Sease's current desk; a temporary move into an office shared with a Higher Education

94

Associate through May 11, 2026; frequent breaks, including the ability to split her lunch hour into four fifteen-minute breaks and to use annual leave for additional breaks.

507.     The letter also offered FMLA or intermittent FMLA as medically needed.

508.     The same denial letter advised Plaintiff Sease of her right to appeal to the ADA Coordinator, identified as Corina Lozada Smith, and reflected that the determination would be shared with supervisory and campus-planning personnel for implementation of the proposed on-site alternatives.

509.     The categorical assertion that KCC was "not an online college" was false or, at minimum, materially misleading.  KCC publicly offered fully online programs, and board-approved CUNY materials for KCC's Health Sciences A.S. program described fully online, hybrid, and in-person delivery modalities without requiring new facilities, library resources, or faculty.

510.     In light of KCC's own online offerings, CUNY SPS's university-wide role in developing online programs and training faculty, and CUNY's continued use of remote and hybrid operations, Defendants' reliance on a blanket "not an online college" rationale supports the inference that Plaintiff Sease's request was not denied after a genuine individualized inquiry, but pursuant to a pretextual resistance to allowing disabled employees access to modalities CUNY already used for other purposes.

*Plaintiff Sease's Prompt Appeal and Objection to Inadequate Alternatives*

511.     On February 23, 2026, Plaintiff Sease signed the accommodation decision only under protest and without prejudice, expressly stating that she was signing solely to acknowledge receipt and comply with administrative requirements, that she disputed the decision, that she was

95

exercising her right to appeal, and that her signature did not constitute acceptance of the determination or waiver of any rights, remedies, or claims.

512.   Defendants also distributed or copied the denial determination and related communications to multiple management officials, including Provost Sharon Warren Cook, Asif Hussain, Avery Mullen, Cynthia Mendola, Sandy Lujan, and Illeana Viquez, thereby placing college leadership on notice of Plaintiff Sease's request, the denial, and her objection to the proposed alternatives.

513.   On February 25, 2026, before Defendants fully explained what "Option 3" actually meant, Plaintiff Sease initially responded that she would accept "Option 3 (relocation from A101)" and stated that she was ready to proceed with the move.  She further stated that she was working remotely for the remainder of that week and asked Defendants to advise if the move would not occur during that same week.

514.   Later that day, Rohr clarified that "Option 3" did not mean relocation outside the triggering environment.  Rather, Rohr explained that the proposed move was still within A101, that Plaintiff Sease would share office space with Elba Grau through May 11, 2026, that Defendants would move the current staff member in that office to Plaintiff Sease's desk, and that HR would also begin planning a cubicle around Plaintiff Sease's permanent desk in the outer area.

515.   On February 27, 2026, after receiving that clarification, Plaintiff Sease formally objected to and declined Option 3.

516.   She explained that the proposal was a half-desk within a shared office in Room A101, that the desk was currently assigned to the College Assistant supporting Elba Grau, that requiring two full-time HEO-titled employees to share a reduced and undersized workspace was

96

not an effective accommodation, and that relocating her to a shared half-desk in the same office and environment that triggered her symptoms was not a meaningful change in working conditions.

517.    Plaintiff Sease expressly stated that her decision to decline Option 3 was specific to that proposal and was not a withdrawal of her accommodation request.  This written objection confirms that Plaintiff Sease did not refuse reasonable accommodation in general; rather, she rejected a materially inadequate and functionally diminished proposal within the same triggering environment.

518.    In her appeal submission to OEO, addressed to Chief Diversity Officer Corina M. Lozada Smith and Diversity Program Manager and Deputy Title IX/ADA Coordinator Shaune Wallace-Bostic, Plaintiff Sease explained that her position was primarily systems-based and coordination-based, including schedule-of-classes and rooming work, data entry and quality assurance in CUNYfirst and CourseDog, reports, policy and process work, and cross-department coordination.

519.    She further explained that these duties could be performed remotely during the temporary medical period through secure systems access, email, phone, Zoom or Teams, shared drives, and remote coordination with departments and with Campus Planning, Instructional Computing, Facilities, and other units.

520.    Plaintiff Sease's appeal materials further explained that when room familiarity or verification was needed, it could be satisfied through existing room inventory data, floor plans, photographs, and confirmations from Campus Planning, Facilities, or Instructional Computing rather than physical walkthroughs during the temporary period

97

521.     She also proposed concrete accountability measures, including standard business-hour availability, same-day response to urgent rooming or scheduling issues, weekly status updates, a dated work log or tracker, secure remote access, and continued compliance with confidentiality requirements.

522.     Plaintiff Sease further stated in her appeal that she remained willing to participate in the interactive process and to comply with reasonable accountability measures during the requested twelve-week period.  She asked that, if Defendants' delay prevented approval effective February 16, 2026, because the original provider-supported start date had passed, Defendants approve the equivalent twelve-week period consistent with the medical documentation.

523.     Plaintiff Sease further explained that any occasional non-essential on-site activity during the temporary medical period could be deferred, reassigned, or handled through remote coordination without impairing college operations, and that the most time-sensitive rooming and scheduling work was best supported by uninterrupted focus time and stable systems access.

524.     In that same appeal, Plaintiff Sease further explained that the screen filter had already been purchased and the lights above her desk had already been dimmed, yet those measures remained insufficient.

525.     She further explained that cubicle partitions and shared or undersized workstations in A101 did not remove the core environmental trigger and did not provide an equivalent setting for sustained concentration and confidential communications, such that full remote work remained the effective temporary accommodation.

526.     Plaintiff Sease further stated in her appeal submission that, during the week of February 24, 2026, Avery Mullen directed the entire office to work remotely for the remainder of the week, with Provost approval, even though the campus remained open and fully operational.

527. That sequence further underscored that Defendants had the infrastructure and managerial discretion to authorize remote work when they chose to do so, while refusing to extend that same flexibility to Plaintiff Sease notwithstanding her physician-documented medical need and active accommodation request.

528. Plaintiff Sease's complaints and appeal submissions to OEO thereby placed the institution on notice of Plaintiff Sease's protected complaints and workplace concerns.

***Defendants' March 2026 On-Site Proposal Was Functionally Inadequate and Pretextual***

529. On March 4, 2026, as part of her OEO accommodation appeal, Plaintiff Sease submitted a Supplemental Visual Evidence Memorandum documenting the on-site workspace Defendants had proposed instead of the remote-work accommodation her physician had identified as medically necessary.

530. The photographic evidence showed that Defendants proposed to place Plaintiff Sease at a rolling-cart workstation in a shared office, positioned behind a structural column.

531. The proposed workstation was not a professional desk. It was a mobile cart on wheels with a pull-out keyboard tray, minimal fixed surface area, and a single small monitor mounted on an arm. It resembled a student-worker or auxiliary-equipment cart, not a fixed workstation appropriate for a full-time Higher Education Assistant performing college-wide scheduling work.

532. The cart was not functionally equivalent to the professional workstation from which Plaintiff Sease performed her job.

533. Her ordinary work requires sufficient desk space for active files and materials, dual-monitor functionality, and the ability to review electronic and paper materials at the same time while communicating with departments and addressing scheduling issues.

534.    The proposed cart could not reasonably accommodate the equipment and materials Plaintiff Sease used to perform her work, including dual-monitor navigation, keyboard and mouse use, phone work, document trays, binders, and ongoing paper and electronic scheduling materials.

535.    The proposed setup also lacked privacy screens, locking drawers, document storage, or any other meaningful confidentiality safeguards, even though Plaintiff Sease's job involves handling confidential accommodation information, student scheduling information, medical documentation related to student disabilities, and other sensitive records.

536.    The shared room into which Defendants sought to place Plaintiff Sease was already configured for two existing occupants, including Elba Grau and her part-time College Assistant, John.  Plaintiff Sease's proposed location was the least functional position in the room, tucked behind the structural column, which further reduced visibility, functionality, and usable space.

537.    The lighting and visual conditions of the proposed space were likewise inappropriate for Plaintiff Sease's documented disabilities.

538.    The room had no dimming capacity and no individual lighting control.

539.    That lighting was worse than Plaintiff Sease's existing workspace, where the lights had already been dimmed as a prior adjustment, even though her documented conditions include migraine light sensitivity, glaucoma, and astigmatism.

540.    In these circumstances, the offered on-site arrangement was not a reasonable accommodation.  It was materially inferior to Plaintiff Sease's existing workspace, professionally demeaning, and functioned as an environmental demotion that would have

impaired her ability to perform her essential job functions and exacerbated her medical conditions.

541.    Plaintiff Sease also documented a comparator outside A101.  Susan Lavin, a part-time, non-teaching adjunct with no tenure status, occupied a dedicated office suite in Room F219 with a reception area, while Plaintiff Sease, a full-time 13.3(b) Higher Education Assistant with nearly twenty-eight years of institutional service and an active ADA accommodation request, was offered a rolling cart in a shared office.

542.    Plaintiff Sease previously had a private office but was reassigned to A101.

543.    When this happened, she was told that Susan Lavin would also be relocated.  She was not.  Plaintiff Sease lost her private office while Susan Lavin retained her dedicated footprint.

544.    Plaintiff Sease further documented that Defendants had other available enclosed spaces they never meaningfully explored.  As of March 5, 2026, Room A113 contained three unoccupied desks and multiple vacant private offices near the Registrar's suite.

545.    As of March 2, 2026, Room A116 remained a private enclosed office that had been vacant since the 2022-2023 retirement of its prior occupant and was being used only as temporary file storage.

546.    Plaintiff Sease was open to moving to any viable enclosed workspace, including spaces outside A101, but Defendants did not offer those options.  Instead, they proposed a makeshift rolling cart in the same general environment that had already contributed to her disability-related problems.

547.    Defendants had feasible alternatives to forcing Plaintiff Sease to work in the large, open A101 Registrar environment that aggravated her anxiety and undermined

confidentiality.  When Plaintiff Sease spoke with HR regarding her accommodation request, she explained that she had already been moved from A113 into A101 and that what she was actually hoping for was "just a smaller space," because, with her anxiety, it was difficult to work in "such a huge office" as A101.  She further explained that Avery Mullen had originally offered her the small space where Stephan worked and that she knew there were other offices on campus that were "just like a two people office or a three person office or something with not as many people."

548.    Plaintiff Sease also identified specific alternative locations where she could have been placed.  On January 29, 2026, she told Avery Mullen that Vice President Rios had told her, "I have something for you," in the T2 building.  Plaintiff Sease further stated that she was willing to be placed in a pool space, in T8, or elsewhere, because she "just want[ed] to work."  This communication shows that Plaintiff Sease was not insisting on any one particular office; rather, she was willing to work from other available campus spaces so long as Defendants provided a workable environment.

549.    Indeed, when Plaintiff Sease raised the possibility of remaining in or using other space, Defendants did not say that no such space existed.  Instead, Avery Mullen responded in substance that "everybody needs to be working in the same office" and rejected the idea that Plaintiff Sease could work in a separate, quieter location, even after acknowledging that she wanted a quiet corner and a different physical setup.

550.    Defendants' refusal was driven not by impossibility or lack of available space, but by managerial preference and an insistence on uniform placement in the Registrar's office.

551.   These March 2026 facts further show that Defendants did not engage in a good-faith effort to identify a workable on-site accommodation and that their undue-hardship justification was false, pretextual, or both.

***Defendants Escalated While the Appeal Remained Pending***

552.   On March 9, 2026, while Plaintiff Sease's OEO appeal remained pending, she objected in writing to Defendants' plan to build a cubicle around her workstation and stated that any logistical cooperation would not withdraw her appeal.  Rohr responded that same day, expressly acknowledging that the appeal was pending but confirming that construction would proceed regardless and would remain in place even if the appeal were granted.

553.   On March 13 through March 16, 2026, Defendants constructed the cubicle around Plaintiff Sease's workstation despite her pending appeal and written objection.

554.   Plaintiff began experiencing migraines and renewed environmental stress as soon as she was required to sit in the cubicle.

555.   On March 17, 2026, Avery Mullen -- not HR -- sent Plaintiff Sease the first notification that her prior intermittent FMLA arrangement had expired on March 9 and directed her to resume a 9:00 a.m. to 5:00 p.m. schedule.  No formal HR documentation accompanied this direction.

556.   On March 18, 2026, Plaintiff Sease responded in writing that she had never received formal written HR documentation for the 2025-2026 arrangement or its end date, had not received notice that fitness-for-duty instructions or clearance had developed migraines after the cubicle installation, and had not been medically cleared for a return to a full schedule change while her appeal remained pending.

557.    Later that same day, Rohr replied that the cubicle was the College's "reasonable alternate accommodation," stated that no fitness-for-duty form was required, and advised that Plaintiff Sease no longer had active intermittent FMLA for a 3:00 p.m. departure unless a new request was submitted.  Rohr's email quoted physician-note language in an email copied to Avery Mullen, further supporting Plaintiff Sease's claims of retaliation and a bad-faith interactive process.

558.    Plaintiff Sease objected to and complained about these practices.  Instead of correcting them, Defendants continued the challenged conduct and continued the pattern of materially adverse treatment and retaliation already alleged herein, including hostile supervision, intensified scrutiny, and continued disregard of confidentiality concerns.

## PLAINTIFF SULLIVAN

### *Plaintiff Sullivan's Disability and Initial Accommodation Requests*

559.    In early May 2022, Plaintiff Sullivan began formal treatment for an ongoing, documented mental health condition that constitutes a qualifying disability.

560.    On May 1, 2022, Plaintiff Sullivan submitted a Reasonable Accommodation Request Form to Defendants requesting permission to work remotely for a brief period due to mental health challenges that impeded his ability to visit the office.

561.    Plaintiff Sullivan explained that working remotely temporarily would allow him to continue completing his responsibilities both timely and accurately while continuing to assess, process, and address issues with his mental healthcare provider.  Plaintiff Sullivan's condition at that time made it difficult for him to travel to his place of work resulting in tardiness.

562.    Plaintiff Sullivan's mental healthcare providers completed documentation detailing, confirming, and supporting his request for remote work accommodation.

563.     Specifically, Plaintiff Sullivan's diagnosed disability was PTSD.

564.     A Health Care Provider Accommodation Assessment Form dated July 25, 2022, administered on July 20, 2022, documented that Plaintiff Sullivan suffered from "Borderline clinical depression" and that "due to impaired sleep and low morale, he struggles to arrive at work in a timely manner," though "the quality of his work is not impaired."

565.     A provider assessment thus documented that, although Plaintiff Sullivan's depression, impaired sleep, anxiety at the worksite, and anxiety while traveling to the worksite interfered with timely arrival, the quality of his work was not impaired, confirming that the real issue was the worksite trigger and commute, not Plaintiff Sullivan's ability to perform his job.

566.     The assessment further documented that Plaintiff Sullivan "complains of feelings of anxiety at the worksite and when traveling to worksite" and "suffers from crying spells, causing embarrassment and retreat to restrooms."

*Defendants' Inadequate Initial Accommodation Response*

567.     On May 6, 2022, rather than granting the requested remote work accommodation supported by medical documentation, Defendants offered only a grossly inadequate 30-day schedule modification.

568.     Instead of Plaintiff Sullivan's regular schedule of Tuesdays and Thursdays 9:00am-5:00pm and Wednesdays 11:00am-7:00pm, Defendants modified his schedule to Tuesdays and Thursdays 9:30am-5:30pm with Wednesdays remaining unchanged, for a period of just 30 days running from May 5, 2022, to June 5, 2022.

569.     This accommodation of a mere 30-minute later start time two days per week for one month did not address Plaintiff Sullivan's documented disability, did not implement the medical provider's recommendation for remote work, and did not help alleviate his symptoms of

anxiety, depression, and work-related stress, though he did make some improvements with regard to time and attendance.

570.    Plaintiff Sullivan's experience exemplified Defendants' standard operating procedure of responding to disability-based remote-work requests not with a good-faith individualized evaluation, but with lesser substitute measures that failed to remove the disability-related trigger itself.  After Plaintiff Sullivan explained that the office environment and travel to the worksite exacerbated his mental health condition and that remote work would allow him to continue performing his duties accurately, Defendants first offered only a short start-time modification, then continued minor schedule adjustments, and later granted only a partial arrangement that still required in-person attendance for less than the medically requested duration.  The repeated use of short-duration, non-equivalent substitutes for medically supported remote work supports the inference that Defendants were not engaging in a genuine interactive process but were instead applying predetermined limits to remote accommodations.

***Plaintiff Sullivan's Performance Improvement Plan and FMLA Leave***

571.    On or about June 2, 2022, shortly after Plaintiff Sullivan's initial remote-work request, his supervisor issued a Performance Improvement Plan.

572.    This Performance Improvement Plan was issued despite the fact that Plaintiff Sullivan's performance evaluations for the previous two consecutive years (February 2020-February 2021 and March 2021-February 2022) had been rated as "surpasses expectations," and despite his seven years of satisfactory to exemplary performance from 2015 through March 2022.

573.    The Plan marked the beginning of the retaliatory escalation that followed Plaintiff Sullivan's requests for remote accommodation.  It supports the inference that Defendants

subjected Plaintiff Sullivan to heightened scrutiny, adverse treatment, and retaliatory discipline because he requested reasonable accommodations for his disability.

***Plaintiff Sullivan's July 2022 Accommodation Request and Defendants' Continued Inadequate Response***

574. On June 21, 2022, Plaintiff Sullivan began approved leave under the FMLA for medical surgery performed by a physician, with a medical certification indicating an estimated period of incapacity from June 20, 2022, to July 11, 2022.

575. In July 26, 2022, upon returning to work from FMLA leave taken for medical surgery, Plaintiff Sullivan submitted a new request for reasonable accommodation, framed as an appeal of the previous inadequate accommodation.

576. Although Plaintiff Sullivan requested remote work as his primary accommodation, his medical professional's recommendation had provided two alternative accommodations: (a) work remotely from home, or (b) be given a flexible starting time, for a period of three months with review after that time period.

577. On August 1, 2022, Defendants again provided only a minimal modification to Plaintiff Sullivan's work schedule. Defendants notified him that although his start time on Tuesdays and Thursdays would remain at the previously modified time of 9:30am (rather than the original 9:00am), he could contact his supervisor if he required an additional thirty minutes.

578. Defendants approved this accommodation for a period of three months, from August 1, 2022, through October 31, 2022.  Once again, this accommodation failed to address Plaintiff Sullivan's actual medical needs.

*Plaintiff Sullivan's October 2022 Accommodation Request and Discriminatory Mid-Year Evaluation*

579.    On October 6, 2022, Plaintiff Sullivan submitted another Reasonable Accommodation Request to the Office of Compliance and Diversity, requesting permission to work remotely for six months due to his ongoing mental health condition.

580.    In this comprehensive request, Plaintiff Sullivan explained in detail:

a)  In May of 2022 I began treatment for an ongoing documented mental health condition, considered a disability by both Hostos Community College as well as the State of New York.

b)  This condition has impeded my ability to go to the office. At the time I initially requested a month of remote work in a preventative and restorative attempt to ensure that the condition did not become worse.

c)  This was not granted and, as anticipated, in the ensuing months my condition has been significantly exacerbated, leaving the workplace challenges unaddressed.

d)  This has resulted in an increasingly anxious, stressful, and tense work environment which has, in turn, exacerbated my condition. Despite my best efforts I continue to struggle; as a result I find myself in greater need of assistance and accommodation.

e)  I am requesting to work remotely for a period of six months, at which time I would ask that my mental health care providers be allowed to reevaluate/assess my progress and gauge whether or not I am able to return to in-person work.

581.    This October 6, 2022, request was supported by updated medical documentation from a new psychiatric mental health nurse practitioner (PMHNP) dated October 4, 2022, as well as by the Health Care Provider Accommodation Assessment Form dated July 25, 2022, signed by a licensed clinical social worker (LCSW).

582.    Upon information and belief, while his request was pending, Plaintiff Sullivan made an internal written complaint of disability discrimination and/or failure to accommodate.

583.    Despite his provision of extensive medical support from multiple qualified mental health professionals for a six-month remote work accommodation, on November 8, 2022, Defendants granted only Plaintiff Sullivan a partial and inadequate disability accommodation.

584.    The November 8, 2022, accommodation decision allowed Plaintiff Sullivan to: work a 50% in-person schedule (five in-person days per two-week period) rather than the requested full remote schedule; utilize flexible start times; take periodic rest breaks; and maintain this reduced in-person schedule only from November 14, 2022, through January 31, 2023 -- a period of less than three months, rather than the medically-recommended six months.

585.    This accommodation, while slightly improved from prior responses, still failed to provide the full remote work arrangement that Plaintiff Sullivan's medical providers had determined was medically necessary, and it imposed an arbitrary time limitation contrary to medical recommendations.

586.    Defendants' own records further undermine any contention that remote work was infeasible for Plaintiff Sullivan's position.  During the relevant period, Plaintiff Sullivan was subject to a Remote Work Agreement through the end of 2022 and later received an accommodation permitting a 50% remote schedule.  These admissions show that Plaintiff Sullivan's Registrar duties were already being performed in hybrid and remote form and that the true dispute concerned Defendants' refusal to grant the medically supported degree and duration of remote work, not any inability to perform the essential functions remotely.

587.    Moreover, approximately a week prior, on October 31, 2022, Plaintiff Sullivan was subjected to a formal mid-year performance evaluation -- the only employee in his department or office to receive such an evaluation.

588.    This was unprecedented, as Plaintiff Sullivan had never received a mid-year evaluation during his entire tenure with Defendants from 2015 through 2022.  The mid-year evaluation was conducted virtually, Plaintiff Sullivan's current supervisor was not present at the evaluation meeting, and the formal evaluation document incorrectly listed his former supervisor rather than his current supervisor.

589.    During the mid-year evaluation meeting, Plaintiff Sullivan expressed his sense of unfair treatment and hypervigilance of his activities, noting that supervisors failed to hold other staff members to the same standards.

590.    Plaintiff Sullivan provided specific examples, including being regularly questioned about what time he began and ended his workday -- scrutiny that Defendants did not apply to other employees in the same office performing similar duties -- and being told that he was in danger of non-reappointment for failing to meet this "basic requirement."

591.    When Plaintiff Sullivan pointed out this inequitable treatment, both the Deputy Registrar and the Registrar adamantly denied any hypervigilance or unfair treatment, and the formal written evaluation stated there was no evidence of such disparate treatment.

592.    This mid-year evaluation constituted unlawful retaliation and disparate treatment based on Plaintiff Sullivan's disability and his engagement in the protected activity of requesting reasonable accommodations.

593.    The timing, selective application to only Plaintiff Sullivan while other employees were not subjected to mid-year evaluations, and pretextual justifications for the evaluation demonstrate that Defendants imposed it as retaliation for Plaintiff Sullivan's accommodation requests and as a means of building a false record to support future adverse employment actions.

*Plaintiff Sullivan's December 2022 Health Crisis and Hospitalization*

594.    On or around December 1, 2022, despite having received a partial accommodation allowing a 50% remote work schedule, Plaintiff Sullivan became seriously ill and was hospitalized.  Medical providers diagnosed Plaintiff Sullivan with a severe and potentially life-threatening bacterial infection.

595.    Plaintiff Sullivan also exhibited severe anxiety and stress directly attributable to the workplace environment, Defendants' refusal to provide adequate accommodations, the Performance Improvement Plan, the discriminatory mid-year evaluation, and the ongoing unfair treatment and workplace harassment.

596.    From December 1, 2022, through January 2, 2023, Plaintiff Sullivan was unable to report to work due to his serious medical condition.

597.    Defendants characterized Plaintiff Sullivan's absence from December 1, 2022, through January 2, 2023, as "absent without leave" (AWOL) and claimed that Plaintiff Sullivan failed to provide medical documentation justifying the absence despite multiple requests and opportunities to do so.

598.    However, Defendants' characterization ignores the fact that Plaintiff Sullivan was medically incapacitated during this period, hospitalized for a life-threatening bacterial infection, and suffering from a severe mental health crisis that made it impossible for him to timely submit documentation while in a hospital bed fighting for his health.

*Plaintiff Sullivan's EEOC Complaint, Leave Requests, and Retaliatory Termination*

599.    On or about January 6, 2023, after Defendants repeatedly denied his requests for reasonable accommodation and subjected him to a Performance Improvement Plan and discriminatory mid-year evaluation, Plaintiff Sullivan filed a charge of discrimination with the

111

Equal Employment Opportunity Commission (EEOC), alleging that Defendants discriminated against him on the basis of his disability in violation of the Americans with Disabilities Act.

600.    Plaintiff Sullivan's EEOC charge detailed the progression of his Complex PTSD, the deterioration of his depression from a severity rating of 3 out of 8 to a rating of 7 out of 8, the repeated denials of his accommodation requests despite supporting medical documentation from qualified professionals, and the unfair treatment and workplace harassment that exacerbated his mental health condition.

601.    On or about February 16, 2023, Plaintiff Sullivan was approved by Alysha Willis for a requested New York Paid Family leave to help care for a family member, with a return to work date of March 28, 2023: "This email is to confirm that you have been approved for 12 weeks of Paid Family Leave (PFL) to care for an ill family member from January  3, 2023, to March 27, 2023, at which point your leave will expire.  Your return to work date is March 28, 2023."

602.    On or about March 27, 2023, Plaintiff Sullivan submitted or confirmed a continuous FMLA request for the period March 28, 2023 through May 28, 2023.

603.    This requested was submitted on his final day of New York Paid Family Leave that had been granted through March 27, 2023.

604.    This request was also a request for a disability-based accommodation of leave.

605.    However, on March 29, 2026, just *two days* after his FMLA leave request for self-care and/or disability-based accommodation of leave, *one day* after the expiration of his New York Paid Family Leave, and less than three months after his submission of an EEOC charge alleging disability discrimination submitted to the EEOC (and even less time between his

112

termination and Defendants' actual receipt of that charge), Defendants terminated Plaintiff Sullivan by way of non-reappointment, with a last day of June 30, 2023.

606. The non-reappointment letter was emailed to and received by Plaintiff on March 29, 2023.

607. In a subsequent April 20, 2023 letter purportedly explaining the non-reappointment decision, Hostos acknowledged that Plaintiff Sullivan had received ratings ranging from satisfactory to surpasses expectations for the seven years preceding March 2022, including surpasses expectations in the two evaluation periods immediately before the onset of his disability-related difficulties. The letter nevertheless asserted that the alleged deficiencies began in March 2022, the same period in which Plaintiff Sullivan's Complex PTSD manifested, his mental health deteriorated, and Defendants began denying or materially restricting his requests for remote-work accommodation.

608. Plaintiff Sullivan had also previously taken approved FMLA leave from June 21, 2022 through July 11, 2022.

609. The separation decision was communicated against the backdrop of Plaintiff Sullivan's March 27, 2023 protected FMLA leave request, and prior use of FMLA.

610. The timing of the March 2023 non-reappointment communications -- while Plaintiff Sullivan was on protected Paid Family Leave and after he had filed an EEOC charge alleging disability discrimination -- further supports a causal connection between Plaintiff Sullivan's protected activities and the adverse action.

611. Defendants' asserted reasons for separating Plaintiff Sullivan were also pretextual. In a later explanation of the non-reappointment, Hostos acknowledged that Plaintiff Sullivan had seven years of satisfactory-to-surpasses evaluations, and the claimed problems

113

arose only in the same period when the return-to-office regime intensified, and Plaintiff Sullivan's mental-health-based accommodation requests arose.

612. Defendants' asserted reasons were also contemporaneously disputed as discriminatory and pretextual.

## PLAINTIFF KWONG

### *Plaintiff Kwong's Tenure, Teaching Excellence, and Disability Accommodation*

613. As detailed above, Plaintiff Kwong is a tenured faculty member who has served City Tech with distinction for over a decade, received formal tenure on September 1, 2022, and consistently demonstrated excellence in teaching, particularly in asynchronous online modalities.

614. Plaintiff Kwong suffers from medical conditions of anxiety and ADHD that substantially limit major life activities and constitute qualifying disabilities under applicable law.

615. In April 2025, Plaintiff Kwong submitted a comprehensive request for reasonable accommodation on disability grounds, requesting permission to teach a fully remote asynchronous schedule for Fall 2025.

616. In April 2025, Plaintiff Kwong submitted a disability-accommodation request seeking exemption from in-person instruction for Fall 2025 and subsequent semesters, based on his indefinite cognitive impairment/condition.

617. Plaintiff Kwong supported this request with detailed medical documentation from qualified healthcare providers establishing their disability and the medical necessity of remote work as a reasonable accommodation.

618. The initial disability-accommodation process was itself tainted by a bad-faith interactive process. During Plaintiff Kwong's April 2025 accommodation interview, Human Resources representative Sandra Gordon addressed Plaintiff's disability-related concerns

dismissively, asked intrusive questions about Plaintiff's personal circumstances, and did not meaningfully engage with the provider-supported need for remote asynchronous teaching. She also insinuated that Plaintiff Kwong was fabricating the basis for his accommodation request.

619.    On April 14, 2025, Gordon denied Plaintiff Kwong's request to teach one hundred percent remotely on an indefinite basis, stating that the College had "allowed" Plaintiff to teach online since 2020 and that faculty would be required to teach at least one in-person class beginning in the 2025-2026 academic year.

620.    Instead of the requested accommodation, the City Tech offered only limited modifications such as special eyewear, headsets, a more soundproof classroom, and Access-A-Ride paperwork.  Those measures did not address Plaintiff's documented need to avoid the campus environment itself.

621.    The denial was not an individualized undue-hardship assessment.  It rested on a predetermined requirement that faculty teach at least one in-person class, rather than a good-faith individualized assessment of whether full remote asynchronous teaching would impose an undue hardship.

622.    Plaintiff initiated an internal appeal of the denied disability accommodation on April 23, 2025.

623.    On or about May 19, 2025, Plaintiff Kwong filed a verified administrative complaint with the New York State Division of Human Rights against CUNY and City Tech, alleging denial of a reasonable accommodation and failure to engage in a good-faith interactive process in connection with a policy requiring faculty to teach at least one in-person course.

624.    By June 5, 2025, ADA/504 Coordinator Patricia Cody was still clarifying basic procedural matters, apologizing for confusion regarding scheduling. The day before a scheduled

June 11, 2025 interview, Cody abruptly cancelled the meeting citing a dental emergency and stating that she would reschedule as soon as possible. She did not offer a new date until July 8, 2025, for a July 10, 2025 meeting.

625. Although Plaintiff was given to understand that a decision would be reached shortly after that meeting, Defendants did not grant the requested disability accommodation until August 12, 2025, only weeks before fall classes were set to begin. This months-long delay materially burdened Plaintiff's ability to prepare for the semester and further reflected Defendants' failure to provide an effective accommodation in a timely manner

626. On August 12, 2025, the Interim President issued a letter reversing the initial denial and granting the disability accommodation request.

627. The letter stated: "Based upon my review, I have determined that for the Fall 2025 semester, you will be permitted to teach a schedule of fully remote asynchronous classes, conditioned upon classes that will be assigned to you by the Chair Suzanne Miller having sufficient enrollments to support any such assignments."

628. This reversal and grant of accommodation on appeal confirmed that: (a) the initial denial by OFSR was wrong, legally unsupportable, and discriminatory; (b) remote teaching accommodation could be and was granted to Plaintiff Kwong; (c) it imposed no undue hardship on institutional operations; and (d) Plaintiff Kwong was fully qualified to perform their essential faculty functions with the accommodation of remote asynchronous teaching. The eventual grant also confirmed that the prior denial and the months-long appeal delay were unnecessary and that Defendants could have implemented an effective accommodation substantially earlier. The reversal also undermined any later assertion by Defendants that ordinary faculty responsibilities

116

associated with Plaintiff Kwong's role could only be performed through forced on-campus presence.

***Retaliation for Accommodation Requests***

629.    Following Plaintiff Kwong's accommodation requests Defendants subjected him to increased scrutiny and adverse treatment designed to punish him for asserting his rights.

630.    On September 3, 2025, an administrator sent Plaintiff Kwong an email stating: "As you know, you were given special accommodations for teaching all classes online for this semester. While the special accommodations were for your teaching duties—as your accommodations letter mentions at the end—there are other responsibilities that require an on-campus presence."

631.    The email then mandated that Plaintiff Kwong attend two English Department meetings and participate in a Department Advisory Committee (DAC) election in person and noted that the DAC was "in the process of assigning in-person classroom observations to full-time faculty."

632.    This demand for in-person attendance beyond teaching duties was not merely retaliatory.  It also reflected Defendants' refusal to implement or meaningfully evaluate Plaintiff Kwong's accommodation with respect to meetings, DAC participation, peer observations, and other service obligations, even after Defendants had recognized that Plaintiff could perform the essential functions of the teaching role remotely without undue hardship.

633.    On September 4, 2025, Plaintiff Kwong responded that he had accompanied his wife to a medical procedure scheduled for 1:30 p.m. that day and noted that he had attended virtually every department meeting during his decade at City Tech.  He made clear, however, that the medical appointment was not the only reason he did not come to campus.

117

634. In that same email, Plaintiff Kwong reiterated that for years he had raised health and safety concerns about campus conditions, as well as corroborating evidence, all of which had been ignored. He referenced his earlier presentation regarding mold, asbestos, and other hazardous chemicals and explained that the affected areas included buildings where he had been assigned offices.

635. During fall 2025, Chair Miller abruptly removed Plaintiff Kwong from his role as editor of *City Tech Writer*, the campus journal of student writing, despite the fact that he had served in that position for approximately four years to overwhelmingly positive reception. Miller transferred sole editorship to Plaintiff Kwong's co-editor, who had joined the publication only the year before. Miller justified the decision with vague assertions about "consistency," that were upon information and belief a thinly veiled reference to Plaintiff Kwong's disability-based remote work accommodation and/or his health and safety concerns.

636. Defendants continued their pattern of delay, procedural burden, and piecemeal implementation when Plaintiff Kwong sought continued accommodation and appeal-related relief for spring 2026.

637. After Plaintiff's spring 2026 schedule was circulated with two in-person sections, Plaintiff wrote on November 5, 2025 to begin the appeal process and asked that the matter receive priority in light of how few weeks remained in the semester and how long he had already waited. In the same communication, Plaintiff objected that renewed reverification of the accessibility accommodation was insulting because the President had already affirmed Plaintiff's condition in August 2025 and there was no legitimate basis to imply that the condition had disappeared within eleven weeks.

638. Defendants nonetheless continued to impose procedural burdens and delay.

639.    Cody required additional written submissions for a complete appeal record; Dean Justin Vázquez-Poritz later apologized for delay while stating that faculty were expected to reapply each semester for accommodations; and Cody then advised that her office was managing a Title IX backlog and did not have time for anything else.

640.    Plaintiff Kwong followed up again after weeks without substantive resolution.

641.    Defendants also required Plaintiff Kwong to undergo duplicative reverification of the disability accommodation notwithstanding Plaintiff's contention that the condition was ongoing and notwithstanding the College President's August 2025 recognition of the disability-based need for remote teaching.  This repeated recompilation of the same record imposed an additional burden on Plaintiff and further delayed effective implementation.

642.    Meanwhile Plaintiff Kwong continued to encounter anxiety-inducing stimuli, pertaining to campus-safety concerns. Specifically, Kwong found compelling evidence of asbestos exposure on October 29, 2025 when conducting a teaching observation (not covered by his remote requested accommodation) he saw signs that workers were conducting such abatement in the middle of the day.

643.     Plaintiff Kwong subsequently sent an email to other faculty about the matter on Nov. 6, 2025.

644.    On November 13, 2025, Pamela Brown emailed faculty downplaying Library Building asbestos-remediation safety concerns. She omitted from this email a detail divulged in a private message to Plaintiff Kwong on the same date, which indicated that the contractors had previously conducted unauthorized indoor work during school hours.

645.    On January 12, 2026, Plaintiff Kwong's undersigned counsel sent CUNY a legal preservation letter demanding the preservation of documents concerning Plaintiff Kwong's

119

claims against CUNY including his disability discrimination, failure to accommodate, and retaliation claims.

646.    Only after this correspondence, on January 15, 2026, did Victor Humphrey grant Plaintiff Kwong's request to extend the remote teaching disability accommodation into the spring 2026 semester, but initially stated that the schedule would be a mixture of remote synchronous and asynchronous classes, and again emphasized generalized expectations of in-person faculty presence.

647.    Then, on January 21, 2026, after further review by the English Department, Humphrey notified Plaintiff Kwong that the spring 2026 schedule had been modified to include all asynchronous courses, specifically two ENG 1121 sections and one ENG 2001 section.

648.    This confirmed that remote-compliant teaching assignments were in fact available and could be implemented.

649.    This chronology demonstrates that Defendants did not face any genuine operational barrier to implementing Plaintiff Kwong's accommodation.  Instead, they left Plaintiff under months of uncertainty, required repeated submissions and reverification, invoked mootness and backlog rationales, and only later corrected the schedule after prolonged delay.

650.    Indeed, like his fall 2025 accommodations, the spring 2026 accommodation was not granted until mere weeks before the start of the semester, once again burdening Plaintiff's ability to prepare for his courses.

651.    Defendants also further exacerbated Plaintiff Kwong's generalized anxiety disorder through these accommodation delays, last minute accommodation approvals, and the additional stress caused the failure to address the health and safety concerns he was raising about the campus.

652.    Defendants also cannot plausibly portray online English modalities as unavailable or aberrational.  Internal departmental materials reflected Chair Suzanne Miller's recognition, as stated in a March 1, 2024 email, online sections could appropriately serve students because of health issues and logistics, and by January 2026 Defendants in fact assigned Plaintiff an all-asynchronous Spring 2026 teaching schedule.

653.    City Tech's English Department offered remote and asynchronous sections, including asynchronous English composition sections and other online courses, and Defendants had previously activated at least one online asynchronous ENG 1121 section for Plaintiff Kwong.  Students affirmatively sought those sections because they fit work and caregiving obligations, confirming both demand and operational availability.

***Kwong's Spring 2026 Observation-Accommodation Denial***

654.    Even after Defendants modified Plaintiff Kwong's spring 2026 teaching assignment to all asynchronous courses, they continued to carve out other required faculty duties as categorically in-person.

655.    On March 13, 2026, Plaintiff Kwong submitted a renewed disability-accommodation request seeking exemption from performing spring 2026 peer observations in person.

656.    Plaintiff Kwong's renewed request stemmed from increased anxiety from the information that he discovered subsequent to the beginning of the spring 2026 semester, revealing that, in fall 2025, DASNY-contracted environmental consultants reported high concentrations of asbestos, lead paint, PCBs, and mold throughout City Tech's campus.

657.    Although Defendants ultimately granted Plaintiff Kwong a spring 2026 teaching accommodation, that later grant did not cure or moot their earlier and continuing unlawful

conduct; to the contrary, it underscored that Defendants' prior denials were not the product of any genuine, individualized undue-hardship analysis.

658.    Plaintiff had already explained to Defendants that remote teaching imposed no meaningful financial burden and therefore did not satisfy a recognized undue-hardship criterion.

659.    Nevertheless, Defendant Victor Humphrey articulated a materially different and legally deficient standard, stating that the College evaluated whether a requested accommodation would cause "undue hardship to a department," and then denying Plaintiff's request based on generalized assertions that most students were on campus and that in-person instruction was needed, rather than on any concrete showing of actual cost, operational burden, or unavailability of feasible alternatives. Defendants' later implementation of a fully remote spring 2026 teaching schedule confirmed that remote-compliant assignments were in fact available and that no genuine operational barrier existed. And when Plaintiff later sought accommodation as to Spring 2026 peer observations, Humphrey again denied relief without identifying any concrete undue hardship, instead relying on conclusory job-duty assertions and offering only materially inferior measures. Taken together, these facts support the inference that Defendants were not applying a lawful, good-faith undue-hardship analysis, but were instead relying on predetermined in-person preferences and post hoc rationales to deny or curtail accommodation.

660.    During a call during March 12-16, with Plaintiff, Victor Humphrey made clear that he had not actually identified any concrete undue hardship associated with the requested accommodation. When Plaintiff raised the question of financial burden, Humphrey responded that a financial implication "wouldn't be it." Humphrey further acknowledged that he had "not spoken with [Plaintiff's] chair about this as yet" and then offered only hypothetical examples of possible "challenge[s]" or "impediment[s]," including whether remote observation opportunities

122

had already been assigned or whether reassignment at that stage of the semester would be difficult. Humphrey thus articulated no actual, fact-based hardship and instead relied on speculation and generalized departmental inconvenience.

661.    This exchange supports the inference that Defendants were not conducting a genuine, individualized undue-hardship analysis, but were instead searching for post hoc operational rationales to deny or narrow Plaintiff's requested accommodation.

662.    On March 25, 2026, Victor Humphrey denied that request. Humphrey wrote that Plaintiff's requested accommodation to be excluded from performing in-person peer observations during the spring semester was not approved.

663.    Humphrey justified the denial not by identifying any concrete undue hardship or any individualized inability to accommodate Plaintiff's disability, but by asserting that peer observations were a basic duty of Plaintiff's title, that the two assigned faculty members taught in the same building on the same days, and that Plaintiff therefore could come to campus once to complete both observations.

664.    Rather than remove the on-campus exposure Plaintiff sought accommodation from, Humphrey offered only that air purifiers would be made available in the classrooms. That proposal did not provide an effective accommodation.

665.    Humphrey further advised Plaintiff that any appeal might already be too late given the March 31, 2026 completion deadline. By issuing the denial only days before the deadline while warning that an appeal might be untimely, Defendants rendered the appeal process effectively illusory.

666.    This March 2026 ruling was a separate and later denial of reasonable accommodation beyond Plaintiff Kwong's teaching assignment. Even after Defendants finally

123

implemented remote teaching for spring 2026, they still refused to engage in a lawful individualized dialogue regarding other required faculty responsibilities.

667.    Moreover, there were several available online course that Plaintiff could have been initially assigned to observe and/or reassigned to observe in order for him to observe fully remotely. There were eight observees teaching online sections in spring 2026, three of whom were assigned to one observer -- upon information and belief not based on a disability accommodation.

668.    Defendants should have accommodated Plaintiff Kwong by giving him prioritization for online observes over non-disabled faculty and/or over faculty who had not made a disability (or other) accommodation request.

669.    On information and belief, Defendants also failed to consider available remote alternatives.

670.    Department materials likewise recognized remote instructional practices in connection with observations, including that post-observation conferences could be conducted over Zoom or by phone.  Defendants did not meaningfully assess whether Plaintiff Kwong could satisfy any observation-related duty by observing a remote or asynchronous section, through a remote-observation method, through remote conferencing, or through some other modification that would avoid forcing him onto campus.

671.    Instead, as with Plaintiff Kwong's earlier accommodation requests, Defendants substituted a purported compromise that still required in-person attendance, treated on-campus presence as presumptively mandatory, and refused to engage in a lawful cooperative dialogue directed at an effective accommodation.

672.    On or about March 27, 2026, Plaintiff Kwong reviewed his assignments for the fall semester and he was again assigned an in-person course, despite his permanent and/or long-term disabilities requiring fully remote work accommodations.

673.    Moreover, Plaintiff Kwong had traditionally only been assigned online courses for recent fall semester class assignments.

674.    This assignment will once again require Plaintiff Kwong to re-apply for his disability-based remote work accommodation, on a semester-by-semester basis, despite his permanent and/or long-term disabilities.

675.    Plaintiff Kwong's experience is representative of the class-wide practices challenged here. Kwong, an Associate Professor of English at City Tech, is a faculty employee who, during the limitations period, requested in writing, with supporting medical documentation, a disability-based accommodation to teach fully remote asynchronous courses indefinitely. Defendants denied that request in April 2025, despite provider documentation that his condition and accommodation need were permanent and offered inadequate alternatives instead. Kwong appealed, but the process then unfolded through repeated periods of delay: (1) approximately 47 days passed from the April 23, 2025 initiation of his appeal to the scheduled June 11, 2025 interview, which was cancelled the day before; (2) 28 more days passed before a new date was offered on July 8 for a July 10 meeting. – a total of 75 days; and (3) 33 more days passed after the July 10 meeting before Plaintiff Kwong received a decision on August 12, 2025, shortly before the fall 2025 semester. Even then, Defendants granted only a conditional accommodation tied to enrollment and later required reverification despite the permanent nature of his condition.

## CLASS ACTION ALLEGATIONS

676. This action challenges Defendants' pattern, practice, custom, policy, method of administration, and standard operating procedure of denying, delaying, curtailing, and/or failing to implement disability-based remote-work accommodations; substituting materially inferior measures or leave in place of effective accommodations; treating permanent or long-term accommodation requests as categorically disfavored; and retaliating against employees who request disability accommodations, invoke FMLA or accommodation-related leave, appeal accommodation denials, or complain about disability discrimination.

677. The named Plaintiffs' experiences, across multiple CUNY campuses, are representative examples of these recurring practices.

678. The applicable limitations period for each class and subclass is March 29, 2023 until a final judgment in this matter.

679. Plaintiffs bring this class action on behalf of all non-managerial employees of CUNY, who, requested, in writing, a disability-based remote-work accommodation, whether full-time, hybrid, partial, intermittent, and submitted a medical certification form in support of such request, and whose request, at any time since March 29, 2023, was: (a) denied; (b) granted only through a temporary, partial, or non-equivalent substitute; (c) curtailed to require in-person work notwithstanding the requested accommodation; or (d) nominally approved but not actually implemented in the employee's schedule, assignment, workload, worksite, and/or workspace. (**Disability-Based Remote-Work Accommodation Class")**. Plaintiffs Robin Levine, Noreen Mulvanerty, Shavone Sease, and Lucas Kwong seek to represent this class.

680. Plaintiffs additionally bring this class action on behalf of all non-managerial employees of CUNY, who, during the applicable limitations period, requested, in writing, a

disability-based accommodation, whether full-time, hybrid, partial, intermittent, or supplemented a prior request, or appealed the denial of a prior request, at any time since March 29, 2023, and did not receive: (1) a substantive response to their request; (2) a written final determination on their request; and/or (3) an implemented accommodation within (60) days of their initial request, supplementation, and/or appeal, who submitted medical documentation in support of such request (the "**Accommodation Delay Class**"). Plaintiffs Mulvanerty and Kwong seek to represent this class.

681.  Plaintiffs additionally bring this class action on behalf of all non-managerial employees CUNY, who requested disability-accommodation-based leave as a reasonable accommodation, in writing, and were instead instructed and/or required to, at any time since March 29, 2023, apply for non-disability accommodation-based leave, submit non-FMLA medical-leave paperwork, sign non-FMLA leave documents, or denied consideration of the grant of leave as an reasonable disability accommodation for leave requested following the expiration of FMLA leave, who submitted a medical certification form in support of such request  (the "**Accommodation-Leave Diversion Class** "). Plaintiff Mulvanerty seeks to represent this class.

682.  Plaintiffs additionally bring this class action on behalf of all non-managerial employees CUNY, whether faculty or staff, who, requested, renewed, supplemented, or appealed the denial of a request for a disability-based remote-work accommodation, and were, at any time since March 29, 2023, subjected to any or all of: (1) a delayed return or forced leave despite medical clearance; (2) denial of full workload or equivalent remote assignments; (3) inferior workspace reassignment; (4) written notices deeming remote work or absence unauthorized or subject to discipline or pay loss; (5)recurring or materially burdensome in-person attendance despite approved or pending remote-work accommodations; (6) denial of full-time load or

reduced duties jeopardizing status; and/or (7) constructive discharge including forced retirement, within seventy-five days of such request, renewed request, supplemental request, appeal, or grant of an appeal (the "**Remote Accommodation Retaliation Class**"). Plaintiffs Noreen Mulvanerty, Shavone Sease, Lucas Kwong, and Robin Levine seek to represent this class.

683.    Plaintiffs additionally bring this class action on behalf of all non-managerial employees CUNY who, had twelve months of employment and 1,250 hours of service, and requested FMLA leave, used FMLA leave, and/or were approved for FMLA leave, for their own serious health condition, and were, at any time since March 29, 2023, subjected to termination, non-reappointment within seventy-five days such request, use, and/or or approval for FMLA leave (the "**FMLA Retaliation Class**"). Plaintiffs Sullivan seek to represent this class.

684.    Plaintiffs additionally bring this class action on behalf of a subclass of the Disability-Based Remote-Work Accommodation Class consisting of those members whose request or supporting medical documentation described the condition, limitation, or accommodation need as permanent, long-term, and/or chronic (the "**Permanent Disability-Based Remote-Work Accommodation Subclass**"). Plaintiffs Sease and Kwong seek to represent this subclass.

685.    Plaintiffs additionally bring his class action on behalf of a subclass of the Disability-Based Remote-Work Accommodation Class consisting of those members who were employed in faculty positions (the "**Faculty Remote-Work Accommodation Subclass")**. Plaintiffs Noreen Mulvanerty and Lucas Kwong seek to represent this subclass.

686.    Plaintiffs additionally bring this class action on behalf of a subclass of the Disability-Based Remote-Work Accommodation Class consisting of those members who were

employed in non-faculty staff positions (the "**Staff Remote-Work Accommodation Subclass"**).
Plaintiffs Robin Levine and Shavone Sease seek to represent this subclass.

687. The named Plaintiffs are members of the classes and subclasses they seek to
represent. Their claims arise from the same challenged policies, practices, customs, and methods
of administration that form the basis of the class-wide claims, and Plaintiffs reserve the right to
refine or amend the class and subclass definitions as discovery and class-certification briefing
warrant.

688. The members of the classes and subclasses identified herein are so numerous that
joinder of all members is impracticable. Even before class discovery, the Complaint identifies
multiple concrete affected employees: Professor Ramjerdi and Plaintiffs Levine, Sease,
Mulvanerty, Sullivan, and Kwong.

689. The Complaint already identifies multiple concrete affected employees before any
class discovery: Professor Ramjerdi and Plaintiffs Levine, Sease, Mulvanerty, Sullivan, and
Kwong. They worked at Queensborough, Kingsborough, BMCC, Hostos, and City Tech, in both
faculty and staff roles, and experienced repeating remote-accommodation, leave, retaliation, and
return-to-site problems under the challenged policies and practices.

690. These pleaded examples are geographically and administratively dispersed across
multiple colleges, departments, supervisors, and accommodation channels and are set out as
illustrative examples rather than an exhaustive list of all affected employees.

691. As of August 21, 2024, CUNY publicly reported approximately 39,330
employees systemwide.

692. CUNY publicly reported 880 employees with disabilities on a self-identified basis
as of that date. That figure alone places the disability-defined employee population in the

129

hundreds, before accounting for additional employees who meet statutory disability definitions but have not self-identified.

693. CUNY also publicly reported that it processed 2,563 reasonable accommodations between 2017 and 2023, with annual volumes ranging from 159 to 1,141, demonstrating that the accommodation process reached hundreds of employees in some years and far more employees over time than could practicably be joined in a single action.

694. Numerosity is further supported by the existence of a substantial comparator pool already known to Plaintiffs even before class discovery.

695. Although not every person reflected in those records is necessarily a class member under the operative class definitions, those determinations confirm that disability-based remote-work requests were numerous, recurrent, and processed through repeatable institutional mechanisms.

696. Public CUNY workforce reports further place systemwide headcount at approximately 41,951 employees across 25 campuses and the Central Office in a November 2022 snapshot and approximately 40,040 employees in Fall 2023, confirming both scale and geographic and administrative dispersion.

697. Upon information and belief, disability self-identification understates the true prevalence of disability in a workforce.

698. Using a conservative external comparator of 7.6% working-age disability prevalence in New York City applied to CUNY's 39,330 employees yields an order-of-magnitude estimate of roughly 2,990 disabled CUNY employees although Plaintiffs recognize that survey definitions and statutory disability definitions are not identical.

699.    CUNY's remote-work governance also operated through broadly applicable systemwide policies and standardized remote-work agreement frameworks, including a 70% in-person expectation beginning in or about spring 2022 and remote-work agreement processes extended through 2025 and 2026.

700.    Those common policies further support the inference that disability-based remote-work accommodation disputes, leave diversions, and retaliation issues affected numerous employees under standardized rules rather than isolated individualized circumstances.

701.    The members of the Classes and Subclasses are readily identifiable from Defendants' centralized Human Resources, accommodation, appeal, leave, payroll, scheduling, workload, course-assignment, and remote-work records.

702.    Class treatment under Fed. R. Civ. P. Rules 23(b)(2), 23(c)(4), and 23(c)(5) is a fair and efficient means of adjudicating the common questions presented here because the challenged conduct arises from recurring policies, common forms, centralized decision channels, and repeatable implementation failures.

703.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted and/or refused to act on grounds generally applicable to the Classes by maintaining and applying the challenged policies, practices and/or procedures, and/or standard operating procedures.  Declaratory and injunctive relief is therefore appropriate with respect to the Classes as a whole because a single injunction or declaration would provide relief to each class member.

704.    Plaintiffs have retained counsel competent and experienced in employment class actions. Plaintiffs' claims are typical of the claims of the classes and subclasses because they arise from the same challenged policies, practices, customs, and methods of administration and

131

because Plaintiffs seek declaratory, injunctive, and other appropriate relief stemming from the same course of conduct.

705.    Each proposed class and subclass is ascertainable because membership turns on objective criteria with definite boundaries set out in the class definitions, not subjective belief or individualized merits determinations.

706.    Class membership can be determined from Defendants' centralized and campus-level human resources, payroll, time and attendance, leave, FMLA, accommodation, appeal, interactive-process, Fitness for Duty, remote-work, discipline, performance, reappointment, non-reappointment, separation, email, and grievance records. Those records will show whether an employee was faculty, staff, or other covered personnel during the relevant period, whether and when the employee requested disability-based remote work, disability-accommodation leave, non-FMLA leave, or FMLA leave, whether the request was denied, delayed, diverted, nominally approved but not implemented, subjected to repeated recertification, or followed by discipline, separation, or other pleaded consequences, and whether the employee falls within the temporal, campus-based, or position-based limits of the relevant Class or subclass.

707.    The records already at issue in this action, including accommodation forms, FMLA forms, remote-work agreements, performance and disciplinary records, and non-reappointment and separation records, show that membership can be identified through Defendants' ordinary-course business records.

708.    Excluded from the classes and subclasses are: (1) Defendants; (2) current or former Department Chairs; (3) Defendants' legal representatives, successors, and assigns; (4) the Judge(s) to whom this case is assigned and members of their immediate families; (5) any person whose claims against these Defendants concerning the challenged practices have already been

132

finally adjudicated or fully released; (6) the direct or indirect supervisors(s) of the Plaintiffs; and (7) any current faculty of the College of Staten Island.

## Common Questions of Law and Fact

709.    Questions of law and fact common to the Classes and Subclasses include, without limitation, whether Defendants:

a.    maintained a policy, practice, custom, method of administration, or standard operating procedure of treating disability-based remote-work requests as presumptively disfavored, disallowed, or subject to heightened resistance;

b.    maintained a policy, practice, custom, method of administration, or standard operating procedure of failure to conduct a good faith individualized analysis of some or all disability-based remote work accommodations;

c.    maintained a policy, practice, custom, method of administration, or standard operating procedure of retaliation against employees who requested a disability-based remote work accommodation;

d.    maintained a policy, practice, custom, method of administration, or standard operating procedure of retaliation against employees who requested FMLA leave;

e.    maintained a policy, practice, custom, method of administration, or standard operating procedure of delayed responses to and/or consideration of disability-based remote work accommodation requests;

f.    prior COVID-related remote work requirements support the absence of an undue hardship regarding remote work accommodations, and if so to what extent, including to what extent it is relevant to the undue hardship factors of the nature and cost of the accommodation needed.

133

g.  ability to satisfy its affirmative defense of an undue hardship with respect to the factors of CUNY's: (1) overall financial resources; (2) size; (3) number of employees; and (4) effect on expenses and operations of remote work;

h.  denied or materially curtailed disability-based remote-work accommodations despite feasibility and the absence of undue hardship;

i.  prohibited consideration of disability-based accommodation leave following the expiration of FMLA leave;

j.  treated permanent, chronic, ongoing, long-term, or indefinite disabilities and/or accommodation requests as categorically or presumptively disfavored;

k.   imposed repeated recertification demands, semester-limited approvals, or renewed application burdens not justified by individualized circumstances;

710.  Certification of the Classes and Subclasses is appropriate under Fed. R. Civ. P. 23(a) because numerosity, commonality, typicality, and adequacy are satisfied.

711.  Certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the classes and subclasses, making final injunctive and declaratory relief appropriate with respect to the Classes and Subclasses as a whole.

712.  Certification also is appropriate under Fed. R. Civ. P. 23(c)(4) as to the common issues identified above and under Fed. R. Civ. P. 23(c)(5) as to the pleaded Subclasses because resolution of those issues on a class-wide basis will materially advance the litigation, narrow any remaining individualized questions, and promote judicial economy.

**CAUSES OF ACTION**

## FIRST CAUSE OF ACTION

### Rehabilitation Act – Failure to Accommodate

### (Brought on Behalf of All Plaintiffs)

### (Brought on Behalf of the Disability-Based Remote-Work Accommodation Class, Accommodation Delay Class, Accommodation-Leave Diversion Class, Permanent Disability-Based Remote-Work Accommodation Subclass, Faculty Remote-Work Accommodation Subclass, and Staff Remote-Work Accommodation Subclass)

713.    Plaintiffs repeat and reallege all preceding allegations as if fully set forth herein.

714.    CUNY and NYC are recipients of federal financial assistance within the meaning of Section 504, 29 U.S.C. § 794.

715.    Defendants are subject to the Rehabilitation Act.

716.    Plaintiffs are qualified individuals with disabilities within the meaning of Section 504.

717.    With reasonable accommodations, including fully remote or materially greater remote work where effective, prompt implementation of approved accommodations, disability-accommodation-based leave or post-FMLA leave where reasonable and necessary, temporary interim measures while requests were pending, and other functionally equivalent modifications, Plaintiffs could perform the essential functions of their positions and enjoy equal employment opportunities.

718.    Defendants had actual notice of the relevant disabilities, functional limitations, and accommodation needs through accommodation requests, appeals, accommodation request forms, medical certifications, medical provider letters, leave paperwork, meetings, grievances, and related communications.

719.    Defendants nevertheless denied, delayed, materially curtailed, semester-limited, conditionally burdened, or failed to implement effective accommodations; approved

accommodations only nominally while withholding corresponding schedule, assignment, course-load, workspace, reporting, or workload changes; and substituted materially inferior measures or leave in place of effective accommodation.

720. Defendants further failed to conduct individualized, prompt, and/or good-faith accommodation analyses.

721. Upon information and belief Defendants also treated permanent, chronic, ongoing, long-term, and indefinite disabilities and/or accommodation requests as presumptive undue hardships

722. Defendants subjected Plaintiff to repeated re-verification demands, semester-by-semester approvals, and renewed application burdens not justified by individualized circumstances.

723. Defendants subjected Plaintiff to unreasonable delays in the evaluation of disability accommodation request.

724. The remote disability accommodations requested by Plaintiffs, and upon information and belief the classes, would not have imposed an undue hardship.

725. The remote disability accommodations requested by Plaintiffs, and upon information and belief the classes, would have allowed them to fulfill the essential functions of their positions.

726. Defendants failed to engage in a good faith interactive process regarding disability-based remote work accommodations for the Plaintiffs or the classes.

727. Defendants' own remote operations, the existence of remote and asynchronous instructional modalities, and the histories of successful remote performance demonstrate

feasibility and the absence of undue hardship support the effectiveness of and the absence of an undue hardship regarding, the requested disability-based remote work accommodations.

728.    Defendants denied Plaintiffs the benefits of employment, excluded them from equal participation in employment opportunities, and otherwise discriminated against them in violation of Section 504 by denying, delaying, only partially granting, and/or attempting to avoid the implementation or approval of their requested disability-based reasonable remote work accommodations.

729.    As a direct and proximate result of Defendants' conduct, Plaintiffs, and upon information and belief the classes, suffered damages.

730.    Defendants' denial, partial denial, delay, and/or attempted avoidance of disability-based remote work accommodation was Defendants' policy, practice, and/or standard operating procedure with respect to the classes.

731.    The classes seek class-wide declaratory relief, class-wide injunctive relief attorney's fees, costs, interest, and such other relief as the Court deems just and proper.

732.    Plaintiffs seek all relief available under Section 504 and 29 U.S.C. § 794a, including individual declaratory and injunctive relief including approval of their requested disability-based accommodation and/or reinstatement, actual damages, nominal damages, back pay, front pay and/or reinstatement, attorney's fees, costs, interest, and such other relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION**

**Rehabilitation Act – Disability Discrimination**

**(Brought on Behalf of All Plaintiffs)**

733.    Plaintiffs repeat and reallege all preceding allegations as if fully set forth herein

137

734.    CUNY and NYC are recipients of federal financial assistance within the meaning of Section 504, 29 U.S.C. § 794.

735.    Plaintiffs are qualified individuals with disabilities within the meaning of Section 504.

736.    Defendants discriminated against Plaintiff because of her disabilities including but not limited to by subjecting them to inferior terms and conditions of employment as compared her non-disabled peers, refusing to approve her disability accommodation requests, utilizing her disability and/or need for disability-related accommodations as a negative factor in personnel decisions and/or as determinative of personnel decisions, terminating and/or seeking to terminate them from the CUNY workforce because of her disability.

737.    Plaintiffs' disabilities were obvious, known to, and/or disclosed to Defendants.

738.    As a direct and proximate result of Defendants' conduct, Plaintiffs, and upon information and belief the classes, suffered damages.

739.    Plaintiffs seek all relief available under Section 504 and 29 U.S.C. § 794a, including individual declaratory and injunctive relief including approval of their requested disability-based accommodation and/or reinstatement, actual damages, nominal damages, back pay, front pay and/or reinstatement, attorney's fees, costs, interest, and such other relief as the Court deems just and proper.

### THIRD CAUSE OF ACTION

**Rehabilitation Act – Retaliation**

**(Brought on Behalf of All Plaintiffs)**

**(Brought on Behalf of the Remote Accommodation Retaliation Class)**

740.    Plaintiffs repeat and reallege all preceding allegations as if fully set forth herein.

138

741.    Plaintiffs engaged in protected activity by requesting disability accommodations; appealing accommodation denials; submitting supporting medical documentation; requesting disability-accommodation-based leave where applicable; complaining about disability discrimination, accommodation denials, or accommodation-related irregularities; filing administrative charges; participating in grievance or union processes; and otherwise opposing practices forbidden by disability-discrimination law.

742.    The class engaged in protected activity.

743.    Defendants knew of that protected activity.

744.    Defendants knew of the protected activity of the class.

745.    After and because of that protected activity, Defendants subjected Plaintiffs to materially adverse actions, including but not limited to heightened scrutiny, discipline, AWOL designations or threats, forced leave usage, schedule changes, supervisory changes, reassignment, reduced or distorted workloads, denial or curtailment of teaching assignments, adverse evaluations, hostile treatment, non-reappointment, forced retirement, termination, and other actions that would dissuade a reasonable employee from engaging in protected activity

746.    The temporal proximity between protected activity and adverse action, together with the pleaded pattern of escalating mistreatment, inconsistent explanations, pretextual justifications, and recurring retaliation after accommodation requests and appeals, establishes the requisite causal connection.

747.    As a direct and proximate result of Defendants' conduct, Plaintiffs, and upon information and belief, the class, suffered damages.

748.    The class seeks class-wide declaratory relief, class-wide injunctive relief, attorney's fees, costs, interest, and such other relief as the Court deems just and proper.

749.     Plaintiffs seek all relief available under Section 504 and 29 U.S.C. § 794a, including individual declaratory and injunctive relief including approval of their requested disability-based accommodation and/or reinstatement, actual damages, nominal damages, back pay, front pay and/or reinstatement, attorney's fees, costs, interest, and such other relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION

### Rehabilitation Act – Screening

### (Brought on Behalf of All Plaintiffs)

### (Brought on Behalf of the Disability-Based Remote-Work Accommodation Class, Accommodation Delay Class, Accommodation-Leave Diversion Class, Permanent Disability-Based Remote-Work Accommodation Subclass, Faculty Remote--Work Accommodation Subclass, and Staff Remote-Work Accommodation Subclass)

750.     Plaintiffs repeat and reallege all preceding allegations as if fully set forth herein.

751.     CUNY and NYC are recipients of federal financial assistance within the meaning of Section 504, 29 U.S.C. § 794.

752.     Plaintiffs, and upon information and belief the class and subclass members, are qualified individuals with disabilities within the meaning of Section 504.

753.     Defendants maintained and enforced systemwide and recurring standards, criteria, approval structures, and methods of administration that screened out or tended to screen out qualified employees whose disabilities required remote work and/or leave disability-based accommodations.

754.     Those challenged standards, criteria, and methods also included the CUNY 70/30 policy and the CUNY one in-person class teaching requirement.

755.     Those challenged standards, criteria, and methods also otherwise included, without limitation: (a) categorical or presumptive in-person attendance expectations, including

140

faculty-side in-person teaching requirements and staff-side in-person presence requirements, applied without an individualized assessment of the employee's actual essential job functions; (b) decision rules and practices that deferred to unsupported departmental or supervisory assertions that in-person presence was required, rather than analyzing whether the employee could perform the essential functions of the position with telework or other effective accommodation; (c) approval structures and implementation practices that permitted departments, chairs, supervisors, or managers to defeat, narrow, or fail to implement accommodations even after Human Resources approved them, including by withholding corresponding  schedule, assignment, workload, worksite, reporting, or workspace changes; (d) recurring practices of treating permanent, chronic, long-term, ongoing, or indefinite disability-related accommodation needs as categorically or presumptively disfavored through semester-limited approvals, repeated recertification demands, and renewed  application burdens not justified by individualized circumstances; and (e) methods of administration that delayed or obstructed effective accommodation by requiring serial, duplicative, or shifting paperwork, shifting responsibility between Human Resources and departments, delaying appeals, failing to consider interim remote measures, or failing to timely issue and implement final determinations.

756.    As alleged above, Defendants used these standards, criteria, and methods as recurring institutional mechanisms.

757.    These standards, criteria, and methods of administration screened out or tended to screen out Plaintiffs, and class members and subclass members, from equal employment opportunities because they conditioned continued work, full workload, equivalent assignments, or continued employment status on the ability to satisfy rigid in-person expectations or to obtain

141

departmental acceptance of remote work notwithstanding disability-related need and, in some cases, notwithstanding human resources approval.

758. The challenged standards, criteria, and methods were not job-related and consistent with business necessity as applied to Plaintiffs and class members.

759. Defendants failed to conduct an individualized assessment of actual job functions and to provide reasonable accommodation where doing so would permit performance of the essential functions of the position without undue hardship.

760. Defendants failed to conduct an individualized assessment of any actual undue hardship arising from Plaintiffs and the classes requests for disability-based accommodation of remote work and/or leave.

761. In addition, as alleged above, Plaintiffs, and upon information and belief the class members, could perform the essential functions of their positions with reasonable accommodation, including fully remote work, materially greater remote work, prompt implementation of approved accommodations, temporary interim remote measures while requests were pending, and/or equivalent schedule/worksite/workspace modifications.

762. By maintaining and enforcing the foregoing standards, criteria, and methods of administration, Defendants discriminated against Plaintiffs and class members on the basis of disability in violation of Section 504, as informed by 42 U.S.C. § 12112(b)(3) and (6)

763. As a direct and proximate result of Defendants' conduct, Plaintiffs, and upon information and belief, the classes, suffered damages.

764. The classes seeks class-wide declaratory relief, class-wide injunctive relief, attorney's fees, costs, interest, and such other relief as the Court deems just and proper.

142

765.    Plaintiffs seek all relief available under Section 504 and 29 U.S.C. § 794a, including individual declaratory and injunctive relief including approval of their requested disability-based accommodation and/or reinstatement, actual damages, nominal damages, back pay, front pay and/or reinstatement, attorney's fees, costs, interest, and such other relief as the Court deems just and proper.

## FIFTH CAUSE OF ACTION

### Family and Medical Leave Act – Retaliation

### (Brought on Behalf of Plaintiffs Sullivan, Levine, Mulvanerty, and Sease)

### (Brought on Behalf of the FMLA Retaliation Class)

766.    Plaintiffs repeat and reallege all preceding allegations as if fully set forth herein.

767.    Plaintiff and the class were FMLA eligible employees.

768.    Defendants were FMLA covered employers.

769.    Defendants employed more than fifty employees within seventy-five miles of Plaintiffs' worksites.

770.    Plaintiffs and class engaged in protected activity under the FMLA by requesting and/or using, and/or utilizing FMLA leave; submitting certifications or recertifications; invoking return-to-work rights; and/or opposing practices made unlawful by the FMLA.

771.    Defendants knew of that protected activity.

772.    Defendants thereafter took materially adverse actions because of Plaintiffs' exercise of FMLA rights, including but not limited to, heightened scrutiny, discipline, negative evaluations, pressure not to use protected leave, denial of additional accommodation-based leave, denial of disability accommodation requests, denial of restoration rights, non-reappointment, termination, and other actions that penalized or deterred the exercise of FMLA rights.

143

773. Defendants' retaliatory conduct violated 29 U.S.C. § 2615(a) and/or 29 U.S.C. § 2615(b).

774. Defendants' intentional retaliatory conduct was willful.

775. Defendants' intentional retaliatory conduct was not good faith compliance with the FMLA.

776. Upon information and belief, Defendants did not believe that their intentional retaliatory conduct complied with the FMLA.

777. As a direct and proximate result of Defendants' conduct, Plaintiffs, and upon information and belief the classes, suffered damages.

778. The class seeks class-wide declaratory relief, class-wide injunctive relief, attorney's fees, costs, interest, and such other relief as the Court deems just and proper.

779. Plaintiffs seek all relief available under the FMLA including back pay, front pay, liquidated damages, individual declaratory and injunctive relief including approval of their requested disability-based accommodation and/or reinstatement, actual damages, attorney's fees, costs, interest, and such other relief as the Court deems just and proper.

## SIXTH CAUSE OF ACTION

### New York City Human Rights Law – Failure to Accommodate

### (Brought on Behalf of Plaintiff Mulvanerty)

### (Brought on Behalf of the Accommodation-Leave Diversion Class)

780. Plaintiffs repeat and reallege all preceding allegations as if fully set forth herein.

781. Plaintiff, and upon information and belief the class, had disabilities and/or impairments within the meaning of the NYCHRL.

782. Plaintiff Mulvanerty and the class were employees.

144

783. Defendants were employers within the meaning of the NYCHRL.

784. Defendants employed more than four employees at all times relevant to the complaint, including but not limited to, for the period beginning twelve months before the start of an unlawful discriminatory practice and continuing through the end of such unlawful discriminatory practice.

785. For Plaintiff Mulvanerty, and the class, Defendants failed to approve, and/or delayed the approval of, disability-based accommodations without a good faith individualized analysis, absent the existence of an undue hardship, and/or despite no impediment to the ability to carry out the essential functions of their role.

786. Defendants denied or failed to provide reasonable accommodations including but not limited to additional leave as a reasonable accommodation of their disability.

787. Defendants' disability response delays of over two months resulted in effectively denied accommodations, unreasonably denied accommodations, and/or ineffective accommodations.

788. Defendants' more than two-month delay to respond to the disability accommodation requests and related communication from Plaintiff and the class, was not a good faith cooperative dialogue process.

789. Defendants' more than two-month response time for disability accommodation requests and related communication from Plaintiff and the class resulted in the effective denials of disability accommodations requests and/or resulted in ineffective or only partially effective disability accommodations.

145

790.    Defendant failed to reasonably accommodate Plaintiff Mulvanerty by denying her non-reappointment appeal, at least in part, because of her request for, use of, and/or ongoing need for her disability accommodation of remote work.

791.    Defendant failed to reasonably accommodate Plaintiff Mulvanerty by not taking her need for an accommodation into consideration in evaluating her appeal and the prior disability accommodation-based reason that she could not commit to working in-person that was used at least as a negative factor in the non-reappointment analysis that resulted in the non-renewal of her appointment.

792.    Under the NYCHRL, Defendants bore the burden of proving undue hardship with respect to the accommodations at issue. As alleged above, the requested accommodations were reasonable and feasible and did not impose undue hardship.

793.    Defendants' conduct violated N.Y.C. Admin. Code § 8-107(15).

794.    As a direct and proximate result of Defendants' conduct, Plaintiff Mulvanerty, and upon information and belief the classes, suffered damages.

795.    The class seeks class-wide declaratory relief, class-wide injunctive relief, attorney's fees, costs, interest, and such other relief as the Court deems just and proper.

796.    Plaintiff Mulavanerty seeks all relief available under the NYCHRL including back pay, front pay and/or reinstatement, compensatory damages, individual injunctive relief, declaratory relief, attorney's fees, costs, and expert fees, and such other relief as the Court deems just and proper.

146

## SEVENTH CAUSE OF ACTION

**New York City Human Rights Law – Failure to Engage in Cooperative Dialogue**

(**Brought on Behalf of Plaintiff Mulvanerty**)

(**Brought on Behalf of the Accommodation Delay Class and the Accommodation-Leave Diversion Class**)

797.    Plaintiffs repeat and reallege all preceding allegations as if fully set forth herein

798.    Plaintiff Mulvanerty and the class were employees.

799.    Defendants were employers within the meaning of the NYCHRL.

800.    Defendants employed more than four employees at all times relevant to the complaint, including but not limited to, for the period beginning twelve months before the start of an unlawful discriminatory practice and continuing through the end of such unlawful discriminatory practice.

801.    Under N.Y.C. Admin. Code § 8-107(28), once Defendants knew or should have known that an employee had requested, or might require, a disability-related accommodation, Defendants were required to engage in a good-faith cooperative dialogue within a reasonable time and to provide a written final determination at the conclusion of that dialogue.

802.    Defendants knew or should have known that Plaintiff Mulvanerty had requested, or might require, disability-related accommodations.

803.    Defendants delayed providing a substantive response to Plaintiff's disability accommodation request for more than two months.

804.    Defendants refused to consider additional post-FMLA leave disability accommodation leave and instead directed Plaintiff Mulvanerty that she could only to apply for non-protected medical leave instead of protected disability-accommodation based leave.

147

805.    Defendants failed to engage in good faith cooperative dialogues with Plaintiff Mulvanerty, and the classes, within a reasonable amount of time, by failing to provide substantive written responses and/or determinations for more than two months of their initial request, supplemental request and/or appeal seeking a disability-based accommodations.

806.    Defendants failed to engage in good faith cooperative dialogues with Plaintiff Mulvanerty, and the classes, by prohibiting consideration of a disability-based accommodation of leave.

807.    Defendants failed to engage in a good faith cooperative dialogue with Plaintiff Mulvanerty by denying the appeal of her non-reappointment, at least in part, because of her request for, use of, and/or ongoing need for her disability accommodation of remote work.

808.    Defendants failed to engage in a good faith cooperative dialogue with Plaintiff Mulvanerty by making her need for and/or use of her protected disability-based remote work accommodation, at least, a motivating factor, in Defendants consideration of her appeal, and/or by refusing to remove consideration of that factor as a supportive basis for the non-reappointment.

809.    Defendants' conduct violated N.Y.C. Admin. Code § 8-107(28).

810.    As a direct and proximate result of Defendants' conduct, Plaintiff Mulvanerty, and upon information and belief the class, suffered damages.

811.    The class seeks class-wide declaratory relief, class-wide injunctive relief attorney's fees, costs, interest, and such other relief as the Court deems just and proper.

812.    Plaintiff Mulvanerty seeks all relief available under the NYCHRL including back pay, front pay and/or reinstatement, compensatory damages, individual injunctive relief,

declaratory relief, attorney's fees, costs, and expert fees, and such other relief as the Court deems just and proper.

## EIGHTH CAUSE OF ACTION

### New York City Human Rights Law – Disability Discrimination

### (Brought on Behalf of Plaintiff Mulvanerty)

813.    Plaintiffs repeat and reallege all preceding allegations as if fully set forth herein

814.    Defendants were employers within the meaning of the NYCHRL.

815.    Defendants employed more than four employees at all times relevant to the complaint, including but not limited to, for the period beginning twelve months before the start of an unlawful discriminatory practice and continuing through the end of such unlawful discriminatory practice.

816.    Defendants discriminated against Plaintiff Mulvanerty because of, or in part because of, her disability, by denying the appeal of her non-reappointment appeal, at least in part, because of her disability and/or her related need for a disability accommodation of remote work.

817.    Defendants previously discriminated against Plaintiff Mulvanerty because of, or in part because of, her disability, by not initially reappointing her.

818.    Defendants treated Plaintiff less well because of her disability.

819.    Plaintiff Mulvanerty seeks all relief available under the NYCHRL including back pay, front pay and/or reinstatement, compensatory damages, individual injunctive relief, declaratory relief, attorney's fees, costs, and expert fees, and such other relief as the Court deems just and proper.

149

**NINTH CAUSE OF ACTION**

**New York City Human Rights Law – Retaliation**

(**Brought on Behalf of Plaintiff Mulvanerty**)

**(Brought on Behalf of the Accommodation Delay Clas and the Accommodation-Leave Diversion Class)**

820.    Plaintiffs repeat and reallege all preceding allegations as if fully set forth here.

821.    Plaintiff Mulvanerty repeatedly opposed the disability discrimination and/or failure to accommodate her disabilities.

822.    Plaintiff Mulvanerty engaged in protected activity by requesting and/or utilizing her disability-based remote work accommodation.

823.    Defendants were employers within the meaning of the NYCHRL.

824.    Defendants employed more than four employees at all times relevant to the complaint, including but not limited to, for the period beginning twelve months before the start of an unlawful discriminatory practice and continuing through the end of such unlawful discriminatory practice.

825.    Defendants retaliated against Plaintiff Mulvanerty because of, or in part because of, her protected activity of requesting and/or utilizing her remote work disability accommodation, and/or because of her repeated protected opposition to the failure to effectively accommodate her and/or additional protected complaints, by denying the appeal of her non-reappointment, at least in part, because of her protected activity.

826.    Defendants previously retaliated against Plaintiff Mulvanerty because of, or in part because of, her protected activity by not initially reappointing her.

827. Defendants' conduct resulted in adverse actions that were reasonably likely to deter a reasonable person from engaging in protected activity.

828. Plaintiff Mulvanerty seeks all relief available under the NYCHRL including back pay, front pay and/or reinstatement, compensatory damages, individual injunctive relief, declaratory relief, attorney's fees, costs, and expert fees, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, individually, and on behalf of each of the classes, and subclasses, respectfully requests that this Court enter judgment in their favor and against Defendants, and grant the following relief:

(a) An Order certifying the proposed classes and subclasses pursuant to Fed. R. Civ. P. 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiff's counsel as Class Counsel pursuant to Rule 23;

(b) Class-wide declaratory judgment, on behalf of Plaintiffs and the classes and subclasses, declaring the acts complained of herein are violations of the Rehabilitation Act, the Family and Medical Leave Act, and the New York City Human Rights Law, and that Defendants are liable for these violations;

(c) Class-wide injunctive relief on behalf of Plaintiffs and the classes and subclasses enjoining the continuation of the challenged practices;

(d) Back pay for the Plaintiffs;

(e) Front pay and/or reinstatement and/or reinstatement with reasonable accommodations for the Plaintiffs;

(f) Individual injunctive relief providing reasonable accommodations to the Plaintiffs;

(g) Compensatory damages for Plaintiff Mulvanerty;

(h) Liquidated damages for the Plaintiffs;

(i) Nominal damages for the Plaintiffs;

(j)     Actual damages for the Plaintiffs;

(k)     Pre-judgment interest for Plaintiffs;

(l)     Post-judgment interest for Plaintiffs;

(m)     Attorney's fees;

(n)     Expert fees;

(o)     Costs; and

(p)     All such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

by jury on all questions of fact raised by this Complaint.


Dated:   March 29, 2026
         Long Island City, New York


                                        Respectfully submitted,

                                        **THE DUGGER LAW FIRM,
                                        PLLC**

                                        By: /s/ Cyrus E. Dugger_____

                                        Cyrus E. Dugger

                                        Gotham Center
                                        28-07 Jackson Ave., 5th Fl.
                                        Long Island City, New York 11101
                                        Tel: (646) 560-3208
                                        Fax: (646) 390-4524
                                        cd@theduggerlawfirm.com

                                        *Attorneys for Plaintiffs the putative
                                        classes and the putative subclasses*